# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH DAKOTA
## WESTERN DIVISION

LEAD GHR ENTERPRISES, INC. formerly
d/b/a GOLDEN HILLS RESORT,

      Plaintiff,

      vs.

AMERICAN STATES INSURANCE
COMPANY

      Defendant.

Civil No.: 16-5026

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT, OR, ALTERNATIVELY, FOR PARTIAL SUMMARY JUDGMENT

### INTRODUCTION

This lawsuit stems from the failure of a retaining wall after a substantial rain event, caused by accumulated groundwater behind the wall increasing the lateral pressure pressing against it until the wall failed. The wall was adjacent to, but not part of, a hotel that was at one time owned by Plaintiff Lead GHR Enterprises and was insured by Defendant American States Insurance Company ("American States").

The issues before this Court are not complex:

(1) Is American States required under its insurance policy to cover a retaining-wall collapse when the Policy does not insure "retaining walls that are not part of the building," and expressly excludes damages caused by water, earth movement, negligent design and workmanship, and collapse?

(2) Did American States act in bad faith in denying a claim when the Policy does not insure "retaining walls that are not part of the building," and expressly excludes damages caused by water, earth movement, negligent design and workmanship, and collapse?

(3) Can American States be liable in bad faith when Plaintiff has established no extra-contractual damages?

(4) Can American States be liable for punitive damages when Plaintiff's claim for bad faith fails as a matter of law?

Because the answer to all of these questions is no, and because Plaintiff has failed to allege a viable claim in conversion, American States is entitled to judgment as a matter of law.

## STATEMENT OF FACTS

### 1.  The Property

As this Court may recall, Lead GHR Enterprises once owned a hotel and its surrounding property in Lead, South Dakota.[1]  The hotel, located at 900 Miners Avenue, was constructed in the late 1980s as part of a larger construction project that included a YMCA recreation center on an adjacent property. (Ex. 1 at 34:16-17; Ex. 16 at 22:6-10).[2]

An asphalt parking lot sits between the two buildings.  (Ex. 04 at AMS-GHR000203-04). And because the property is located on a hill, the parking lot was constructed with the support of a ten-foot-tall retaining wall.  (*Id*.)  The wall as originally constructed extends approximately 125 feet from east to west, and is attached to a twelve-foot, north-to-south wall that is affixed to the

---

[1] Lead GHR Enterprises, according to its corporate representative, "restructured" in 2014 and ceased to file any required corporate disclosures thereafter.  (Ex. 01 at 13:14-18; 12:15-21).  The corporate representative falsely testified that Lead GHR maintained possession of the hotel after the restructure, (*Id.* at 15:24-16:13), however public records demonstrate that Lead GHR transferred the property to Roundhouse Properties at the time of "restructuring."  (Ex. 02).  Its corporate representative subsequently recanted his testimony.  (Ex. 01 at 106).  Lead GHR, therefore, is a company with no assets that is over two years delinquent in submitting its corporate filings to the South Dakota Secretary of State, and according to online resources has now been dissolved.  (Ex. 01 at 12:15-18; Ex. 03).

[2] As used herein, all references to "Ex." refer to the Declaration of Daniel W. Berglund in support of Defendants' June 1, 2018 Motions, filed concurrently herewith.

hotel with rebar.  (*Id.* at AMS-GHR00204).  A similar, twenty-foot wall exists extending and attaching the retaining-wall system to the recreation center.  (*See* Illustration A).



***Illustration A:  Overview of the Retaining Wall***
*(Source: Ex. 04 at AMS-GHR0000211)*

### 2.  The Coverage

With the advice and guidance of a professional insurance agent, Lead GHR purchased commercial property coverage under policy No. 01CI3273611 (the "Policy") from American States, effective April 14, 2010 to April 14, 2011.  (Ex. 05 at AMS-GHR000009).  The Policy covers direct physical loss of or damage to "Covered Property," which under the terms of the Policy includes only the "building" and "business personal property." (*Id.* at AMS-GHR 000039).   "Building," in turn, is defined as "the building or structure described in the Declarations" and, *inter alia,* its foundations, fixtures and all permanently installed machinery and equipment.  (*Id.*).  The Declarations page then describes the "building or structure" as the "hotel."   (*Id.* at AMS-GHR000013).

Among property expressly *excluded* from "Covered Property" are the following:

### 2.        Property Not Covered

Covered Property does not include:

    \*\*\*

    d.     Bridges, roadways, walks, patios or other paved surfaces

    \*\*\*

    f.     The cost of excavations, grading, backfilling or filling;

    g.     Land (including land on which the property is located), water, growing crops or lawns;

    \*\*\*

    l.     Retaining walls that are not part of a building;

    \*\*\*

(*Id.* at AMS-GHR000040).  In other words, the policy expressly provides coverage for the hotel (and the business personal property related to it), but not for the parking lot or the land on which the hotel was built, or for retaining walls that are not considered *part of* the building.[3]

### A.  Covered and Excluded Perils

In addition to its definition of Covered Property, the Policy also defines what American States considers a "Covered Cause of Loss" in the Policy's "Causes of Loss—Special Form." Although Section A of the "Special Form" initially provides a broad coverage grant, coverage is subsequently limited or excluded by the perils listed in Sections B and C of the "Special Form." (*Id.* at AMS 000070-75).

Specifically, with respect to the exclusions in Section B.1, the Policy expressly states that if any of the listed exclusions <u>caused or contributed</u> to the loss, either <u>directly or indirectly</u>, and <u>in any sequence</u>, there is *no coverage* for the loss:

---

[3] If an insured wished to insure this additional property, coverage forms exist that can amend the policy to add such property to the policy. (*See, e.g.*, Exs. 06, 07).  No such forms were used in the procurement of the policy at issue in this lawsuit, (Ex. 08 at 24:14-26:20), nor is there any communication in American States's underwriting file that coverage for any retaining walls was requested.

> 1.    We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

(*Id.* at AMS 000070). It then lists specific exclusions relevant to this dispute:

**b.    Earth movement**

\*\*\*

(4)    Earth sinking other than sinkhole collapse, rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of Realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

**g.    Water**

\*\*\*

4.    Water under the ground surface pressing on, or flowing or seeping through:

a.   foundations, walls, floors or paved surfaces

This exclusion applies regardless of whether any of the above…is caused by an act of nature or is otherwise caused.  An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.[4]

\*\*\*

(*Id.* at AMS 000070-71; AMS-GHR000038).   The Policy then, in Section B.2, additionally excludes "loss or damage caused by or resulting from":

**d.    Other Types of loss:**

(1) Wear and tear

---

[4] The Water exclusion was modified by endorsement to emphasize that the exclusion applies regardless of natural or man-made cause.  (Ex. 05 at AMS-GHR000038). The key language of the exclusion, however, is identical to the original form in that any loss caused by groundwater pressing on walls is excluded under the policy.  (*Id.* at AMS-GHR000071).

      (2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself

      ***

      (3) settling, cracking, shrinking or expansion

      ***

    **k.**    **Collapse:** collapse, except as provided below in the additional coverage for collapse. But if collapse results in a covered cause of loss at the described premises, we will pay for the loss or damage caused by that covered cause of loss.

  ***

    **m.**   **Neglect:** neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

(Ex. 05 at AMS-GHR000072-73).

Finally, in Section B.3, the Policy provides certain additional exclusions that grant coverage only if the loss results in a covered cause of loss:

    3.    We will not pay for loss or damage caused by or resulting from any of the following, **3.a** through **3.c.** But if an excluded cause of loss that is listed in **3.a** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

      **a. Weather Conditions:** weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph 1. above to produce the loss or damage.

      ***

      **c. Negligent work:** faulty, inadequate or defective:

        (1) planning, zoning, development, surveying, siting;

(2) design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) materials used in repair, construction, renovation or remodeling; or

(4) maintenance;

of part or all of any property on or off the described premises.

(*Id.* at AMS-GHR000073).

## B.  The Limited Collapse "Give-Back"

Although the "Special Form" generally excludes coverage for all forms of collapse, Section D of the "Special Form" does provide a limited "give-back" for certain types of collapse caused by certain types of peril.  (*Id.* at AMS-GHR000075). According to Lead GHR's testifying coverage expert, as well as the Policy's express terms, this "give-back" is still considered a "Covered Cause of Loss" as defined in Section A, which means it is still subject to the exclusions and limitations of Sections B and C.  (Ex. 09 at 44:10-13; 45:6-25).  Specifically, for the purposes of this lawsuit, the Policy's "give-back" is as follows:

### D. Additional Coverage – Collapse

The term Covered Cause of Loss includes the Additional Coverage – Collapse as described and limited in **D.1.** through **D.5**. below.

1. With respect to buildings:

a.  Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose;

b.  A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse;

     c.      A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building;

     d.      A building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

     2.      We will pay for direct physical loss or damage to covered property, caused by collapse of a building or any part of a building that is insured under this coverage form or that contains covered property insured under this coverage form, if the collapse is caused by one or more of the following:

     ***

     b.      Decay that is hidden from view, and less the presence of such decay is known to an insured prior to collapse;

(Ex. 05 at AMS-GHR000075).

In other words, in order for the "give-back" to apply, the insured must establish that (1) the "collapse" must be of a "building or part of a building" that prevents the "building or part of a building" from being "occupied for its intended purpose," and (2) the "collapse" was caused by latent *decay* (or some other expressly named peril).[5] (*Id.*)  However, any such "give-back" is still excluded if one of the exclusions described above applies.  (*Id.* at AMS-GHR000038, 70-71; *see also* Ex. 09 at 44:10-13; 45:6-25).

---

[5] Other parts of the policy distinguish between "decay" and "deterioration."  (*E.g.,* Ex. 05 at AMS-GHR000072).  Since the terms are distinguished elsewhere in the policy, reading the policy as a whole, the doctrine of *expressio unius est exclusio alterius* (the expression of one thing is the exclusion of another) should apply.  *See Haman v. First Nat'l Bank in Sioux Falls*, 115 N.W.2d 883, 887 ("ancient rule" applies to contracts as well as statutes).  Further, since neither term is defined in the policy, the standard definition of each term should also apply.  *Ass Kickin Ranch, LLC v. North Star Mut. Ins. Co.,* 2012 S.D. 73, ¶ 12, 822 N.W.2d 724, 727-28. Decay is more generally associated with organic material.  (Ex. 10).  Deterioration, however, is not.  (Ex. 11).

### C.   Overview of Coverage

In summary, because the Policy expressly provides coverage only for the "building" and for business personal property, in order for coverage to apply for a <u>retaining wall</u> under the Policy, the insured must overcome the following coverage hurdles:

1.  The insured must establish that the retaining wall is "part of the building." (Ex. 05 at AMS-GHR000039-40).

2.  The loss cannot be caused by faulty or negligent design and construction, wear and tear, or deterioration.  (*Id.* at AMS-GHR000072-73).

3.  Any loss involving "collapse" must be of a building or part of a building so that the building "cannot be occupied for its intended purpose," and must be caused by hidden and unknown *decay* (or other expressly named peril).  (*Id.* at AMS-GHR000075).

4.  Regardless of other contributing causes, neither "water under the ground surface pressing on walls," nor "expansion or movement of soil" can cause <u>or contribute</u> to the failure <u>in any sequence</u>.  (*Id. at* AMS-GHR000038, 70-71).

### 4.  The Failure

During the overnight from October 10 to 11, 2010, a substantial rainfall occurred in Lead, SD, which by all accounts dropped between four and six inches of rain in a matter of a few hours.  (Ex. 04 at AMS-GHR0000204; Ex. 12; Ex. 13 at 3 and Att. A; Ex. 14).  At some point during this deluge, the retaining wall supporting the Golden Hills Resort's parking lot collapsed.  (*See* Illustration B).  The twelve-foot, north-south wall actually connected to the hotel, however, remained completely intact.[6]  (*See* Illustration C).

---

[6] The retaining wall's failure had no impact on the structure of the hotel, or on its day-to-day operations.  (Ex. 16 at 43:3-15; Ex. 25 at 58:16-19; Ex. 27 at 55:14-56:10; Ex. 40 at 72:14-73:2).



***Illustration B:  The failed portion of the 125-foot east-west retaining wall span***
*(Source: Ex. 04 at AMS-GHR0000216)*



***Illustration C:   The intact north-south span attached to the hotel***
*(Source: Ex. 15 at AMS-GHR0000571)*

The loss was reported by hotel employees to Perry Roth, the hotel's maintenance manager, at 3 a.m. on October 11. (Ex. 16 at 33:2-10). Roth visited the scene shortly thereafter, and reported his findings to the hotel's general manager, Rory Maynard, via text. (*Id.* at 36:9-37:1). Maynard contacted Lead GHR's insurance agent and informed the agent of the loss the following morning, and the agent informed American States of the loss shortly before noon. (Ex. 17 at AMS-GHR000506-07). Lead GHR's agent reported the loss as a retaining-wall collapse caused by heavy rains. (*Id.*, *see also* Ex. 12).

### 5. The Investigation

American States retained the services of independent adjuster Chris Shopshear, who visited the site on October 18, 2010. (Ex. 15 at AMS-GHR000564). Shopshear confirmed that the rain event had caused the failure, and that "they have had so much rain over the past few weeks that the ground is just saturated."[7] (Ex. 17 at AMS-GHR000278). Notwithstanding that report, American States additionally retained a structural engineering firm to further inspect the loss and independently determine its cause. (*Id.* at AMS-GHR000278-79).

The inspection, conducted by Tim Strasser and David Teasdale of Haag Engineering, took place on October 29, 2010 in the presence of Maynard and Alan Schreier, Lead GHR's retained engineer. (Ex. 4 at AMS-GHR000203-04; Ex. 12). This inspection took place over the course of several hours, and included interviews, photography, and excavation of the collapsed wall. (Ex. 18 at 18:25-19:24; Ex. 4 at AMS-GHR000204-06).

During this same time frame, Maynard requested a "face-to-face" meeting with the American States adjuster handling the file. (Ex. 17 at AMS-GHR000240). The adjuster,

---

[7] American States also conducted online research regarding precipitation amounts in the days leading up to the loss. (Ex. 17 at AMS-GHR000314).

Jonathan Lawlee, agreed to Maynard's request, and conducted his own inspection of the property on November 4, 2010 before discussing the claim with Maynard. (Ex. 17 at AMS-GHR000238). According to Lawlee's notes:

> I inspected the wall that collapsed and there is not much of a question on what caused the wall to collapse. [T]he parking lot is sloped at about 8 degrees towards this wall. [Y]ou can see the washed out dirt and where the water has entered the building.
>
> I have also inspected the interior of the building and there is an interior tunnel that has water damage. You can see where the ground water is entering the building. [A]lso the elevator shaft had water in it. You can also see where ground water entered into this portion of the building also.
>
> I explained to the insured that there is no coverage for damaged [sic] caused by groundwater and there is no coverage for retaining walls under his policy. The insured explained to me that he shops his policy every year. [H]e has no idea if the retaining walls were covered under any of the other policies.
>
> ***
>
> I left it with the insured that I would await the engineer report and then make a decision on coverage then.

*(Id.)*

The Haag report came later in the month, and concluded, to the surprise of no one, that the retaining wall collapsed due to increased lateral pressure against the wall from soil over-saturation. (Ex. 04 at AMS-GHR000207). The report also noted that the "weep holes" (which are essentially PVC pipes that are installed into the base of the wall to allow water from behind the wall to drain) were clogged with soil, which allowed water (and pressure) to accumulate behind the wall. (*Id.*). The inspection also concluded there was no physical damage to the hotel related to the retaining-wall collapse. (*Id.* at AMS-GHR000208).

### 6.  The Denial

Based upon (1) the conclusions of the report issued by Haag Engineering, (2) the representations made by the insured, and (3) the two separate physical inspections performed by Chris Shopshear and Jonathan Lawlee, American States formally denied the claim on December 1, 2010.  (Ex. 19).  In its denial letter, American States noted its findings, and cited the policy exclusions described above.  (*Id.*).

Specifically, because the 125-foot wall span that collapsed was not connected to, and did not provide any structural or foundational support for, the hotel, American States did not consider the collapsed wall "part of the building."  The retaining wall was therefore *not* considered "Covered Property" under the coverage grant of the Policy. (*Id.* at AMS-GHR000189).

Moreover, even if the wall could conceivably be considered the covered "building" under the Policy, the denial letter also notes that the loss was caused by several excluded perils.  (*Id.* at AMS-GHR000189-191).  In fact, the denial letter specifically names the water, earth movement, collapse, and negligent work exclusions, all of which preclude coverage under the Policy.  (*Id.*). The letter continues by analyzing the "Additional Coverage—Collapse" section, and finds that the retaining wall is not covered under that section either.  (*Id.* at AMS-GHR000191-193).  The letter concludes by stating that if Lead GHR is "aware of any additional information relevant to the loss," it should forward any such information to American States. (*Id.* at AMS-GHR000193).

Lead GHR did not further communicate with American States or otherwise dispute the denial in the five years leading up to this lawsuit. [8]   It did, however, further discuss the denial

---

[8] By contrast, this Court may recall that Lead GHR repeatedly challenged the denial of coverage for the hail-loss claim that was the subject of its earlier lawsuit.  (*See, e.g.,* Ex. 20; Ex. 21).  That hail loss occurred during the same policy period, with the date of loss occurring *before* the

with its agent at Western Dakota Insurors, and its retained engineer Al Schreier. In internal

discussions, agents within Western Dakota Insurors confirmed the propriety of the denial:

> That's about what I expected. Retaining walls aren't covered unless
> attached to a building or specifically added on. Then you have the
> problem of flood and earthquake exclusion wording. I don't see
> much hope to change their minds.

(Ex. 23).   Plaintiff's retained engineer Schreier also reviewed the Haag report and agreed that

the report's causation finding—that is, "excessive groundwater in the soil exceeding the drainage

capacity of the soils and drainage systems of the wall"—was "basically accurate in my opinion."

(Ex. 24 at 1).  He further opined that negligent design or construction could have also contributed

to the loss, but noted that even if true, that peril was excluded as well.  (*Id.* at 2; Ex. 25 at 60:18-

61:22).

### 7. The Current Lawsuit and Claim for Damages

Although this loss occurred in October 2010 and the denial followed shortly thereafter,

Lead GHR waited five and a half years to file the instant lawsuit.  The complaint, filed April 26,

2016, alleges that American States "failed to properly adjust the claim and to pay for the

damages caused by the Wall's collapse."  (Complaint at ¶ 15).  It then alleges four causes of

action, (1) breach of contract; (2) bad faith, for American States's alleged failure "to give equal

consideration to the interest of GHR"; (3) conversion, for American States' acceptance of GHR's

premium payments, and (4) punitive damages, for American States's alleged "fraudulent,

malicious, intentional, and/or willful and wanton" conduct. (*Id.* at ¶¶ 14-27).

In subsequent discovery, Lead GHR further outlined the damages it seeks in relation to

this lawsuit.  In its initial disclosures, Lead GHR stated:

---

retaining wall failure at issue in this dispute, and with the hail denial taking place *after* the denial
here.  (Ex. 22 at 9:5-9:21; Ex. 40 at 68:14-69:20).  This is true even though it had apparently
retained the attorneys currently representing them shortly after the denial.  (Ex. 12 at 2).

### C.   Information Related to Calculation of Damages

Plaintiff has not definitively determined its damages. This evidence will likely come from expert testimony, as Plaintiff has no personal knowledge on this matter.  Discovery is continuing and this answer will be supplemented at the appropriate time.

The damage estimate that Plaintiff has made to date is as follows:

1. Damages in excess of $75,000 suffered as a consequence of the Defendant's failure to pay Plaintiffs insured loss, under the terms of the contract.

2. Other damages in an amount to be determined as a consequence of the Defendant's bad faith refusal to pay Plaintiffs insured loss.

(Ex. 26 at 3).   Although Plaintiff stated that it would supplement this disclosure (as it is required to do under Rule 26), it never did so.  And though Plaintiff subsequently provided an estimate for replacement of the wall (which at least arguably supports its breach-of-contract claim), Plaintiff never provided any expert reports on damages, and has provided no evidence or itemization of damages related to its claim of bad faith.   When specifically asked about damages during deposition, Lead GHR's corporate designee stated:

Q What is Lead GHR's current claim for damages in this lawsuit?

A Well, I'd like to get, I guess, what it takes to replace the existing wall. Plus the -- I guess the time, expense, interest, from the collapse until now.  I mean, that can be a demand. And really what it's going to take for Liberty Mutual, American States, whoever they are to do their job and pay the -- pay everybody else's claim.

(Ex. 01 at 97:7-15).

In other words, other than some vague request for punitive damages for other parties' claims unrelated to the claim at issue here, Plaintiff *only* asserts damages related to the alleged contractual breach.  (*Id.* at 97:16-19).  Plaintiff has not identified any "premiums" in support of its claim for conversion, despite alleging such premiums in its Complaint. (Complaint at ¶¶ 23-

24). Plaintiff has not identified any damages at all resulting from any alleged bad faith. Moreover, neither a computation of the bad-faith damages nor supporting documents and materials were provided with Plaintiff's disclosures (Ex. 26), nor were any such damages provided thereafter. The deadline for completing discovery has now passed.

## ARGUMENT

### 1. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate if the movant can "show that there is no genuine issue as to any material fact and that [the movant] is entitled to judgment as a matter of law." In considering such a motion, the burden is placed on the movant to establish that summary judgment is warranted, and the Court should view all facts and inferences in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but must set forth specific facts showing that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Supreme Court has instructed that summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). The nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts," and "[w]here the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 586-7.

Indeed, according to Eighth Circuit precedent, courts should "be somewhat more hospitable to summary judgment than in the past. The motion for summary judgment can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those cases that really do raise genuine issues of material fact." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op.*, 838 F.2d 268, 273 (8th Cir. 1988). Thus, "it is incumbent upon the nonmoving parties to establish significant probative evidence to prevent summary judgment." *Blue Legs v. U.S. Bureau of Indian Affairs*, 2007 WL 1815994 at *2 (D.S.D. 2007) (*citing Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank*, 934 F.2d 976, 979 (8th Cir. 1991).

## 2.  Plaintiff's Breach-of-Contract Claim Fails Because the Loss Was Not Covered.

An insurance policy is interpreted under the same rules that govern the construction of any written contract. *Nat'l Farmers Union Property & Cas. Co. v. Iverson*, 346 F.Supp. 660, 662 (D.S.D. 1972).  The Court must determine the intent of the parties as expressed by the language of the policy.  *Id.*  Provisions of an insurance policy must be read as a whole, and all terms therein, if not defined under the policy, should be given their ordinary meaning. *Heitmann v. Am. Family Mut. Ins. Co*., 2016 S.D. 51, ¶ 12, 883 N.W.2d 506, 509-510.  Where the language of an insurance policy is unambiguous, the Court gives the language its natural and ordinary meaning. *Berkley Regional Specialty Ins. Co. v. Dowling Spray Service*, 2015 S.D. 9, ¶ 6, 860 N.W.2d 257, 260.  Language is unambiguous when it has a definite and precise meaning concerning which there is no reasonable basis for a difference of opinion. *Continental Holdings, Inc. v. Crown Holdings Inc.*, 672 F.3d 567, 578 (8th Cir. 2012)

Furthermore, in interpreting a policy, a court may not "seek out a strained or unusual meaning for the benefit of the insured." *Rumpza v. Donalar Enters., Inc.*, 1998 S.D. 79, ¶ 12, 581

N.W.2d 517, 521 (*quoting Olson v. U.S. Fid. & Guar. Co.,* 1996 S.D. 66, ¶ 6, 549 N.W.2d 199, 200). Instead, "[a]n insurance contract's language must be construed according to its plain and ordinary meaning and a court cannot make a forced construction or a new contract for the parties." *Stene v. State Farm Mut. Auto. Ins. Co.*, 1998 S.D. 95, ¶ 14, 583 N.W.2d 399, 402 (alteration in original). Essentially, this means that when the terms of an insurance policy are unambiguous, these terms "cannot be enlarged or diminished by judicial construction." *Am. Family Mut. Ins. v. Elliot*, 523 N.W.2d 100, 102 (S.D.1994) (*citing O'Neill v. Blue Cross of W. Iowa & S.D.*, 366 N.W.2d 816, 818 (S.D.1985)). Finally, "insurance policies must be subject to a reasonable interpretation and not one that amounts to an absurdity." *Prokop v. N. Star Mut. Ins. Co.*, 457 N.W.2d 862, 864 (S.D.1990) (*citing Helmbolt v. LeMars Mut. Ins. Co., Inc.*, 404 N.W.2d 55, 59 (S.D.1987)).

### A.     The Wall Was Not "Part Of" The Building.

To begin, it is noteworthy that the 125-foot retaining wall that collapsed was not actually connected to the building. It was connected to another twelve-foot wall, a wall that stands to this day. (*See* Ex. 04 at AMS-GHR000204; Ex. 15 at AMS-GHR0000571; Ex. 27 at 39:3-13). And the parties do not reasonably dispute that the collapsed wall did not provide any structural support for the hotel itself, but instead supported the parking lot that sits between the hotel and the recreation center. (Ex. 4 at AMS-GHR000203-04; Ex. 27 at 53:7-11; 113:24-114:1; Ex. 13 at 2). In fact, the wall was not even designed by the same architect, and the design drawings of the hotel only make passing reference to it. (*See, e.g.,* Ex. 28).

In other words, although the wall was *related* to the hotel because of its attachment to another wall, it was by no means integrated into the hotel. Its failure had no impact on the

structure of the hotel, or on its day-to-day operations.  (Ex. 16 at 43:3-15; Ex. 25 at 58:16-19; Ex. 27 at 55:14-56:10; Ex. 40 at 72:14-73:2).

In order to establish coverage, it is initially the *insured*'s burden to establish that the property is, in fact, covered under the policy of insurance.  *Ins. Co. of North America v. Schultz*, 441 N.W.2d 686, 689 (S.D. 1989); *Pentair, Inc. v. Am. Guarantee and Liability Ins. Co.,* 400 F.3d 613, 615 (8th Cir. 2005); *Modern Equipment Co. v. Continental Western Ins. Co.*, 355 F.3d 1125, 1128 (8th Cir. 2004).  Only after this initial threshold is met does the burden shift to the insurer to prove the application of the Policy's exclusions.  *Pentair,* 400 F.3d at 615-16.

Here, because Plaintiff cannot establish that the retaining wall was "part of" the covered hotel, it cannot overcome the initial coverage threshold. First, the standard definition of "building" is "a usually roofed and walled structure built for permanent use (as for a dwelling)." (Ex. 29; *see also* Ex. 30 at 3).   "Part," in turn, is defined as "an essential portion or integral element."  (Ex. 31).  Simply put, under the standard definition of these terms, the retaining wall is not "part of the building" because it is not "an essential portion or integral element" of the "roofed and walled structure" that is the subject of the Policy (the hotel), nor is it any of the other types of related property that are expressly included in the Policy grant for the "building."  (Ex. 05 at AMS-GHR000039).

This case is analogous to a case decided shortly before the wall collapse at issue in this lawsuit.  In *Ass'n of Unit Owners of Nestani v. State Farm Fire and Cas. Co.*, decay had caused portions of the supporting and weight-bearing structural members of the subject condominium buildings to crumble.  670 F.Supp.2d 1156 (D. Or. 2009).  The Plaintiff homeowners association argued that the decay caused a collapse to "part of the building," triggering coverage under the subject policy.  *Id.* at 1164.  The court rejected Plaintiff's proffered definition because it "would

rewrite the Policy to cover the collapse of "portions" of a building as opposed to an "entire collapse of ... any part of a building":

> In the context of this Policy, a "part" is "an essential portion or integral element," whereas the plain meaning of "portion" is "an often limited wart set off or abstracted from a whole." Merriam–Webster's Collegiate Dictionary, *supra*, at 902–03, 967 (emphasis added). An "integral element" is "essential to completeness," *id*. at 650, rather than a limited "portion."

*Id*.

Here, the record reflects that the subject retaining wall was not "part of the building" because it was not an essential part of the function or structure of the hotel. The wall was not even attached to the hotel.[9] The hotel was not damaged by the collapse of the retaining wall, and continued to function after the collapse. (Ex. 40 at 72:14-73:2.) Because the retaining wall was not "part of the building," it is not covered property under the Policy. (Ex. 05 at AMS-GHR000039-40).

### B. The Loss was Subject to Multiple Exclusions.

Even if the wall *could* be considered "part of the building"—a premise that has no support under South Dakota law—the loss is still subject to multiple exclusions precluding coverage in this case. Indeed, every individual that actually witnessed the wall in its collapsed condition—whether representing or retained by American States *or* Lead GHR—agreed that heavy rain caused the wall to collapse. (Ex. 4 at AMS-GHR000207; Ex. 12; Ex. 15 at AMS-GHR000565; Ex. 17 at AMS-GHR000238, 506; Ex. 24.) And in fact, even Lead GHR's retained testifying expert (who did not inspect the site until five years later, after the collapsed wall had been removed), agrees that lateral forces caused by water pressing against the wall *contributed* to

---

[9] If anything, the wall was "part of" the parking lot for the hotel, but parking lots are expressly excluded under the policy. (Ex. 05 at AMS-GHR000039-40, Ex. 09 at 31:9-20).

the failure. (Ex. 27 at 88:15-25; 106:25-107:16; Ex. 32 at 3).  With this concession, no set of facts would allow coverage under the Policy.

### i. Anti-Concurrent Causation

Again, with respect to the "earth movement" and "water" exclusions, the policy contains an "anti-concurrent causation" clause (also known as an anti-efficient-proximate-cause clause), which expressly states that it "will not pay for loss or damage caused <u>directly or indirectly</u> by" such perils, "regardless of any other cause or event that contributes concurrently or in any sequence to the loss."  (Ex. 05 at AMS-GHR000070).  In other words, due to this exclusion-broadening language, other contributing causes are irrelevant; if either of these perils caused or contributed to the failure, there is no coverage. (*Id.*)

Although the South Dakota Supreme Court has yet to consider the enforceability of anti-concurrent causation clauses, this Court has previously considered "relevant state precedent, analogous decisions, considered dicta, and any other reliable data" and determined such a provision is enforceable under South Dakota law.  In *Swenson v. State Farm Fire and Casualty Co.*, this Court stated that "most courts which have addressed this issue have found that exclusionary language designed to avoid the 'efficient proximate cause' doctrine is enforceable." 891 F.Supp.2d 1101, 1110 (D.S.D. 2012) (*citing, inter alia, Assurance Co. of Am., Inc. v. Jay–Mar, Inc.*, 38 F.Supp.2d 349, 354 (D.N.J.1999); *St. Mary's Area Water Auth. v. St. Paul Fire & Marine Ins. Co.*, 472 F.Supp.2d 630, 636 (M.D.Pa.2007) ("An anticoncurrent-cause clause defeats the operation of the efficient proximate cause rule."); *Preferred Mut. Ins. Co. v. Meggison*, 53 F.Supp.2d 139, 142 (D.Mass.1999) (explaining that the "vast majority of states" uphold "anticoncurrent causation provisions"); *TNT Speed & Sport Ctr. Inc. v. Am. States Ins. Co.*, 114 F.3d 731, 733 (8th Cir.1997) (determining that the "more persuasive cases from other

states recognize that the parties may contract out of application of the efficient proximate cause doctrine"; *State Farm Fire & Cas. Co. v. Paulson*, 756 P.2d 764, 769 (Wyo.1988) (excluding coverage due to the existence of an anti-concurrent causation clause).  It then predicted that "the Supreme Court of South Dakota would follow the great weight of the authority to allow parties to contractually agree that the efficient proximate cause doctrine does not apply to certain exclusions in an insurance policy."  *Swenson,* 891 F.Supp.2d at 1110.  The *Swenson* court then concluded that because an expressly excluded peril contributed to loss, "Plaintiffs may not recover for any loss that would not have occurred in the absence of [the excluded peril], regardless of whether a covered peril was the efficient proximate cause of the loss."  *Id.* at 1111.

In this case, like *Swenson,* because there is no reasonable dispute that one or more of the named excluded perils caused the loss to occur when it did, even if other factors may have contributed to the failure, there is no coverage.  *See id.*

### ii.  The Water Exclusion Precludes Coverage.

There is no reasonable dispute that (1) a significant rainfall occurred the overnight the collapse occurred; (2) accumulated water under the ground surface added lateral pressure behind the wall; and (3) lateral pressure from the accumulated water caused or contributed to the collapse.  Again, the Policy expressly excludes "loss or damage caused <u>directly or indirectly</u> by":

> **g.**     **Water**
>
> \*\*\*
> 4.     Water under the ground surface pressing on, or flowing or
>        seeping through:
>
>        a.   foundations, walls, floors or paved surfaces

(Ex. 05 at AMS-GHR000038, 71).

According to the Haag report, "[t]he retaining wall failure at the Golden Hills Resort resulted from earth pressure on the wall. The lateral earth pressure was likely increased by accumulated water behind the wall."  (Ex. 04 at AMS-GHR000207).  This conclusion verified the observations of the on-site inspection of the independent adjuster initially retained to inspect the loss (Ex. 15 at AMS-GHR000565; Ex. 17 at AMS-GHR000278), and those of the American States adjuster inspecting the loss shortly after the Haag inspection.  (Ex. 17 at AMS-GHR000238).  Indeed, even Plaintiff's retained engineer agreed that Haag's conclusions were "basically accurate in my opinion." (Ex. 24 at 1).  And Lead GHR's insurance agent also agreed that, based on these facts, the exclusion for water would apply to preclude coverage.  (Ex. 23).

Thus, regardless of whether *any other* causes may have contributed to the loss, because it is undisputed that groundwater beneath the surface added lateral pressure against the wall—in other words, it "pressed" against the wall—and that lateral pressure caused or contributed to the failure, the exclusion applies.  *See, e.g., Wurst v. State Farm Fire and Cas. Co.*, 431 F.Supp.2d 501, 505-06 (D.N.J. 2006) (finding water exclusion applied, and "the possibility that other conditions, namely decay and snow load, also contributed to the loss does not preclude application of the policy's exclusions"); *Amherst Country Club, Inc. v. Harleysville Worcester Ins. Co.*, 561 F.Supp.2d 138 (D.N.H. 2008) (applying similar anti-concurrent-causation language to hold that because water and earth movement contributed to loss, exclusions applied regardless of other causes); *see also Provencal, LLC v. Tower Ins. Co. of New York*, 230 N.Y.S.3d 138 (N.Y. App. Div. 2016) (applying water exclusion to rain-related retaining wall collapse).

### iii.  The Earth Movement Exclusion Precludes Coverage.

Similarly, based on the Haag conclusions, the "earth movement" exclusion also applies, as the Policy expressly excludes coverage for the following:

### b.      Earth movement

\*\*\*

(4)      Earth sinking other than sinkhole collapse, rising or shifting
including soil conditions which cause settling, cracking or
other disarrangement of foundations or other parts of
Realty. Soil conditions include contraction, expansion,
freezing, thawing, erosion, improperly compacted soil and
the action of water under the ground surface.

(Ex. 05 at AMS-GHR00070).  Again, the Haag report concluded that "[t]he retaining wall failure at the Golden Hills Resort resulted from earth pressure on the wall. The lateral earth pressure was likely increased by accumulated water behind the wall."  (Ex. 04 at AMS-GHR000207). Whether this pressure was caused by shifting or improperly compacted soil, or by the "action of water under the ground surface," any loss caused by the peril is excluded.  (Ex. 05 at AMS-GHR000070).  *See also Great American Ins. Co. v. Bogley*, 837 F.Supp.2d 570, 573-74 (E.D. Va. 2011) (applying similar earth movement exclusion and anti-concurrent-causation language to preclude coverage); *Amherst Country Club,* 561 F.Supp.2d at 147-149.

### iv.   There Is No Coverage For Negligent Workmanship.

The Haag report additionally noted that the water buildup behind the retaining wall was at least in part caused by clogged "weep holes" at the base of the wall.  Those weep holes were designed to allow accumulated water behind the wall to pass through, in order to relieve lateral pressure.  (Ex. 04 at AMS-GHR000207).  The Haag report opined that "rainfall built water behind the wall faster than it could drain" at least in part because the weep holes had clogged over time, and no effort was made to clear them.  (*Id.*).

The Policy expressly excludes coverage for "faulty, inadequate or defective" workmanship, repair, construction, renovation, remodeling, grading, compaction, and maintenance.  (Ex. 05 at AMS-GHR000073).  If indeed the Haag report was correct—which no

one who actually visually inspected the site at or near the time of failure disputes (*see, e.g.,* Ex. 24)—this failure to properly maintain or clear the weep holes is an additional excluded peril under the Policy.

And although not directly addressed in the denial letter, Lead GHR's retained engineer also surmised that the wall was poorly designed and/or constructed, which contributed to the wall's inability to withstand additional lateral pressure. (Ex. 24 at 2; Ex. 25 at 60:18-61:22; *see also* Ex. 33 at 3). If true, the "negligent workmanship" exclusion would apply to preclude coverage for that peril as well, as both negligent design and construction are excluded. (Ex. 05 at AMS-GHR000073).

### v. There Is No Coverage For Collapse.

Finally, there is no dispute that the retaining wall collapsed. The Policy expressly excludes "collapse, except as provided below in the additional coverage for collapse." (Ex. 05 at AMS-GHR000073). As previously noted, however, the limited "give-back" for collapse only covers "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building *cannot be occupied for its intended purpose*," and even then only when it is caused by one of the limited covered perils. (*Id.* at AMS-GHR000075). And again, because this "give back" is still considered a "Covered Cause of Loss" under Section A of the Causes of Loss—Special Form, it is still subject to the anti-concurrent causation provision in Section B of the form. (Ex. 05 at AMS-GHR000070; Ex. 09 at pp. 44:10-13; 45:6-25). In other words, even with the "give-back," the loss is not covered if (1) the collapse does not prevent a building or part of a building to be occupied for its intended purpose, or (2) water or earth movement directly or indirectly caused the collapse. (Ex. 05 at AMS-GHR00038; 70-71; 75).

Once an insurer has established that an exclusion applies, the burden shifts back to the insured to establish a policy "carve-out" applies to reinstate otherwise excluded coverage. *Modern Equipment,* 355 F.3d at 1128.  Here, Plaintiff cannot meet this burden.  As an initial matter, regardless of any other contributing causes, there is no reasonable dispute that accumulated groundwater caused by heavy rain added lateral pressure to the wall that led the wall to fail when it did.  (Ex. 04 at AMS-GHR000207; Ex. 24; Ex. 27 at 106:25-107:16). Because "Additional Coverage—Collapse" is considered a "Covered Cause of Loss" under Section A of the Special Form, it is still subject to the Exclusions of Section B.  (Ex. 05 at AMS-GHR000070, 75; Ex. 09 at pp. 44:10-13; 45:6-25).  And since the anti-concurrent causation language still excludes coverage if water and earth movement caused or contributed to the loss, there would still be no coverage for collapse.  (Ex. 05 at AMS-GHR000038, 70-71).

Perhaps more importantly, however, Plaintiff has provided no evidence that any part of the hotel collapsed in a manner that the hotel could not be "occupied for its intended purpose." To the contrary, all evidence demonstrates that the hotel remained open after the retaining wall failure.  (Ex. 01 at 34:13-15; Ex. 16 at 43:6-7; Ex. 25 at 58:16-19; Ex. 40 at 72:14-73:2).  No rooms were rendered unavailable because of the retaining wall collapse.  (Ex. 01 at 32:2-8).  The hotel's convention center and restaurant all operated as before.  (*Id*. at 32:9-13; 34:13-15).  There was no structural damage to the hotel at all as a result of the wall's failure.  (Ex. 16 at 43:6-7; Ex. 27 at 55:14-17).[10]    In short, regardless of the retaining wall failure, the building could still be occupied for its intended purpose—to provide lodging and conference services to customers. The retaining wall was not, therefore, a covered "collapse" under the policy.

---

[10] Indeed, Plaintiff has not even presented evidence that any reduced parking capacity potentially resulting from the retaining wall failure actually impacted day-to-day operations of the hotel.

### 3.  Plaintiff's Conversion Claim Fails as a Matter of Law.

Plaintiff asserts a cause of action for conversion, alleging as its basis that Lead GHR made regular premium payments to American States, and that "Defendant has exercised control over [Plaintiff's] premium payments since they were made in a manner that has deprived Plaintiff of its interest in those payments."  (Complaint at ¶ 23-24).  It then seeks *punitive* damages for that conversion as its prayer for relief.  (*Id*. at ¶ 25).

There is no legal basis for a conversion cause of action under the circumstances of this case.  Historically, the cause of action derives from an actor so seriously interfering with the dominion or control over another party's chattel that "in justice he should be required to buy the chattel."  Restatement (Second) Torts, § 222A, cmt. c.   In such cases, the measure of damages is the full value of the chattel, at the time and place of the tort.  *Id.*  Such a cause of action has never applied to the consideration paid for contracts such as insurance policies; indeed, the closest any South Dakota court has come to such a conclusion was in a footnote to an unpublished federal decision, where it states in passing that "[a]n insurer's failure to pay policy benefits is *similar* to a conversion."  *Hurley v. State Farm Mut. Auto. Ins. Co.*, 2012 WL 6012803 at * 4, n.3.  In that case, however, no such cause of action was recognized or alleged.

Here, Plaintiff alleges not that the *benefits* were converted, but rather that *premiums* were converted, an assertion that sounds more in rescission than conversion. And in order to prevail on such a claim, Lead GHR must prove: "(1) [it] owned or had a possessory interest in the property; (2) [its] interest in the property was greater than [the defendant's]; (3) [the defendant] exercised dominion and control over or seriously interfered with [Lead GHR's] interest in the property; and (4) such conduct deprived [Lead GHR] of [its] interest in the property."  *First Am.*

*Bank & Trust, N.A. v. Farmers State Bank*, 2008 S.D. 83, ¶ 38, 756 NW2d 19 (S.D. 2008) (*citing* S.D. Pattern Jury Instructions Civ. 170-30-2)).

  If indeed Plaintiff is correct that the American States policy is an enforceable contract (a premise no one disputes), the paid premiums are necessary as consideration for that contractual relationship.   (*See* Ex. 5 at AMS-GHR000009).   And in return, American States provided coverage, adjusted losses and provided liability defense during the applicable policy period.   As such, Lead GHR cannot now claim that its interest in the paid premiums is greater than those of American States, which accepted those premiums to issue the Policy and be bound by its terms. As a matter of law, its claim for conversion must fail.

  Further, as discussed above, no evidence of conversion damages has been produced. Although it alleges in its complaint that premiums were "converted," it has not identified any such premiums during this litigation.   (*See, e.g.*, Ex. 26 at 3).   The punitive damages Lead GHR alleges in its complaint are not recoverable for conversion either.   *See* Restatement (Second) of Torts § 927; *Jacobson v. Leisinger*, 2008 S.D. 19, ¶ 14, 746 N.W.2d 739, 742 (adopting Restatement).   As such, because (1) there is no legal basis for conversion; (2) the conversion claim is insufficient as pled; and (3) Plaintiff has presented no damages to support its claim of conversion, this cause of action fails and must be dismissed.   *See Advanced Pain Therapies, LLC v. Hartford Fin. Servs. Group*, 2014 WL 4402800 at *3 (D.S.C. Sept. 3, 2014) (dismissing a conversion claim because it was insufficiently pleaded and was "no more than an effort to recast its breach of contract action").

**4.   Plaintiff's "Bad Faith" Claim Fails As a Matter of Law.**

**A.   Coverage Was "Fairly Debatable."**

Even if the Court determines that summary judgment is not warranted with respect to Plaintiff's breach-of-contract claim, the record is clear that American States' denial was not in bad faith.  In *Walz v. Fireman's Fund Ins. Co.*, the South Dakota Supreme Court reiterated that, in order to find an insurer liable in bad faith, "there must be an absence of a reasonable basis for denial of policy benefits and the knowledge or reckless disregard [of the lack] of a reasonable basis for denial."  1996 SD 135, ¶7, 556 N.W.2d 68, 70 (*quoting Champion v. United States Fidelity & Guar. Co.*, 399 N.W.2d 320, 324 (S.D.1987)).  Indeed, an insurance company may challenge claims that are fairly debatable and will be found liable "only where it has intentionally denied (or failed to process or pay) a claim without a reasonable basis." *Id.* "The issue is determined based upon the facts and law available to the Insurer at the time it made the decision to deny coverage." *Id.* at ¶8, 556 N.W.2d at 70.  In considering a claim of bad faith, "[t]he focus is on the existence of a debatable issue, not on which party was correct." *Dakota, Minnesota & Eastern R.R. Corp. v. Acuity*, 2009 SD 69, ¶20, 771 N.W.2d 623, 630.

Here, based upon the record, there is ample evidence supporting American States' coverage position—indeed, if anything, *Lead GHR*'s position is not "fairly debatable." As discussed above, the wall that collapsed was not directly connected to the building and provided no support for it (*See* Section 2.A, *supra*), and as such was not Covered Property.  (Ex. 05 at AMS-GHR000040).  The reported cause of collapse by the insured—and verified by the three engineers and two adjusters visiting the scene shortly after the loss—was heavy rain increasing

the lateral force pressing against the wall.[11]   (Ex. 04 at AMS-GHR000207; Ex. 15 at AMS-GHR000565; Ex. 17 at AMS-GHR000238, 278; Ex. 24 at 1).  The Policy has express exclusions for water, earth movement, collapse, faulty maintenance and workmanship, and decay and deterioration.  (Ex. 05 at AMS-GHR000038, 70-73).

In short, American States had abundant evidence that the claimed loss was either not covered at the outset, or caused by an excluded peril.[12]   There was, therefore, a "reasonable basis" for the position it took, and therefore no claim in bad faith exists under South Dakota law. *See Anderson v. Western Nat. Mut. Ins.*, 857 F.Supp.2d 896, 903-8 (D.S.D. 2012).

### B.  Plaintiff Has Presented No Extra-Contractual Damages.

As set forth above, Plaintiff had an affirmative obligation[13] under the provisions of Fed. R. Civ. P. 26(a)(1)(A)(iii) to provide American States with the identification and computation of its bad-faith compensatory damages and any supporting documents or materials.  Plaintiff has not done so.  Indeed, Lead GHR has failed to produce any evidence that the alleged bad faith of American States resulted in any damage separate and distinct from the contractual breach. For example, there is no evidence that Lead GHR lost business or that the damage occurred to the hotel as a result of any alleged bad faith.

---

[11] Lead GHR's testifying "bad faith" expert even concedes that if these engineering findings are correct, then the exclusions cited by American States apply.  (Ex. 9 at 115:9-116:3).  Moreover, he does not contend that American States steered or directed the engineer's investigation in any way.  (Ex. 36 at 99:13-100:9).

[12] And furthermore, no South Dakota case has ever determined that a wall not connected to a building should be considered "part of a building."  As discussed above, however, other jurisdictions have declined to make such a finding in similar circumstances.  (Section 2.A, *supra*).

[13] Fed. R. Civ. P. 26(a)(1)(A) states that "a party <u>must</u>" make the disclosures set forth therein. (Emphasis added).

Furthermore, unlike first-party bad faith claims involving individual plaintiffs, Lead GHR may not recover compensatory damages for mental anguish or emotional distress. First, it has not identified any such damages. Moreover, a corporation such as Lead GHR may not recover damages for mental anguish or emotional distress. *See F.D.I.C. v. Hulsey*, 22 F.3d 1472, 1489 (10th Cir. 1994) ("Since a corporation lacks the cognizant ability to experience emotions, a corporation cannot suffer emotional distress."); *Lampliter Dinner Theater, Inc. v. Liberty Mut. Ins. Co.*, 792 F.2d 1036, 1040 n.2 (11th Cir. 1986) ("corporations cannot experience emotional distress and cannot therefore maintain a suit for outrageous conduct"); *Gurman v. Metro Hous. and Redevelopment Auth.*, 884 F.Supp.2d 895, 902 (D. Minn. 2012) ("corporations do not have emotions and therefore cannot bring claims for emotional distress"); *Barreca v. Nickolas*, 683 N.W.2d 111, 124 (Iowa 2004) (a limited liability company "certainly cannot suffer emotional distress; such would stretch the bounds of the legal fiction of corporate personhood too far"); *see also Diversified Educ. Training and Mfg. Co., Inc. v. City of Wichita*, 473 F.Supp.2d 1140, 1153 (D. Kan. 2007) (holding that a corporation could not recover damages for the humiliation and pain and suffering of its owners).

While attorney's fees expended to pursue a breach of contract action may arguably be recoverable as an element of compensatory damages for bad faith, they are not recoverable under the circumstances of this case.  First, contrary to Fed. R. Civ. P. 26(a)(1)(A)(iii), Plaintiff has not identified attorney's fees as claimed damage, nor have they provided a computation of such fees or documents and evidentiary materials upon which such a computation would be based. Likewise, Plaintiff has not identified expert testimony that any such fees were reasonable and necessary. Moreover, for an award of compensatory damages for bad faith to include attorney's fees, the fees must have been expended in a "previously litigated breach of contract action." *See*

*Hurley v. State Farm Mut. Auto Ins. Co.*, Civ. 10-4165-KES, 2012 WL 6012803, *3-5 (D.S.D. Dec. 3, 2012) (*emphasis added*); *but cf. McElgunn v. Cuna Mut. Ins. Soc.*, 700 F.Supp.2d 1141 (D.S.D. 2010) (allowing recovery of attorney's fees as an element of compensatory damages for bad faith within an action also making a claim for breach of contract where the breach of contract claim was dismissed early on in the litigation and the parties did not dispute the amount of such fees). Since attorney's fees associated with a claim for bad faith are not recoverable, *Isaac v. State Farm Mut. Auto Ins. Co.*, 522 N.W.2d 752, 763 (S.D. 1994), the prior litigation requirement ensures that the fees are "separable and recoverable." *Hurley*, 2012 WL 6012803 at *3 n.2 (citations omitted).

Here, the breach-of-contract and bad-faith causes of action have been pursued simultaneously by Plaintiff. Any claim by Plaintiff for attorney's fees will have to be pursued under the provisions of S.D.C.L. §§ 58-12-3 and 58-12-3.1. The time for disclosing any evidence – categories, computations, documents, expert opinions – supporting compensatory damages for American State's alleged bad faith has passed. (*See* Docket 13 at p. 2, para. 4). Failure to provide such information "well prior to the discovery deadline . . . would obviously and unfairly prejudice a defendant in its trial preparation." *Marvin Lumber & Cedar Co. v. Norton Co.*, 113 F.R.D. 588, 593 (D. Minn. 1986) (citations omitted).

The jury will not have a legally sufficient basis to find for Plaintiff on its bad-faith claim. The damages element of that claim cannot be satisfied. Plaintiff has not produced any evidence of compensatory damages for American State's alleged bad faith, and discovery is now closed. Courts routinely enter judgment as a matter of law on claims where the evidence of damages was insufficient. *See Hinz v. Neuroscience, Inc.*, 538 F.3d 979, 984-85 (8th Cir. 2008) (upholding district court's grant of judgment as a matter of law where there was no reasonable basis for the

calculation of damages); *Morsey v. Chevron, USA, Inc.*, 94 F.3d 1470, 1476-77 (10th Cir. 1996) (upholding district court's grant of judgment as a matter of law where there was a failure of proof as to temporary damages necessary for the plaintiff's claim).   Because no such evidence of damages was disclosed here, summary judgment is proper.

### C.  First-Party Insurance Disputes Do Not Require "Equal Consideration."

Plaintiff also alleges, as the basis for its bad-faith claim, that American States has a *legal* obligation to give "equal consideration" to its insured.   (Complaint at ¶ 20).   Indeed, its expert relies on that same legal duty to support his finding of bad faith, contending that "equal consideration needs to be given by the insurance carrier to the insured."   (Ex. 34 at 5; Ex. 35 at 4; Ex. 09 at 48:6-8; Ex. 36 at 17:4-17).   But such a position, reached without ever reviewing the claim file,[14] contradicts the legal obligations set forth by the South Dakota Supreme Court for first-party property insurers.

Indeed, the South Dakota Supreme Court has long noted the distinction between third-party claims—where an insurer has a duty to defend an insured against the allegations of others—and first-party claims, where the Court has deemed the relationship between insureds and insurers as "adversarial":

> Customarily, bad faith litigation can be classified as either first- or third-party bad faith. Third-party bad faith is traditionally based on principles of negligence and arises when an insurer wrongfully refuses to settle a case brought against its insured by a third-party. *Kunkel v. United Security Ins. Co. of New Jersey*, 84 S.D. 116, 121, 168 N.W.2d 723, 726 (1969) (negligence and bad faith "are often used interchangeably"); *Crabb v. Nat'l Indem. Co.*, 87 S.D. 222, 229-30, 205 N.W.2d 633, 637 (1973). Third-party bad faith exists when an insurer breaches its duty to give equal consideration to the interests of its insured when making a decision to settle a case.

---

[14] (*see* Ex. 36 at 7:18-24).

> First-party bad faith, on the other hand, is an intentional tort and typically occurs when an insurance company consciously engages in wrongdoing during its processing or paying of policy benefits to its insured. *Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032, 1036 (1973); *Champion v. U.S. Fidelity & Guar. Co.*, 399 N.W.2d 320, 324 (S.D.1987). In these cases, the parties are adversaries, and therefore, an insurer is permitted to challenge claims that are fairly debatable. However, a frivolous or unfounded refusal to comply with a duty under an insurance contract constitutes bad faith. *Champion*, 399 N.W.2d at 324 (*citing Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1275 (Colo.1985)); *see also Isaac v. State Farm Mut. Auto. Ins. Co.*, 522 N.W.2d 752, 758 (S.D.1994); *Julson v. Federated Mut. Ins. Co.*, 1997 SD 43, ¶ 6, 562 N.W.2d 117, 119-20.

*Hein v. Acuity*, 2007 SD 40, ¶¶ 9-10, 731 N.W.2d 231, 235; *see also Bertelsen v. Allstate Ins. Co.*, 2011 S.D. 13, ¶¶ 46, 48, 796 N.W.2d 685, 700-01.  In other words, to successfully establish bad faith in the first-party context, the insured must establish that the denial was *frivolous* and *unfounded*.  *Hein*, 2007 SD 40, ¶¶ 9-10, 731 N.W.2d at 235.

Here, the evidence establishes that the loss was reported by Lead GHR as caused by "heavy rain." (Ex. 17 at AMS-GHR000506; *see also* Ex. 12).  The independent adjuster assigned to the claim also concluded that the failure was caused by the rain event.  (Ex. 15 at AMS-GHR000565; Ex. 17 at AMS-GHR000278).  American States retained an engineering firm that independently concluded that the rain event caused water to collect behind the wall, leading to excess lateral pressure, causing the wall to collapse.  (Ex. 04 at AMS-GHR000207).  An American States adjuster also inspected the site, and concluded that the rain event caused the collapse, but waited for the engineer's formal report before making any coverage determinations.  (Ex. 17 at AMS-GHR000238).  Even *the engineer retained by Lead GHR* agreed with the conclusions made by American States and its retained engineers.  (Ex. 24 at 1).

Based upon the findings made by *every single* individual that observed the scene at or near the time the wall collapsed, it can hardly be said that American States' position was

*frivolous* and *unfounded*.[15]   To the contrary, American States made every effort to inspect the loss and make an informed coverage determination.   Summary judgment on the bad-faith cause of action is therefore warranted.

### D.  Plaintiff's Claim for Punitive Damages Fails as a Matter of Law

Although Plaintiff raises a cause of action for punitive damages (Complaint at ¶ 26-27), such a prayer for relief is not an independent cause of action under South Dakota law.  *Berry v. Time Ins. Co.*, 798 F.Supp.2d 1015, 1021 (D.S.D. 2011).   Rather, such exemplary relief is statutorily provided "where the defendant has been guilty of oppression, fraud, or malice, actual or presumed" in any action "for the breach of an obligation not arising from contract."   S.D.C.L. § 21–3–2.  In other words, the conduct giving rise to punitive damages must be tied to a separate cause of action, and in the insurance context, "there can be no liability in punitive damages absent a finding of bad faith." *Roth v. Homestake Min. Co. of California*, 74 F.3d 843, 845 (8th Cir. 1996).

Here, as noted above, American States' conduct was at minimum "fairly debatable."  *See* section 4.B, *supra*.   And should the Court agree that there is no claim in bad faith, Plaintiff's claim for punitive damages fails as a matter of law as well.  *See Roth*, 74 F.3d at 845.[16]

---

[15]  In fact, even applying the "equal consideration" standard, its efforts to send two adjusters and two engineers to the site, who all agreed with the observations of all witnesses to the rain event and collapse—and with the causation findings of Lead GHR's retained expert at that time— before denying coverage does not evince American States giving insufficient "consideration" to the insured.

[16]  Even if a separate cause of action *could* exist, Plaintiff has failed to establish sufficient "malice," which "is not simply the doing of an unlawful or injurious act, it implies that the act …was conceived in the spirit of mischief or of criminal indifference to civil obligations."  *Bierle v. Liberty Mut. Ins.*, 792 F.Supp. 687, 692 (D.S.D. 1992). Plaintiff alleges no such "mischief" or "criminal indifference" here, and because "South Dakota is among the states having the most stringent conduct requirements" relating to punitive damages, Plaintiff's claim must fail.  *See id.* at 691-93.

Once more, even if a claim for punitive damages is theoretically possible under the circumstances of this case, as noted above Plaintiff has failed to assert any damages separate and distinct from its contractual damages.  Under South Dakota law, compensatory damages are a prerequisite to punitive damages.  *Hoaas v. Griffiths*, 2006 SD 27, ¶ 18, 714 N.W.2d 61, 67 ("We have consistently held that punitive damages are not allowed absent an award for compensatory damages.") (quotations and citations omitted); *Morsey v. Chevron, USA, Inc.,* 94 F.3d 1470, 1477 (10th Cir. 1996) (applying Kansas law*); see also* S.D.C.L. § 21-3-2 ("In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, . . . the jury, in addition to actual damage, may give damages for the sake of example, and by way of punishing the defendant.") (*emphasis added*).  Any recovery by Plaintiff solely on its breach-of-contract claim, without any recovery of compensatory damages for the tort of bad faith, cannot give rise to a claim for punitive damages.  *Stoner v. State Farm Mut. Auto. Ins. Co*., 780 F.2d 1414, 1419 (8th Cir. 1986) (granting summary judgment on insured's punitive damages claim to the extent it was based on contract); *Baker v. Masco Builder Cabinet Group, Inc*., 912 F.Supp.2d 814, 827 (D.S.D. 2012) ("Punitive damages are not ordinarily recoverable in actions for breach of contract[.]") (quotations and citations omitted); *Thu v. Am. Family Ins. Co*., 292 N.W.2d 109, 111 (S.D. 1980) (holding that it was error to submit the issue of punitive damages to the jury where the cause of action at issue was a breach of contract action based on refusal to pay benefits under the terms of an insurance policy); S.D.C.L. § 21-3-2 ("In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, . . . the jury, in addition to actual damage, may give damages for the sake of example, and by way of punishing the defendant.") (*emphasis added*).  With no evidence of separate

compensatory damages resulting from American State's alleged bad faith, punitive damages cannot be submitted to the jury.  And as such, summary judgment on Plaintiff's punitive-damage claim is appropriate.

## **CONCLUSION**

This matter is ripe for summary judgment.  Plaintiff seeks coverage for the collapse of a retaining wall that was not covered property under the Policy in the first place, and for a collapse that was caused by one, if not several, expressly excluded perils.  Under the clear terms of the Policy, this loss was not covered.

Moreover, at the very least, American States made coverage determinations that were consistent with the Policy language and the facts available to them—based upon its engineers' representations, its own site visit, and *the representations of Lead GHR and its agents.*  As a matter of law, this is not bad faith, nor can the coverage position it took subject American States to punitive damages.

Finally, regardless of whether the facts demonstrate an arguable case of bad faith—which they do not—Plaintiff failed to present any evidence of bad-faith damages separate and distinct from the contractual damages alleged.  As such, its claim for bad faith fails on that basis as well.

Because Plaintiff has failed to establish (1) a covered claim, (2) that American States' coverage position was unreasonable based upon the facts and Policy language, or (3) any extra-contractual damages flowing from any alleged contractual breach; and because Plaintiff's conversion claim fails as a matter of law, American States is entitled to summary judgment on all claims alleged against it.

Dated: June 1, 2018

RICHARDSON, WYLY, WISE, SAUCK & HIEB


 /s/ Jack H. Hieb_____

One Court Street
P.O. Box 1030
Aberdeen, SD 57401
Phone:  605-225-6310
Fax:     605-225-2743
E-Mail:  jhieb@rwwsh.com

and

GROTEFELD, HOFFMANN, SCHLEITER
GORDON, OCHOA & EVINGER, LLP
Daniel W. Berglund (MN  #0329010)
Patrick Jarosch (MN#0395445)
150 South Fifth St. Suite 3650
Minneapolis, MN 55402
Telephone: (612) 564-4895
Facsimile:  (612) 326-9996
dberglund@ghlaw-llp.com
pjarosch@ghlaw-llp.com

***ATTORNEYS OF DEFENDANT***

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Jack H. Hieb, certify that Defendant American States Insurance Company's Memorandum of Law in Support of its Motion for Summary Judgment, or, Alternatively, for Partial Summary Judgment complies with Local Rule 7.1(B)(1).

I further certify that, in preparation of this memorandum, I used Microsoft Office Word 2010, and that this word processing program has been applied specifically to include all text, including headings, footnotes, and quotations in the following word count.

I further certify that the above-referenced memorandum contains 11,002 words.


Dated: June 1, 2018

RICHARDSON, WYLY, WISE, SAUCK & HIEB


 /s/  Jack H. Hieb

One Court Street
P.O. Box 1030
Aberdeen, SD 57401
Phone:   (605) 225-6310
Fax:      (605) 225-2743
jhieb@rwwsh.com

and

GROTEFELD, HOFFMANN, SCHLEITER
GORDON, OCHOA & EVINGER, LLP
Daniel W. Berglund (MN #0329010)
Patrick Jarosch (MN# 0395445)
150 South Fifth St. Suite 3650
Minneapolis, MN 55402
Phone: (612) 564-4895
Fax:      (612) 326-9996
dberglund@ghlaw-llp.com
pjarosch@ghlaw-llp.com

***ATTORNEYS OF DEFENDANT***