**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH DAKOTA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| LEAD GHR ENTERPRISES, INC. formerly d/b/a GOLDEN HILLS RESORT, | ) | Civ. 16-5026-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **PLAINTIFF'S MEMORANDUM OF** |
| AMERICAN STATES INSURANCE | ) | **LEGAL ISSUES IN SUPPORT OF** |
| COMPANY, | ) | **PLAINTIFF'S MOTION FOR PARTIAL** |
| | ) | **SUMMARY JUDGMENT** |
| Defendant. | ) | |
| | ) | |
| | ) | |

Plaintiff, Lead Golden Hills Resort, Enterprises, Inc. ("Lead GHR"), by and through its counsel of record, has moved for partial summary judgment, on Count I of its Amended Complaint, on the issue of Defendant's "enforceable promise" or duty for Plaintiff's claim for Breach of Contract. Plaintiff's Motion is attached hereto, and incorporated herein by reference. Plaintiff's Motion is made pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Plaintiff offers this Memorandum of Legal Issues in Support of Plaintiff's Motion for Partial Summary Judgment.

## INTRODUCTION

The standard this Court applies when considering a motion for summary judgment is well established. Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

"Resolution of disputes by way of summary judgment is not a 'disfavored procedural shortcut,' but is 'an integral part of the Federal Rules as a whole.'" *Jordan v. Union Ins. Co.,* 771 F.Supp. 1031, 1033 (D. S.D. 1991) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986)). While Defendant as the nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record, Defendant may not merely rest upon the allegations in its pleadings. *Ghane v. West*, 148 F.3d 979, 981 (8th Cir. 1998). Defendant must come forward with specific facts by affidavit or otherwise to show that a genuine issue of material fact exists. *Forrest v. Kraft Foods, Inc.* 285 F. 3d 688, 691 (8th Cir. 2002).

This Motion presents three narrow legal issues, arising out of the insurance policy: (1) whether the wall that collapsed on or about October 10, 2010, was "covered property" under the insurance contract between the parties, (2) whether the additional collapse coverage supersedes the general "anti-concurrent causation" clause, and (3) whether the term "decay," as used in the coverage form only applies to organic material.   Questions of contract interpretation are questions of *law. See Nelson v. Schellpfeffer*, 2003 S.D. 7, ¶ 7, 656 N.W.2d 740, 743 (emphasis added). Each of these questions presented bear on the insurer's enforceable promise to Lead GHR pursuant to the Policy.  It is hoped that resolution of this issue will help narrow the scope of evidence to be presented to the jury, either by motions *in limine* or other exclusion under Federal Rule of Evidence 403. This Motion *does not* seek to resolve liability for the collapse, but only seeks to answer the "coverage" question.

## ISSUE PRESENTED

1. Based on the insurance contract between the parties, whether the subject wall is "part of" the building as that phrase is used in the Policy?

2. Whether the "anti-concurrent causation" clause is superseded by the "Additional Coverage - Collapse" clause of the Policy?

3. Whether the term "decay," as used in the additional collapse coverage form *only* applies to organic materials?

### FACTUAL BACKGROUND

In 2010, Plaintiff Lead GHR, operated a hotel in Lead, South Dakota. Defendant American States Insurance Company ("American States") is an Indiana corporation, doing business in South Dakota.[1] At the time of the loss that gave rise to this action, American States was the commercial property insurer for the Lead Golden Hills Resort, under the express terms and conditions of Policy No. 0-C1-327361-1 (hereinafter, the "Policy"). *Affidavit of Nathan R. Oviatt* ("*Oviatt Aff.*"), Exhibit ("Ex.") B, Policy of Insurance, No. 01-C1-327361-1 (the "Policy") (AMS-GHR000001 to 000156). From April 14, 2010 to April 14, 2011, American States agreed to provide commercial property insurance coverage for the hotel located at 900 Miners Avenue, Lead, SD  57754. *Id.*

The hotel itself is a six-story hotel/convention center that faces generally west, and is constructed, like much of Lead, on a sloped and terraced site. *Oviatt Aff.*, Ex. C, Duckett Preliminary Engineering Report, ("Duckett Report") pp. 2-3, dated January 26, 2017. On the south side of the hotel, at the basement/ground level, a reinforced concrete retaining wall extended southward, then eastward, away from the building. *See Oviatt Aff.*, Ex. D, Haag Report, November 24, 2010, at (HAAG 00010). The retaining wall's height was approximately 11'-0" and there was an asphalt-paved parking area at the top of the wall as well as an asphalt-paved road with parking at its base. *Oviatt Aff.*, Ex. C, Duckett Report, pp. 2-3. The retaining wall was

---

[1] The hotel has since been transferred to Roundhouse Properties, LLC, a corporation formed by two of Plaintiff's owners.  The insurance claim at issue in this lawsuit has remained the property of Plaintiff for purposes of prosecuting this case. Oviatt Aff., Ex. A, Memorandum of Understanding.

constructed at or near the same time as the rest of the Lead GHR building in late 1989/early 1990. *Id.*

In the early morning of October 10, 2010, at approximately 3:30 a.m., a portion of the Lead GHR retaining wall collapsed and damaged two vehicles that had been parked adjacent to the base of the wall. *Id.* The wall had withstood every rain, hail, and snow event since its construction in 1989-1990. *Id.* at pp. 4-5.

There is no dispute that the retaining wall at issue in this case was attached to the hotel building with both concrete and rebar. *Oviatt Aff.*, Ex. E, American States Insurance Company ("ASIC") 30(b)(6) Depo., 38:17-25. There is no dispute that American States owed Lead GHR a duty to investigate fully and fairly *all* causes of the collapse, including covered causes of loss. *Id.*, at 108:9-12. There is no dispute that American States has declined all coverage for Lead GHR's claim, and represented to Plaintiff that the wall was not covered property because the wall did not provide "structural support" for the building. *Oviatt Aff.*, Ex. F, Denial Letter, December 1, 2010. There is no definition in the Policy which promotes Defendant's interpretation of "part of" a building to mean "structurally support" a building. *See generally, Oviatt Aff.*, Ex. B, the Policy. There is no way for an insured to know of Defendant's strained interpretation of "part of" a building prior to suffering a loss. *Oviatt Aff.*, Ex. G, Lumaye Depo. 33:4-25 to 36:1-23.

## LEGAL ANALYSIS

## I. Summary Judgment is necessary on the issue of Defendant's *Enforceable Promise* on Count I

Count I of the Complaint is a breach of contract claim relating to Defendant's breach of its enforceable promise to pay for the damage sustained to the retaining wall of the Golden Hills

Resort. *See generally* Document 1. "[T]he elements of breach of contract are: 1. An enforceable promise; 2. A breach of the promise; 3. Resulting damages." *Guthmiller v. Deloitte & Touche, LLP,* 2005 SD 77, ¶ 14, 699 N.W.2d 493, 498.  The central dispute on this issue arises from the parties' interpretation of the Policy language. "State law controls the construction of insurance policies when a federal court is exercising diversity jurisdiction." *Bell v. Allstate Life Ins. Co.,* 160 F.3d 452, 455 (8th Cir.1998).

### A. The Subject Retaining Wall is "Covered Property" Under the Policy.

The first issue presented by this Motion for Partial Summary Judgment (and a central dispute in this litigation) is whether the subject retaining wall was covered property under the Policy.  Because insurance contract interpretation is a question of law, this issue must be resolved by the Court -- not the jury.  *Ass Kickin Ranch, LLC v. N. Star Mut. Ins. Co.*, 2012 S.D. 73, 822 N.W.2d 724, 726.

Under South Dakota law, the Court analysis begins with the plain language of the insurance policy between the parties.  *See Pauley v. Simonson*, 2006 S.D. 73, ¶ 8, 720 N.W.2d 665, 667-68.  "The existence of the rights and obligations of parties to an insurance contract are determined by the language of the contract, which must be construed according to the plain meaning of its terms."  *State Farm Fire & Cas. Co. v. Harbert*, 2007 S.D. 107, 741 N.W.2d 228, 234. "The terms of an unambiguous insurance policy cannot be enlarged or diminished by judicial construction."  *O'Neill v. Blue Cross of W. Iowa & S.D.,* 366 N.W.2d 816, 818 (S.D.1985).  It is the Court's duty to apply the contract terms according to their plain and natural meaning, or determine that such terms are ambiguous. *Roden v. Gen. Cas. Co. of Wis.,* 2003 S.D. 130, ¶ 6, 671 N.W.2d 622, 625. However, "[i]f doubt exists as to whether the insured's claim falls within the policy coverage after considering the complaint and record evidence, 'such

doubts must be resolved *in favor of the insured*.'" *Harbert*, 2007 S.D. 107, 741 N.W.2d 228, 234 (internal citations omitted) (emphasis added).

Here, the Policy language applicable to this issue reads as follows:

2**. Property Not Covered**

Covered Property does not include:

…

**l.** Retaining Walls that are *not* part of a building;

*Oviatt Aff.*, Exhibit B, (AMS-GHR 000040) (emphasis added). Important to this discussion is that there is no dispute that retaining walls that are "part of a building" are "Covered Property." *Oviatt Aff.*, Ex. E, ASIC 30(b)(6) Depo., 33:13-16. Thus, the only question to answer on this issue is what it means to have a retaining wall be "part of" a building.

This author can find no legal definition of "part of" a building. Because this question turns on the definition of "part," it is helpful to understand how that word is defined. *See e.g. Lead GHR Enterprises, Inc. v. Am. States Ins. Co.*, 2014 WL 10538028, at *9 (D.S.D. 2014). Oxford Dictionary defines "part" as a noun, which means: "An amount *or section* which, when *combined with others* make up the whole of something." ENGLISH OXFORD LIVING DICTIONARIES, https://en.oxforddictionaries.com/definition/part (last visited May 30, 2018) (emphasis added). Here, the retaining wall is a section which, when combined with the walls of the hotel with concrete and iron make up the whole of the building. It meets the most basic definition of "part." If this retaining wall does not meet the definition of "part of" a building, no retaining wall could.

Plaintiff described in detail the reasons it believed the wall to be "part of" the rest of the building. Lead GHR's Rule 30(b)(6) designee, Rory Maynard explained that this wall "was

concreted in, rebarred (sic) in, attached, built prior to when the building was even erected as part of the foundation part of the building. It was stuccoed (sic) and painted to match exact part of the building. It was part of the building." *Oviatt Aff.*, Ex. H Lead GHR 30(b)(6) Depo., 25:11-15. Although it appears that the wall and the building do not in fact share footings, the importance of the wall to the rest of the building cannot be understated.

Mr. Duckett explained that the wall was even more integral to the rest of the building than Mr. Maynard stated. He explained in his report:

> Buildings constructed on sloped sites typically require and utilize retaining walls to create flat areas. These areas may consist of planters, grassed areas or, more importantly, paved areas that support activities essential for the required functions of the building and its intended use . . . Barring an inordinate and unreasonable amount of land, buildings constructed on sloped sites without retaining walls could not be planned, permitted or constructed, the retaining wall is an essential element of the building in order to allow the building to be constructed.

*Oviatt Aff.*, Ex. C, Duckett Report, p. 3. Given this, and the fact that this particular wall was bound to the rest of the building with rebar, concrete and stucco, it is difficult to picture a retaining wall that is more "part of" a building than this wall. This wall is necessary to create the space for the function of the building and "a part" of the building in the most natural sense -- it is connected to and created contemporaneous with the rest of the building.

By contrast, Defendant urges the Court to adopt a strained interpretation of "part of" a building which requires a retaining wall to give the building "structural support" for it to be considered "covered property" under the Policy. *Oviatt Aff.*, Ex. F, Denial Letter. The plain language of the Policy does not require a retaining wall to provide "structural support" to the building before it is considered "part of" the building, and an insured would have no way of knowing this effective exclusion applies until after a loss occurs. *Oviatt Aff.* Ex. G, Lumaye Depo. 35:1-25. The Policy contains no "structural support" element *Id.* Defendant cannot inject

such an element to create an exclusion after a loss has occurred in order to create ambiguity where none exists. The Policy language clearly does not require "structural support." Although to be "part of" a building seems like a clear and unambiguous concept, even if the Court were to find the phrase to be ambiguous, Defendant's proposed definition would impermissibly change the policy language to create an exclusion where none was agreed to by the parties.

This is not the first instance in which this company has injected hidden conditions into its policy interpretations after Plaintiff has sustained a loss.  *See Lead GHR Enterprises, Inc. v. Am. States Ins. Co.*, 2014 WL 10538028, at *9 (D.S.D. 2014). In a separate claim for hail damage sustained to the hotel's metal roof, Defendant urged the Court to adopt an interpretation of "damage" which required "functional damage" in order to justify its refusal to pay the claim pursuant to the Policy's broad coverage grant.  *Id.* The Court rejected Defendant's absurd interpretation, and found that Defendant breached its promise as a matter of law. *Id.*

Defendant's effort to require a retaining wall to give "structural support" to a building where no condition exists is more of the same. It is attempting to create an exclusion without expressly stating it in the Policy. This argument is not allowed in South Dakota. "The terms of an unambiguous insurance policy cannot be enlarged or diminished by judicial construction." *O'Neill v. Blue Cross of W. Iowa & S.D.,* 366 N.W.2d 816, 818 (S.D.1985).  Here, Defendant is attempting to diminish the promise it made.  Plaintiff respectfully submits that summary judgment on this narrow issue of contract interpretation is appropriate.

### B. Defendant's Investigation and Denial.

There is an additional issue with respect to Defendant's "structural support" interpretation, which merits additional discussion -- Defendant had no factual basis to assert it. Prior to denying coverage, American States commissioned two separate inspections of the

damage sustained to the retaining wall Resort from two different agents. The first inspection was conducted by Chris Shopshear of Eagle Adjusting in October of 2010. *Oviatt Aff.*, Ex. I, Shopshear Report, October 18, 2010. Within eight days of the loss, Shopshear reported to the American States adjuster that he "found very little rebar in place" in the wall. He also reported that he felt that the wall "may not have been constructed properly." *Oviatt Aff.,* Ex. J, Claim Note, October 18, 2010, (AMS-GHR000290). He further advised the insurer that this claim could "run over a million dollars if taken care of properly." *Id.* Shopshear stated in his written report to American States' adjuster Janine Mills that the wall appeared to be connected to the GHR hotel. *Id.* Despite Mr. Shopshear's report that the retaining wall was attached to building, Troy Lumaye, the assistant claims manager assigned to the file made a claim note which questioned without any factual basis whatsoever whether the retaining wall was connected to the insured building. *Oviatt Aff.,* Ex. J, Claim Note, October 18, 2010, (AMS-GHR000288). By this time, Shopshear was the only agent for the Defendant to visit the site of the collapse.

A few weeks after Shopshear's inspection, a second inspection was conducted by Tim Strasser and David Teasdale of Haag Engineering. *Oviatt Aff.*, Ex. D, Haag Report, November 24, 2010. Both inspections revealed that Lead GHR's retaining wall had collapsed. *Id.* However, the Haag Engineers concluded:

1. The retaining wall failure at the Golden Hills Resort resulted from earth pressure on the wall. The lateral earth pressure was likely increased by accumulated water behind the wall.

2. The wall was originally built with weep holes to help drain soil behind the wall. The wall and weeps were 20 years old. The weeps appeared clogged.

3. The wall failed due to bending stresses at the base of the wall that exceeded the capacity of the concrete and reinforcement.

4. The tunnel and elevator were too far away to be affected by wall failure.

*Id.*, at 5-6. The Haag Engineers did no investigation into the issue of whether the retaining wall was "part of" the rest of the hotel's building. *See generally id., see also Oviatt Aff.*, Ex. E, ASIC Depo., 66:25 to 67:1-3. In fact, the Haag Engineers were never even asked to look into whether the wall was connected to the rest of the building. *Oviatt Aff.*, Ex. K, Teasdale Depo., 68:16-19. Defendant's "insurance expert," Peter Hildebrand, even admits that whether the retaining wall was "part of" the building was never addressed in the November 24, 2010, Haag Report." *Oviatt Aff.*, Ex. L, Hildebrand Depo., 55:3-4.

On November 4, 2010, American States General Adjuster, Jonathan Lawlee, conducted a site visit of the collapse. *Oviatt Aff.*, Ex. M, Lawlee Depo., 64:17-20. Mr. Lawlee has no training or education or experience as a structural engineer. *Id.*, at 64:6-8. He admits that he did not conduct any testing to determine whether the retaining wall and the building shared footings, or rebar. *Id.*, at 64:9-12. Defendant did not even have any architectural or structural drawings available in the file. *Oviatt Aff.*, Ex. E, ASIC Depo., 45:10-16.

Despite the obvious deficiencies in its investigation into whether the retaining wall was "part of" the rest of the building, Defendant denied Lead GHR's claim on this basis. On December 1, 2010, American States denied Lead GHR's claim, and represented the following to Lead GHR:

> Retaining walls are not covered under Additional Coverage Collapse.[2] Groundwater is also not a covered cause of loss under Additional Coverage Collapse. For these reasons, we are unable to conclude the matter presents a covered claim.

*Oviatt Aff.*, Ex. F, Denial Letter, December 1, 2010 (PLF 000140 to 000145). In its denial, Defendant argued that the retaining wall was not covered property because in his opinion it was not "part of" the building. Mr. Lawlee asserted: "The retaining wall separates the upper parking

---

[2] This policy provision is discussed below in Section B.

lots from the lower parking lots and roadway. The wall does not give the building any support or would not be considered part of your building." *Id.* When asked about the factual basis for this representation to its insured, Lawlee admitted that it was based on his inspection of the collapse.

> Q     Did you have any report that -- from an engineer or otherwise that the wall provided structural support to the building?
>
> A     No.
>
> Q     Okay. So I'm wondering about the factual basis for this assertion to the insured?
>
> A     It was my opinion when I was on site.
>
> Q     Okay. Your opinion based on your visual inspection alone?
>
> A     Correct.

*Oviatt Aff.*, Ex. M, Lawlee Depo. 65:18-25 to 66:1-5. Defendant's basis for telling the insured its retaining wall did not provide structural support to the rest of the building was obviously deficient.  Its investigation into the issue was obviously deficient.

Defendant promised to indemnify Lead GHR for damage to retaining walls that are "part of" Golden Hills Resort.  "An insurer, having affirmatively expressed coverage through broad promises, assumes a duty to define any limitations or exclusionary clauses in *clear* and *explicit* terms."  *Hometown Plumbing & Heating Co. v. Secura Ins. Co.*, 815 N.W.2d 779 (Iowa Ct. App. 2012) (emphasis added).  In this case, Defendant has failed to satisfy its duty to define this exclusion in *any* terms, let alone clear and explicit terms.

The "plain and ordinary" language of the Policy does not contain any requirement that a retaining wall must provide "structural support" to be considered "part of" the building.  If the insurer wanted to include that requirement in to the definition of "part of the building," it could have done so when it sold the policy. Defendant cannot engage in post-occurrence underwriting

by creating an exclusion through an interpretation that would effectively eliminate all retaining wall coverage. This is business as usual for Defendant, and it violates South Dakota law.

"[T]he provisions of an insurance contract 'are to be read and understood according to the natural and obvious import of the language, without resorting to subtle and forced construction for the purpose of either limiting or extending their operation.' " *State Farm Mut. Auto. Ins. Co. v. Vostad*, 520 N.W.2d 273, 275 (S.D. 1994).   Here, Lead GHR urges the plain and natural meaning of "part of" a building to mean a retaining wall which is "attached to and constructed contemporaneous with" the rest of the building.   There is no question that the retaining wall was built at or around the same time as, and connected to the rest of the building with rebar and concrete, stucco and paint. The wall is "part of" the rest of the building in the most common and natural sense of the phrase.

"The fact that the parties differ as to the contract's interpretation does not create an ambiguity."  *Ass Kickin Ranch, LLC*, 822 N.W.2d at 727.  To Plaintiff, the meaning of the term "part of" is plain and obvious. However, even if the Court were to conclude somehow that the phrase "part of" a building is ambiguous, such ambiguity "must be resolved *in favor of the insured*.'" *Harbert*, 741 N.W.2d at 234 (internal citations omitted) (emphasis added).

Because Defendant drafted the contract, it foregoes the benefit of doubt when it comes to ambiguity.  Although it is Lead GHR's position that its interpretation of "part of" is clean, clear, and obvious, if doubt remains, such doubt should be resolved in Plaintiff's favor.  As such, Plaintiff's Motion for Partial Summary Judgment should be granted on Defendant's duty to extend coverage for the wall for covered perils.[3]

---

[3] The Complaint also includes separate counts for "bad faith" and punitive damages.  Plaintiff acknowledges that fact questions remain on these issues as well as the issue of Defendant's breach. Defendant has offered at least some evidence from its expert David Teasdale in support its invocation of the water and soil exclusions in the Policy. Whether Defendant was reasonable, in light of the totality of circumstances, in relying on Mr. Teasdale's report

## II. The "Anti-Concurrent Causation Clause" Does Not Apply to Collapse Coverage.

The next issue the Court needs to resolve with respect to the Policy is the language of the "Additional Coverage - Collapse" form, and its relation to the "anti-concurrent causation" clause.

### A. The Additional Collapse Coverage Gives Coverage Back.

As a result of Mr. Lawlee's assertion that retaining walls are not covered under the Policy, American States' investigation was narrowed. The issue of the wall's faulty construction was never pursued by Defendant after receiving Shopshear's report. *Oviatt Aff.*, Ex. E, ASIC 30(b)(6) Depo., 66:2-10.[4] Nor was the fact that the wall had withstood every storm in the wall's 20-year history ever explored by Defendant. *Id.*, at 18:13-20. Instead, Defendant denied Lead GHR's claim and asserted its denial was supported by the Haag Report. Defendant alleged:

> Retaining walls are not covered under Additional Coverage Collapse. Groundwater is also not a covered cause of loss under Additional Coverage Collapse. For these reasons, we are unable to conclude the matter presents a covered claim.

*Oviatt Aff.*, Ex. F, Denial Letter, December 1, 2010, (PLF 000140 to 000145). Even though its adjuster, Chris Shopshear, had alerted the company to the defective design issues he observed in the wall, Defendant never investigated any of the covered causes of collapse, under the "Additional Coverage - Collapse" form of the Policy. *Oviatt Aff.*, Ex. E, ASIC 30(b)(6) Depo., 55:3-8 and 66:7-10.

The "groundwater" exclusion referenced in Defendant's denial letter includes an "anti-concurrent causation" clause which provides in relevant part:

---

remains to be determined by the jury. *See Mordhorst v. Dakota Truck Underwriters and Risk Admin. Serv's*, 2016 S.D. 70, 886 N.W.2d 322.
[4]Defendant testified that it would have pursued the faulty design issue, but for its determination that the retaining was not "covered property." Interestingly, it would have pursued this issue in order to preserve any of its own subrogation rights against the builder/designer -- not for the benefit of its insured.

**B. Exclusions**

>    **1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
>
>    …
>
> >    **b. Earth Movement**
> >
> >    …
> >    **(4)** Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty.   Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.
>
>    …
>
> >    **g. Water**
> >
> >    …
> >
> >    **(4)** Water under the ground surface pressing on, or flowing or seeping through;
> >
> > >    **(a)** Foundations, walls, floors or paved surfaces;
> > >    **(b)** Basements, whether paved or not; or
> > >    **(c)** Doors, windows or other openings.

*Oviatt Aff.*, Exhibit B, Causes of Loss – Special Form (AMS-GHR 000070-71).

   **B. The General Cannot Overrule the Specific.**

   The "anti-concurrent causation" clause is used to eliminate any consideration of efficient proximate cause rule in claims involving excluded perils.  *See Swenson v. State Farm Fire and Cas. Co.*, 891 F.Supp.2d 1101, 1109 (D.S.D. 2012). However, when considering "additional coverage," like the collapse coverage at issue here, Courts have refused to apply either anti-concurrent causation or efficient proximate cause analysis because "general exclusions listed in

the Policy do not modify or qualify the additional collapse coverage." *Ken Johnson Properties, LLC v. Harleysville Worcester Ins. Co.*, Civ. No. 12-1582, 2013 WL 5487444, * 15 (D. Minn. Sept. 30, 2013) (citing *State Auto. Mut. Ins. Co. v. R.H.L., Inc.*, No. 07-1197, 2010 WL 909073, at * 12 (W.D. Tenn. Mar 12, 2010); *Young Sook Pak v. Alea London Ltd.*, Civ. No. 1:08-CV-0824, 2009 WL 2366549, at * 7 (M.D. Penn. July 30, 2009), *see also Tabernacle-The New Testament Church v. State Farm Fire and Cas. Co.*, 616 Fed. Appx. 802 (6th Cir., 2015). In other words, because the specific "Additional Coverage -- Collapse" gives coverage back, it makes little sense to reapply the general exclusion, including the anti-concurrent causation clause. Even Defendant admits that the additional coverage for "collapse" is an exception to the general exclusions in the Policy:

> Q      But is that, collapse then, is an exception to the exclusions in B, correct?
>
> A      Yeah.

*Oviatt Aff.*, Ex. E, ASIC 30(b)(6) Depo., 60:20-22. In other words, the coverage is "given back."

These "give back" clauses work exactly as one would expect, i.e., they "give back" coverage that would otherwise be excluded under the general exclusions of the Policy. *See Oviatt Aff.*, Ex. N, Caudill Depo., 53:1-10. Terry Caudill, the independent insurance agent who sold Lead GHR the subject Policy, explained the "give back" coverage as follows:

> Q   Is it your position that a collapse, as defined in the additional coverages portion of the policy, supersedes any excluded peril in the cause of loss form?
>
> A   Yes, because it brings back coverage for that retaining wall.
>
> Q   Okay. Regardless of whether the exclusion is a cause, a concurrent cause of the collapse?
>
> …
>
> A   The coverage for that retaining wall has to do with the collapse section of that policy and the absence of language within the additional . . .  collapse section that

would specifically exclude water. And, in fact, it talks about water collecting on roofs.  So I think the intent of that section is that it would be covered.

Q   Okay. So just to make sure I understand what you are saying, that when you have a collapse, as defined in the additional coverages portion of the policy --

A   Yes.

Q   And I will provide you a copy of that if you want it. I'm happy to do so. But it's your position that if you have a collapse under the additional coverages, that will supersede any of the exclusions that are in the general coverage?

A   Yes. It gives coverage back.

*Oviatt Aff.*, Ex. N, Caudill Depo. 53:5-25; 54:1-9.

Here, the "give back" coverage reads:

**D. Additional Coverage - Collapse**

The term Covered Cause of Loss includes the Additional Coverage - Collapse as described and limited in D.1. through D.5. below.

**1.** With respect to buildings:

**a.** Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose; …

**2.** We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building that is insured under this Coverage Form or contains Covered Property insured under this Coverage Form, if the collapse is caused by one or more of the following:
…

b. Decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

…

f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation. However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in 2.a. through 2.e., we will pay for the loss or

> damage even if use of defective material or methods, in construction, remodeling or renovation, contributes to the collapse.

*Oviatt Aff.*, Exhibit B, (AMS-GHR 000075).

In this case, Lead GHR has presented competent evidence that the additional collapse coverage applies to this case.  Lead GHR has retained a structural engineer, Mark Duckett, who has opined that the wall collapsed due to "decay and deterioration" (discussed in paragraph D(2)(b) of the Policy) at the base of the wall. Mr. Duckett explained, "[g]iven the fact that the Lead GHR retaining wall system experienced greater rain events prior to the incident date without collapse, it is my opinion that its collapse on the incident date was caused by latent decay/deterioration of the reinforced concrete wall and/or its weep/drainage system . . ." *Oviatt Aff.*, Ex. C, Duckett Report, pg. 5. Assuming the jury reaches this same conclusion, the additional collapse coverage is invoked.  This begs the question: if the jury agrees with Mr. Duckett and the additional collapse coverage is found to apply, what effect if any does the "anti-concurrent causation" clause have on the issue of coverage?

In *Ken Johnson Properties*, the Federal District Court for the District of Minnesota was facing a similar issue with nearly identical policy language. *Ken Johnson Properties, LLC*, Civ. No. 12-1582, 2013 WL 5487444, * 15 (D. Minn. Sept. 30, 2013). There, after a significant rainfall water pooled on the roof of an apartment building because of a clogged roof drain. *Id.*, at 1. The additional weight of the pooled water caused the roof to buckle. *Id.*  The Minnesota Court was therefore called upon to reconcile a similar water exclusion endorsement which related to water which "backs up or overflows from a sewer, drain or sump," and an additional collapse coverage form. *Id.,* at *2. The *Johnson Properties* Court agreed that "general exclusions listed in the Policy do not modify or qualify the additional collapse coverage."  *Id.*, at *15. It concluded

that to find the general water exclusion applied regardless of the additional "give back" coverages would effectively nullify the additional coverage for the collapse.  *Id.*

The Court rejected the argument from the insurer, and instead adopted the result urged by Lead GHR, in this matter.  These two clauses can be read in harmony, but the general cannot override the specific.   Coverage given back cannot be limited by the general exclusions. Otherwise, what is actually given back?

In *Tabernacle-The New Testament Church v. State Farm Fire and Cas. Co.*, the Sixth Circuit Court of Appeals dealt with a similar case.  There, just as with *Ken Johnson Properties*, the Sixth Circuit found that the general exclusion for design defect cannot preclude coverage where an enumerated cause of loss is specifically extended by the policy.  616 Fed. Appx. 802, 812 (6th Cir. 2015).  That case additionally dealt with an insurer's definition of "decay" which will be discussed in Section III.

In light of the foregoing authority, the answer for this question is that the coverage under the additional collapse coverage supersedes the "anti-concurrent causation" clause. *See Ken Johnson Properties, LLC v. Harleysville Worcester Ins. Co.*, Civ. No. 12-1582, 2013 WL 5487444, * 15 (D. Minn. Sept. 30, 2013) (citations omitted). Thus, in the likely event that the jury finds that this collapse occurred due to decay, the additional collapse coverage then brings *in* coverage irrespective of the "anti-concurrent causation" language. *See id.*  Because the legal authority supports the conclusion that coverage "given back" through additional coverage forms is not still excluded by the general "anti-concurrent causation" language, this issue bearing on Defendant's duty is ripe for summary judgment.

### III. The Term "Decay" As Used In The Policy Is Not Limited To Organic Material.

Within the language of the additional collapse coverage a tertiary issue has arisen in light of Mr. Duckett's opinion which requires the Court to determine whether the term "decay" as used in the additional collapse coverage applies only to organic materials -- not inorganic materials like concrete and rebar.  As with the other issues presented, because this is an issue of contract interpretation, this is a matter for the Court, not the jury, to resolve. *Nelson v. Schellpfeffer*, 2003 S.D. 7, ¶ 7, 656 N.W.2d 740, 743.  Once again, Defendant is urging an interpretation which limits its promise to the insured without expressly stating it in the Policy.

Defendant has argued throughout this litigation that the terms "decay," as used in the additional collapse coverage *only* applies to "organic" material like wood, rather than "inorganic" material like concrete and iron. *See e.g. Oviatt Aff.*, Ex. E, ASIC 30(b)(6) Depo., 52:2-15.  Applying the "plain language rule" discussed above at length, the term "organic" does not appear anywhere within the plain language of the collapse coverage language.  It is, once again, an additional term offered by Defendant to minimize its promise to indemnify under the Policy.

On the other hand, Lead GHR contends that "decay" and "deteriorate" both mean the same thing -- to get worse over time. Neither the term "decay" nor "deteriorate" *require* the material undergoing the process to be organic. The definition of *decay* is "to decline from a sound or prosperous condition."[5] Merriam-Webster's Collegiate Dictionary, 11th Ed., *available at* https://www.merriam-webster.com/dictionary/decay (last visited May 30, 2018). The definition of *deteriorate* is "to make inferior in quality or value," Merriam-Webster's Collegiate Dictionary, 11th Ed., *available at* https://www.merriam-webster.com/dictionary/deteriorate (last

---

[5] During its 30(b)(6) deposition, Defendant indicated that it was relying on "Webster's Dictionary" to interpret policy terms. Oviatt Aff., Ex. E, ASIC 30(b)(6) depo. 24:18-19.

visited May 30, 2018) or "to become progressively worse." ENGLISH OXFORD LIVING DICTIONARIES, https://en.oxforddictionaries.com/definition/deteriorate (last visited May 30, 2018). Although the Oxford Dictionary does include one definition exclusive to organic material, e.g. "to rot," it also defines "decay" more broadly to mean to "fall into disrepair; deteriorate." ENGLISH OXFORD LIVING DICTIONARIES, https://en.oxforddictionaries.com/definition/decay (last visited May 30, 2018). Critically, this definition of "decay" actually uses the word "deteriorate" *as a definition*. Clearly, these words are used synonymously in the plain and ordinary sense. The both mean the same thing, i.e. to get worse over time.

Mr. Duckett's testimony illustrates that the base of the retaining wall got worse over its twenty-year lifespan. *Oviatt Aff.*, Ex. C, Duckett Report. As a result of its reduced quality, it was susceptible to failing under loads it was designed to withstand. It was the reduced quality -- the decay and/or deterioration -- that cause the wall to fail, and not the load it was designed to withstand.

In the *Tabernacle* case cited above, the Sixth Circuit Court of Appeals discussed the term "decay" in the context of a similar policy provision at issue here. 616 Fed. Appx. 802, 810. There, the insurer was similarly asserting that the "decay" provision only applied to organic rot. *Id.* at 809. The Sixth Circuit discussed the definitions offered by both parties and used "decay" and "deterioration" interchangeably. *Id.* Its discussion throughout its analysis used "decay" and "deterioration" to define one another. *See e.g. Id.*, at 810 (describing decay as "'the deterioration of a matter from its normal state' or 'material degrading from its natural state'").

"Decay" and "deterioration" are synonymous. The definition of "decay" does not *require* an "organic" material. It merely contemplates that it may apply. Defendant is again attempting

to add contract terms after a loss has occurred.  Plaintiff respectfully requests the Court enter an order finding that the term "decay," as used in the additional collapse coverage, has no organic/inorganic element.  It simply means to get worse over time or to deteriorate matter from its normal state.  Defendant's "organic" arguments are, thus, not relevant to the issues to be presented to the jury, and should therefore, be resolved by this Motion. Summary judgment on this issue is appropriate.

## CONCLUSION

For the foregoing reasons, Lead GHR respectfully requests the Court enter an Order setting forth the scope of the enforceable promise made by Defendant pursuant to the terms of the Policy.  Lead GHR specifically requests such order identify the subject retaining wall is "covered property" under the Policy, and that the additional "collapse" coverage supersedes the general exclusions raised by Defendant.  Additionally, Plaintiff requests the Court enter an Order finding that the term "decay" as used in the additional "collapse" coverage applies to both organic and inorganic material.

Dated this 1st day of June, 2018.

GOODSELL QUINN, LLP
/s/   Nathan R. Oviatt_____
Nathan R. Oviatt
G. Verne Goodsell
GOODSELL QUINN, LLP
246 Founders Park Dr., Suite 201
P.O. Box 9249
Rapid City, SD 57709-9249
Tel:  (605) 343-3000

**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH DAKOTA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| LEAD GHR ENTERPRISES, INC. formerly d/b/a GOLDEN HILLS RESORT, | ) ) ) | Civ. 16-5026-JLV |
| Plaintiff, | ) ) | |
| v. | ) ) | **CERTIFICATE OF SERVICE** |
| AMERICAN STATES INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) ) | |

The undersigned hereby certifies that on June 1, 2018, he served a true and correct copy of the **PLAINTIFF'S MEMORANDUM OF LEGAL ISSUES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** by electronic filing through the South Dakota CM/ECF system, upon the following:

Jack H. Hieb
One Court Street
Post Office Box 1030
Aberdeen, SD  57402-1030
JHieb@rwwsh.com

Daniel W. Berglund
Patrick P. Jarosch
Grotefeld Hoffman Schleiter
Gordon, Ochoa & Evinger LLP
150 South Fifth Street, Suite 3650
Minneapolis, MN  55402
dberglund@ghlaw-llp.com
pjarosch@ghlaw-llp.com

BY: /s/ Nathan R. Oviatt
(Electronically Filed)