# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH DAKOTA
## WESTERN DIVISION

LEAD GHR ENTERPRISES, INC. formerly
d/b/a GOLDEN HILLS RESORT,

     Plaintiff,

     vs.

AMERICAN STATES INSURANCE
COMPANY

     Defendant.

Civil No.: 16-5026

---

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff's motion is titled one for "partial summary judgment," yet seeks no actual determination of any claim or defense.  Rather, it requests that the Court make certain coverage determinations, while it ignores facts and policy language necessary for the Court to fully determine whether such coverage actually triggers. Plaintiff's myopic approach to "summary judgment" is improper and should be denied for that reason alone.

In any event, Plaintiff cannot reasonably assert coverage exists because:

(1) The wall that collapsed was *not* attached to—and not "part of"—the covered "building";

(2) The loss was caused by a non-covered peril;

(3) Any coverage granted under the "Additional Coverage—Collapse" provision is subject to the Policy's exclusions and limitations; and

(4) Plaintiff's factual concessions confirm that the "Additional Coverage—Collapse" provision cannot apply.

Because Plaintiff fails to establish entitlement to partial summary judgment on any claim or defense, its motion fails as a matter of law.

# I.    MATERIAL FACTS

American States has previously detailed the facts giving rise to this lawsuit, and incorporates its prior statement of facts by reference. (Dkt. 43 at 2-16). For the purposes of responding to Plaintiff's motion, American States emphasizes the following:

## A.  The Property

American States agrees that Plaintiff once owned and operated a hotel in Lead, SD,[1] that the hotel was constructed "on a sloped and terraced site," and that a reinforced concrete retaining wall system is located to the southeast of the hotel. (Plaintiff's Brief at 3). But Plaintiff mischaracterizes this wall system as a *single* wall extending "southward, then eastward, away from the building." (*Id.*).  In reality, *three* walls exist: one twelve-foot wall extends south from the building, another 125-foot wall extends from east to west, and a third wall extends northeast and connects with a recreation center on an adjacent property.  (Ex. 4 at AMS-GHR000204, 211; Ex. 41 at 52:3-19).[2]

The retaining-wall system, as Plaintiff notes, supports a parking lot situated between the hotel and the recreation center.  (Plaintiff's Brief at 3; Ex. 4 at AMS-GHR0000203-04).  It does not, however, provide structural or foundational support for the hotel, (*e.g.,* Ex. 13 at 2; Ex. 27 at 55:14-22), and, contrary to Plaintiff's representations in its brief, the subject wall does not match the hotel's appearance.[3]  (*See, e.g.,* Ex. 15 at AMS-GHR0000571, 573).

---

[1] As previously noted, Lead GHR conveyed the property in 2014.  (Dkt. 43 at 2, n.1; Ex. 2).  And although Lead GHR now contends it retained the right to pursue this action, the agreement reflecting that "right" is dated May 2, 2018, some four years after the conveyance.  (Plaintiff's Ex. A).  Moreover, the State of South Dakota dissolved Lead GHR two days after the agreement became effective.  (Ex. 3).  It is therefore unclear whether Lead GHR *ever* had standing to bring this lawsuit, and whether it continues to do so after its dissolution. *See, e.g., Floerchinger v. Sioux Falls Gas Co.,* 5 N.W.2d 55, 55 (S.D. 1942) ("the power of a corporation to sue and to be sued is extinguished when it has been dissolved."); *Charles Brooks Co. v. Georgia-Pacific, LLC,* 552 F.3d 718, 722 (8th Cir. 2009); *Superior Seafoods, Inc. v. Hanft Fride, P.A.*, 2012 WL 2891118 (8th Cir. July 16, 2012).

[2] As used herein, all references to Exhibits 1-40 refer to the Declaration of Daniel W. Berglund filed June 1, 2018 (Dkt. 50). References to Exhibits 41-61 refer to the Declaration of Daniel W. Berglund, filed concurrently herewith.
[3] Plaintiff cites the deposition of Rory Maynard, the hotel's general manager, to contend the collapsed wall was "stuccoed and painted to match the rest of the hotel." (*See* Plaintiff's Brief at 7).  But photos of the remaining

### B.  The Failure

During the overnight from October 9 to 10, 2010,[4] between four and six inches of rain fell in Lead.  (Ex. 04 at AMS-GHR0000204; Ex. 12; Ex. 13 at 3 and Att. A; Ex. 14).  At some point during this deluge, approximately 80 of the 125 feet of the east-west retaining wall failed.  (Ex. 4 at AMS-GHR0000205).  The eighty-foot failed span was on the eastern edge of the wall, some 40 feet away from the north-south wall connected to the hotel structure.  (*Id.* at AMS-GHR0000205, 211, 216).  The north-south wall remained intact.  (Ex. 15 at AMS-GHR0000571; Ex. 27 at 39:3-13).

Rory Maynard, the hotel's general manager, informed Lead GHR's insurance agent of the loss, and the agent relayed the message to American States shortly before noon on October 11.  (Ex. 17 at AMS-GHR000506-07).  Lead GHR's agent reported the loss as a retaining-wall collapse caused by heavy rains.  (*Id.*, *see also* Ex. 12).

### C.  The Investigation

American States retained independent adjuster Chris Shopshear, who visited the site on October 18, 2010.  (Ex. 15 at AMS-GHR000564).  Shopshear confirmed the rain event at the time of the collapse, and told American States that the area "had so much rain over the past few weeks that the ground is just saturated."  (Ex. 17 at AMS-GHR000278).  American States then retained a structural engineering firm to further inspect the loss and independently determine its cause. (*Id.* at AMS-GHR000278-79).

---

portion of the wall at the time of the failure demonstrate this testimony is false.   (*See, e.g.,* Ex. 15 at AMS-GHR0000571, 573).  The still-standing north-south wall shared the paint color (but not the stucco) of the hotel, but the collapsed wall shared neither paint nor stucco.  (*Id.*).

[4] Defendant's initial brief indicated that the rain event occurred between October 10 and 11, 2010.  (Dkt. 43 at 9).  It actually occurred the overnight before, and Plaintiff reported the failure on October 11.  (Ex. 17 at AMS-GHR000506).

The inspection, conducted by Tim Strasser and David Teasdale of Haag Engineering, occurred on October 29, 2010 in the presence of Maynard and Alan Schreier, Lead GHR's retained engineer.  (Ex. 4 at AMS-GHR000203-04; Ex. 12).   This inspection lasted several hours, and included interviews, photography, and excavation of the collapsed wall. (Ex. 18 at 18:25-19:24; Ex. 4 at AMS-GHR000204-06).

Prior to receiving Haag's engineering report, American States adjuster Jonathan Lawlee also inspected the property on November 4, 2010.  (Ex. 17 at AMS-GHR000238).  According to Lawlee's notes:

> I inspected the wall that collapsed and there is not much of a question on what caused the wall to collapse. [T[he parking lot is sloped at about 8 degrees towards this wall. [Y]ou can see the washed out dirt and where the water has entered the building.
>
> I have also inspected the interior of the building and there is an interior tunnel that has water damage. You can see where the ground water is entering the building. [A]lso the elevator shaft had water in it. You can also see where ground water entered into this portion of the building also.
>
> I explained to the insured that there is no coverage for damaged [sic] caused by groundwater and there is no coverage for retaining walls under his policy. The insured explained to me that he shops his policy every year. [H]e has no idea if the retaining walls were covered under any of the other policies.
>
> ***
>
> I left it with the insured that I would await the engineer report and then make a decision on coverage then.

(*Id.*)

The Haag report came later in the month, and concluded that increased lateral pressure from soil over-saturation caused the wall collapse.  (Ex. 04 at AMS-GHR000207).  The report also noted that the "weep holes" (drainage pipes installed into the wall's base to allow water from behind the wall to drain) were clogged with soil, which allowed water (and pressure) to

accumulate.  (*Id.*).  The inspection also concluded there was no physical damage to the hotel related to the retaining-wall collapse.  (*Id.* at AMS-GHR000208).

### D.  The Denial

Based upon (1) the conclusions of the Haag report, (2) the insured's representations, and (3) the two inspections performed by Shopshear and Lawlee, American States formally denied the claim on December 1, 2010.  (Ex. 19).  In its denial letter, American States determined:

(1) Because the collapsed wall span was not connected to, and did not provide structural or foundational support for, the hotel, American States did not consider the wall "part of the building."  (*Id.* at AMS-GHR000189).

(2) The loss was caused by several excluded perils, including but not limited to water, earth movement, collapse, and negligent maintenance.  (*Id.* at AMS-GHR000189-191); and

(3) The "Additional Coverage—Collapse" section did not apply under the circumstances.  (*Id.* at AMS-GHR000191-193).

The letter concludes by stating that if Lead GHR is "aware of any additional information relevant to the loss," it should forward such information to American States. (*Id.* at AMS-GHR000193).  Lead GHR did not further communicate with American States or otherwise dispute the denial in the five years leading up to this lawsuit.  It *did*, however, further discuss the denial with its agent at Western Dakota Insurors and its retained engineer Al Schreier. In internal discussions, agents within Western Dakota Insurors confirmed the propriety of the denial:

> That's about what I expected. Retaining walls aren't covered unless attached to a building or specifically added on. Then you have the problem of flood and earthquake exclusion wording. I don't see much hope to change their minds.

(Ex. 23).  Lead GHR's retained engineer Al Schreier also reviewed the denial and agreed that the Haag engineers' causation finding—that is, "excessive groundwater in the soil exceeding the drainage capacity of the soils and drainage systems of the wall"—was "basically accurate in my opinion."  (Ex. 24 at 1).  And in his deposition, Schreier agreed that although additional testing

*could* have been performed, he would not have done so given the most likely cause of failure. (Ex. 25 at 60:4-9).

## II.    ARGUMENT

### A.  Legal Standard

Under Fed. R. Civ. P. 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." A movant is only entitled to summary judgment if the movant can "show that there is no genuine issue as to any material fact and that [the movant] is entitled to judgment as a matter of law." *Id.*

In considering summary judgment, all facts and inferences are viewed in the light most favorable to the nonmoving party, and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. *See id.; Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). *Matsushita* was further addressed by the Supreme Court in *Eastman Kodak Co. v. Image Technical Services, Inc.*, where the Court said, "*Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury." 504 U.S. 451, 468 (1992). "Summary judgment will not lie...if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 468 n. 14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether a genuine issue of material fact exists, the court views the evidence presented based upon which party has the burden of proof under the underlying substantive law. *See Talkington v. American Colloid Co.*, 767 F.Supp. 1495, 1497 (D.S.D. 1991) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).

In coverage disputes, it is Plaintiff's burden to establish that coverage exists.  *Ins. Co. of North America v. Schultz*, 441 N.W.2d 686, 689 (S.D. 1989); *Pentair, Inc. v. Am. Guarantee and Liability Ins. Co.,* 400 F.3d 613, 615 (8th Cir. 2005); *Modern Equipment Co. v. Continental*

*Western Ins. Co.*, 355 F.3d 1125, 1128 (8th Cir. 2004).  Once established, the burden shifts to the Defendant to establish the applicability of a policy exclusion. *Pentair,* 400 F.3d at 615-16. The burden then shifts *back* to the Plaintiff to establish a policy "give back" if an exclusion applies. *Modern Equipment,* 355 F.3d at 1128.

### B.  Plaintiff's Motion Fails to Seek Summary Judgment

As an initial matter, Plaintiff's title of this motion as one for "partial summary judgment" is a misnomer. Fed. R. Civ. P. 56(a) requires the motion identify "each claim or defense – or the part of each claim or defense – on which summary judgment is sought." Rather than identifying any claim or defense (or part of a claim or defense) that its motion seeks to resolve dispositively, Plaintiff instead acknowledges that the motion does not seek to resolve *any* pending allegations in this lawsuit.  (Plaintiff's Brief at 2).

Federal courts deny summary judgment if a motion fails to identify a specific claim or defense that the movant wishes the Court to dismiss.  *Weinstock v. MDTV Med. News, Inc.*, 2007 WL 433238 (S.D. Cal. Jan. 25, 2007) (summary judgment denied for movant's failure to "identify the required elements or prongs for the claims on which he seeks summary judgment."); *S.E.C. v. Capital Holdings, L.L.C.*, 2006 WL 1660541 (D. Colo. June 12, 2006) (summary judgment denied for failure to "identify any of the claims or defenses as to which he seeks summary judgment.")  Here, Plaintiff's motion does not identify a single cause of action of which the motion will dispose, and any rulings on this motion would not dispose of any "claim or defense or part of a claim or defense." As such, to the extent this motion fails to seek "summary judgment" on any claim or defense, it fails outright.

### C.  The Policy Does Not Cover Plaintiff's Loss

Even if not procedurally improper, Plaintiff's motion fails for any number of policy-based reasons.  First, Plaintiff cannot establish as a matter of law that the subject wall was "part

of" the hotel.   Second, Plaintiff concedes that perils subject to the anti-concurrent causation clause caused or contributed to the failure, thus precluding coverage even if the wall *was* "part of" the building. Finally, Plaintiff has failed to meet its burden to establish that the "Additional Coverage—Collapse" provision applies.

### 1.   The Wall Was Not "Part of the Building."

Plaintiff asserts that American States, in contending the wall provided no structural support for the building, has added "hidden conditions" to the Policy to conclude the wall is not "part of" the building.[5]   (Plaintiff's Brief at 8).   But Plaintiff's argument does not tell the full story; although true American States denied coverage because the retaining wall provided no structural support for the hotel, coverage also does not exist because the collapsed wall is not attached to the building.   Further, notwithstanding Plaintiffs contentions, coverage is not extended merely because the wall's purpose (that is, to support an adjacent parking lot) was "essential to the building's *function*."   This strained interpretation of the Policy must be rejected.

### a.   The Collapsed Wall Was Not Physically Attached To the Building.

Regardless of Plaintiff's repeated assertions, the wall that collapsed *was not attached to the building*.   Instead, it was connected to another twelve-foot wall that did *not* collapse, and remains in place to this day.   (Ex. 4 at AMS-GHR000203; Ex. 15 at AMS-GHR0000571; Ex. 27 at 39:3-13).   To suggest that a *single* wall extended "southward, then eastward, away from the building" is equivalent to suggesting that the four walls of any given room are instead *one* wall that "extends twenty feet in one direction, turns 90 degrees and extends another twenty feet

---

[5] Plaintiff's reference to the prior lawsuit to contend that *this* denial was a breach of contract is a clear attempt to improperly persuade the Court with "other acts" evidence.  (Plaintiff's Brief at 8).  The hail denial involved different adjusters from different offices, and the two claims were handled separately.  (*See* Exs. 19-21).  If the Court *was* to consider hail-claim conduct, it should also note that Plaintiff repeatedly challenged the propriety of the hail-claim denial, but never once challenged the denial here, even though the hail loss occurred *before* this claim and the hail denial occurred *after*. (Exs. 20-21; Ex. 22 at 9:5-21; Ex. 40 at 68:14-69:20).  As noted above, *everyone* agreed on the wall failure's cause at the time of the loss, so no dispute existed. (Ex. 4 at AMS-GHR0000207; Ex. 12; Ex. 15 at AMS-GHR0000565; Ex. 17 at AMS-GHR000238, 506; Ex. 24; Ex. 50 at 8:10-18).

before turning 90 degrees again and extending twenty feet and turning 90 degrees one last time and extending another twenty feet." Such an argument, of course, is nonsense. These were three separate walls comprising a retaining wall *system* that supported a parking lot adjacent to the hotel. (Ex. 4 at AMS-GHR0000211). To accept that the entire wall *system* is "part of the hotel" merely because one edge of it is attached to the hotel would be to accept that the wall is also an insurable "part of" the adjacent rec center, or even that the rec center is "part of" the hotel because both are connected to ends of the retaining-wall system. No logical reading of the policy would support such outcomes. *Rumpza v. Donalar Enters., Inc.*, 1998 S.D. 79, ¶ 12, 581 N.W.2d 517, 521 (a court may not "seek out a strained or unusual meaning for the benefit of the insured") (*quoting Olson v. U.S. Fid. & Guar. Co.,* 1996 S.D. 66, ¶ 6, 549 N.W.2d 199, 200).

### b.  "Attached To" Is Not Synonymous With "Part Of."

Even accepting Plaintiff's strained argument that the wall is circuitously attached to the hotel because of its attachment to another wall that is attached to the hotel, "attachment" in and of itself does not by definition make the attached item "part of" the item to which it is attached. Using the Oxford Living Dictionaries cited by Plaintiff, attached means "joined, fastened, or connected to something." (Ex. 42). By contrast, Plaintiff's cited definition of "part" requires the "amount or section" to, "when combined with others make up the *whole* of something." (Plaintiff's Brief at 6); (Ex. 43).

Thus, something can be *attached* to something without being "part" of it. A staple does not become paper when it becomes fastened to it. And in the context of a building, which is defined by that same dictionary as "[a] structure with a roof and walls, such as a house or factory," the hotel is still a whole "building"—a structure with a roof and walls—without the adjacent retaining wall. (Ex. 44). In fact, even in its briefing, Plaintiff contends that the wall

"extends southward, then eastward, *away from the building*." (Plaintiff's Brief at 3).  If the wall was *part* of the building, it could not extend *away* from it but would instead be integral to it.[6]

### c.  The wall did not provide structural support.

Because "attachment" is not the proper litmus test to determine whether something is "part of the building" under the Policy—and because the wall was not attached to the building in any event—the question then turns to whether the wall is actually "*part of* the building" in any reasonable sense.  Applying the standard definition of "part" as "an essential portion or integral element," (Ex. 31), American States considered whether the wall should be considered "integral" to the building by providing some form of structural or foundational support for it.  American States concluded, based upon its investigation, that the wall provided no such support.  (Ex. 19 at AMS-GHR000189).  And Plaintiff does not contend otherwise, conceding in its brief that it the "wall and building do not share footings," (Plaintiff's Brief at 7), and conceding elsewhere that it provided no other structural support.[7] (*e.g.,* Ex. 27 at 53:7-11; 113:24-114:1).

Those concessions belie Plaintiff's current contention that "[i]f this retaining wall does not meet the definition of 'part of' a building,' no retaining wall could."  (Plaintiff's Brief at 6).  In reality, based on the standard definition of "part," retaining walls *are* considered part of property when they provide foundational or structural support for the building itself.  This wall

---

[6] Plaintiff also fails to note that its Oxford citation continues by defining "part" as "[a]n element or constituent that is essential to the nature of something."  (Ex. 43).  As further described in Defendant's summary judgment brief, at least one federal court applied a comparable definition to reject a similar argument to that made by Plaintiff here. (Dkt. 43 at 19-20) (*citing Ass'n of Unit Owners of Nestani v. State Farm Fire and Cas. Co.*, 670 F.Supp.2d 1156 (D. Or. 2009)).

[7] Although Plaintiff does not dispute Defendant's position on this issue, it contends its adjuster's conclusion is not credible because he lacks an engineering background.  (Plaintiff's Brief at 10). But in this case, no such background was necessary.  The adjuster visited the scene and witnessed the wall first-hand. (Ex. 17 at AMS-GHR0000238).  He saw that the wall collapse occurred more than 40 feet away from the building.  He saw that the north-south section actually attached to the building did *not* fail.  It was clear from what he saw, based upon his professional experience, that because the collapsed wall was located where it was, it did not provide structural support for the hotel, and its failure did not affect the building's structural integrity.  (*See id.; see also* Ex. 45 at 63:21-66:19; Ex. 41 at 52:3-19). Those findings, whether based on engineering or "common sense" (to borrow Plaintiff's term) are not genuinely disputed in this lawsuit.  (Ex. 4 at AMS-GHR000203-04; Ex. 27 at 53:7-11; 113:24-114:1; Ex. 13 at 2).

did not do that, as Plaintiff concedes. (Plaintiff's Brief at 7; Ex. 27 at 53:7-11; 113:24-114:1). Instead, if anything, it provided structural support for the parking lot, which is not covered property under the policy. (Ex. 5 at AMS-GHR000040).[8]

### d. Whether the Wall is "Essential to the *Function*" of the Building's Parking Lot Does Not Make it "Part of the Building."

Because the wall is neither attached to nor part of the actual building, Plaintiff alternatively contends that the wall is essential to the *function* of the building because it supports the property's parking lot, and the terrain and *perhaps* city ordinances would require a retaining wall to provide the requisite parking spaces for the hotel's business. (Plaintiff's Brief at 7). This is, of course, a curious argument given that it relies on policy language that does not exist, and Plaintiff contends elsewhere that a party should not read into or enforce hidden terms into the Policy. (*Id.* at 8).

The Policy does not cover property that assists in the *function* of the building. It covers the building. (Ex. 5 at AMS-GHR000039). And with respect to retaining walls, only retaining walls that are "*part of the building*" are covered, and no coverage exists for those that are not. (Ex. 5 at AMS-GHR000040). Because Plaintiff acknowledges that parking lots are expressly excluded, it cannot reasonably argue that because parking lots support the *function* of the business, a wall providing structural support for that parking lot is somehow covered when the parking lot is not.[9] (*Id.*; Ex. 9 at 31:9-20). To strain the Policy language that far would be to suggest that *any* retaining wall on a given commercial property should be covered because it is at

---

[8] Plaintiff suggests "there is no way for an insured to know" a retaining wall such as this is not covered prior to suffering a loss. (Plaintiff's Brief at 4). But Plaintiff never read the Policy prior to the failure, and was unaware of what coverage it provided. (Ex. 46 at 34:6-25). If it did, it would have seen the Policy's express treatment of retaining walls as "not part of the building." (Ex. 5 at AMS-GHR000040). If questions arose, Plaintiff could have sought guidance from its retained insurance agent, who was aware that retaining walls are generally not covered. (Ex. 47 at 31:6-32:17). That same agency recognized after the failure that American States was correct to deny the loss. (Ex. 23). If Maynard expressly told the agent that he wished to have the wall system covered, forms exist that could have extended such coverage. (Exs. 6, 7). But his agent did not seek such coverage. (Ex. 47 at 22:11-25:12).

[9] In fact, Lead GHR's corporate representative testified that he did not believe the parking lot was part of the building. (Ex. 48 at 26:18-27:4).

11

least arguably "essential to" a business's function.  The Court should not torture the plain language of the Policy to find coverage where none exists.  *Rumpza,* 1998 S.D. 79, ¶ 12, 581 N.W.2d at 521; *see also O'Neill v. Blue Cross of W. Iowa & S.D.,* 366 N.W.2d 816, 818 (S.D.1985) ("The terms of an unambiguous insurance policy cannot be enlarged or diminished by judicial construction").

In any event, Plaintiff has failed to put forward any actual evidence to support its contention that the wall is "essential to the [building's] function."  (Plaintiff's Brief at 7).  Plaintiff concedes the hotel's structure was not impacted by the wall's collapse.  (*e.g.,* Ex. 25 at 58:16-19; Ex. 27 at 55:14-22).  Plaintiff has presented no evidence that the handful of parking spaces lost by the collapse measurably affected its business.  In fact, Plaintiff concedes the hotel's operations were *unaffected* by the wall's collapse.  (Ex. 1 at 34:13-15; Ex. 16 at 43:6-7; Ex. 40 at 72:14-24).  Plaintiff's cited expert for this proposition has since acknowledged that he is unaware of any city, state or other codes the hotel currently violates without the wall in place.  (Ex. 27 at 56:16-57:14, 130:7-16).   The fact that the hotel became a Days Inn franchise and continued to operate for *years* after the wall's collapse—and without its replacement—demonstrates it was not "essential" to the building's function.  (Ex. 40 at 72:25-73:2).

Thus, contrary to Plaintiff's unsupported arguments, the wall was not "essential to the function" of the building. And as such, Plaintiff cannot meet its burden to establish the loss involved "Covered Property" as defined by the Policy.  Its motion, therefore, fails even this most basic test.

## 2.   The Loss Was Caused By an Excluded Peril.

Even accepting *arguendo* Plaintiff's argument that the retaining wall is "part of the building," Plaintiff concedes that heavy rain caused or contributed to the wall's failure. (Ex. 27 at 88:15-25; 106:25-107:16; Ex. 32 at 3).  In fact, *all* contemporaneous accounts of the loss—

whether from the insured, the engineers retained by the insured, the engineers retained by the insurer, the adjusters on site, or even outside observers—stated the wall failed because of the rain event. (*E.g.,* Ex. 4 at AMS-GHR0000207; Ex. 12; Ex. 14; Ex. 15 at AMS-GHR0000565; Ex. 17 at AMS-GHR0000238, 506, Ex. 24).  As noted extensively in Defendant's summary judgment brief, not only are the perils of water and earth movement excluded, those exclusions are subject to an "anti-concurrent causation" provision:

**B. Exclusions**

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

\*\*\*

**b.**      **Earth movement**

\*\*\*

(4)      Earth sinking other than sinkhole collapse, rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of Realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

**g.**      **Water**

\*\*\*

4.      Water under the ground surface pressing on, or flowing or seeping through:

a.   foundations, walls, floors or paved surfaces

This exclusion applies regardless of whether any of the above…is caused by an act of nature or is otherwise caused.  An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.[10]

_____

[10] The Water exclusion was modified by endorsement to emphasize that it applies regardless of natural or man-made cause.  (Ex. 05 at AMS-GHR000038). The key language of the exclusion, however, is identical to the original form in that any loss caused by groundwater pressing on walls is excluded under the policy.  (*Id.* at AMS-GHR000071).

***

(Ex. 5 at AMS 000070-71; AMS-GHR000038).  In other words, if water causes or contributes to any failure *in any sequence*, the failure is not covered regardless of whether any other peril caused or contributed to the failure.  (*Id.*)  This Court has determined that such a provision is enforceable under South Dakota law, and Plaintiff does not dispute its general enforceability. (Plaintiff's Brief at 14) (*citing Swenson v. State Farm Fire and Cas. Co.*, 891 F.Supp.2d 1101, 1109 (D.S.D. 2012)).

Here, Plaintiff's witnesses affirmatively asserted that the heavy rainfall caused the failure. (Ex. 17 at AMS-GHR0000506; Ex. 12).  Plaintiff's retained consulting engineer agreed. (Ex. 24). Defendant's retained consulting engineers agreed.  (Ex. 4).  Defendant's adjusters agreed.  (Ex. 15 at AMS-GHR000565; Ex. 17 at AMS-GHR0000238).   And even though Plaintiff now contends that *decay* was the proximate cause of the failure, its testifying expert concedes that the rain *contributed* to the failure.  (Ex. 27 at 88:15-25).  There is no genuine dispute, then, that the water exclusion applies *if* the retaining wall was Covered Property (which it is not, as outlined in Section II.C.1, *supra*).

### 3.   The Anti-Concurrent Causation Provision Applies.

Because the Policy's plain language excludes coverage under the anti-concurrent clause, Plaintiff instead asserts the clause is "superseded" because of the Policy's "give-back" for "Additional Coverage—Collapse." (Plaintiff's Brief at 14-18).  But this Policy's "give back" is more limited and defined than Plaintiff suggests. Indeed, the Policy provides the "Additional Coverage," but in so doing qualifies it by expressly including it as a "Covered Cause of Loss." (Ex. 5 at AMS-GHR000075).  "Covered Cause of Loss" is a term defined in Section A of the "Causes of Loss—Special Form":

14

### A. Covered Causes Of Loss

Covered causes of Loss means Risks Of Direct Physical Loss unless the loss is:

1. Excluded in Section **B., Exclusions**; or

2. Limited in Section **C., Limitations**;

that follow.

(Ex. 5 at AMS-GHR000070).  In other words, rather than "giving back" *unqualified* coverage for collapse, the Policy instead "gives back" limited collapse coverage subject to the same exclusions and limitations as other Covered Causes of Loss.[11]  (*Id.* at AMS-GHR000070, 75). And thus, if water or earth movement caused or contributed to the loss, the anti-concurrent causation provision still acts to preclude coverage.  *See, e.g., Coney Island Auto Parts Unlimited, Inc. v. Charter Oak Fire Ins. Co.*, 619 Fed. Appx. 28 (2d Cir. 2015) (collapse "give back" does not prevent application of the earth-movement exclusion due to the policy's anti-concurrent causation provision).

This qualification distinguishes this "additional coverage" from the analyses of the courts cited by Plaintiff.  (Plaintiff's Brief at 14-15).  In those cases, all unpublished, the "additional coverage" did not involve any excluded perils subject to an anti-concurrent causation provision. For example, in *State Auto Mut. Ins. Co. v. RHL, Inc.,* 2010 WL 909073 (W.D. Tenn. March 12, 2010), the "Additional Coverage for Collapse" was not considered a "Covered Cause of Loss," and therefore not subject to exclusions and limitations of a "Covered Cause of Loss."  (*Compare* 2010 WL 909073 at *3, *to* Ex. 5 at AMS-GHR000070, 75).[12]   And in determining that the

---

[11] This Court should give little weight to the self-serving testimony of Terry Caudill, cited by Plaintiff in support of its position.  (Plaintiff's Brief at 15-16).  This testimony has no legal support, and conflicts with Plaintiff's expert. (Ex. 9 at 44:10-13; 45:6-25).  It also conflicts with the findings of Caudill's insurance agency at the time, which agreed with the denial.  (Ex. 23).

[12] Moreover, the additional coverage provision in *RHL* covered collapse caused by a "specified cause of loss," which by its terms included "water damage," thus contradicting (and thus overriding) the water exclusion. (*Id.*) Plaintiff

"general exclusions listed in the policy do not modify or qualify the additional collapse coverage," *Id.* at *12, the *RHL* court relied on another case cited by Plaintiff, *Pak v. Alea London Ltd.,* 2009 WL 2366549 (M.D. Penn. July 30, 2009).

*Pak* involved a similar policy form to that at issue here, but did not involve any perils subject to the anti-concurrent causation clause. *Id.* at *3. Rather, the parties agreed that the Defendants' cited exclusions—decay, deterioration, water seepage, and collapse—would not apply if the Plaintiff could demonstrate that latent decay proximately caused the collapse. *Id.* at *7. The dispute instead was whether Plaintiffs had met their burden of proving the collapse "give back" had been triggered. *Id.*

Interestingly, although the anti-concurrent causation provision was not at issue in *Pak*, the court raised it in a footnote:

> Defendants spend considerable time in their brief discussing section B.1. Section B.1 states: "We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss." This introductory language is followed by eight specific exclusions not at issue in this case. Section B.2 states: "We will not pay for loss of damage caused by or resulting from any of the following" Conspicuously absent from this section is the modifying language contained in section B.1 stating that "[s]uch loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss." It is unclear from Defendants brief why they spent so much time discussing the B.1 language related to concurrent causes of loss when that language is not contained in section B.2., and all of the stated bases for their denial of coverage are contained in section B.2. ***The court will not read this additional condition into section B.2, and assumes that the parties intended for there to be stricter standards for B.1 exclusions than B.2 exclusions.***

---

alleges here that "the general cannot overrule the specific," (Plaintiff's Brief at 14, 18) but that principle only applies when policy terms conflict. *See e.g., Grinnell Mutual Reins. Co. v. Schweiger*, 685 F.3d 697, 701 (8th Cir. 2012). There is no such conflict here, as the additional collapse coverage does not include a "give back" for damage caused by water or earth movement.

*Id.* at *3, n.3 (*citations omitted, emphasis added*).  In other words, *Pak* did not determine that the exclusions subject to the anti-concurrent causation clause were "superseded," as Plaintiff now contends. (Plaintiff's Brief at 18).  Rather, the exclusions of section B.1 at issue in *this* case were simply not at issue in *Pak*.  *Pak,* 2009 WL 2366549 at * 3, n.3.  And *Pak*'s footnote addressing the anti-concurrent causation clause demonstrates that if the listed exclusions subject to the anti-concurrent causation clause *were* involved, as two are here, the court would have treated the dispute differently.  *Id.*

*Tabernacle-The New Testament Church v. State Farm Fire and Casualty Co*., 616 Fed. Appx. 802 (6th Cir.) reaches similar results. In that case, several potentially applicable exclusions were at issue, but none involved an anti-concurrent causation clause.  *Id.* at 804.  And contrary to Plaintiff's argument here, the court concluded that the "give back" *was* subject to the policy's general exclusions, but determined that the "give back," to the extent its extended coverage conflicted with them, "clearly negates *aspects* of those general exclusions."  616 Fed. Appx. 802, 811 (6th Cir. 2015) (emphasis added).

Plaintiff's reliance on *Ken Johnson Properties, LLC v. Harleysville Worcester Ins. Co*, 2013 WL 5487444 (D. Minn., Sept. 30, 2013), is particularly misplaced.  In that case, there was no dispute about causation: a drain backed up on the roof of the building, which allowed water to pool to the extent the water's weight caused the ceiling of several upper-floor apartments to collapse, which in turn led the City of St. Paul to condemn one of the apartments.  *Id.* at *3, *11. The Harleysville standard form *initially* contained an express exclusion for "[w]ater that backs up or overflows from a sewer, drain, or sump" subject to an anti-concurrent causation clause.  *Id.* at *2.  But in the policy's Water Endorsement, Harleysville "explicitly delete[d]" the exclusion, and instead expressly covered the peril.  *Id.*  And because the Water Endorsement amended the coverage, there was no longer an excluded peril subject to the anti-concurrent causation clause

the Court needed to consider when determining whether the "Additional Coverage—Collapse" provision was *also* triggered for "[w]eight of rain that collects on a roof." *Id.* at *13. In other words, the Water Endorsement changed the scope of coverage to eliminate the exclusion for the peril that actually occurred, thus also eliminating any potential applicability of the corresponding anti-concurrent causation clause. The "give back" did not "supersede" the anti-concurrent causation clause, as Plaintiff contends.

Here, both the Policy's language and its application to this loss are different. Water indisputably contributed to the retaining wall's failure, but unlike *Ken Johnson Properties,* the Water Endorsement in this case did not remove or limit the scope of the anti-concurrent causation provision. (Compare Ex. 5 at AMS-GHR000070 to AMS-GHR000038). Rather, the endorsement clarifies that the exclusion applies whether the peril was natural or man-made. (*Id.*). And as such, because "water" remains subject to the anti-concurrent causation clause, Plaintiff's contention that an *additional* cause of loss contributed to the failure (regardless of the merits of such a contention, *see* Section II.C.4.b, *infra*) does not affect the enforceability of the anti-concurrent causation clause. (Ex. 5 at AMS-GHR000070). And as such, regardless of whether "decay" contributed to the wall's failure, the fact that water did as well precludes coverage under the express terms of the policy.[13]  *See, e.g., Wurst v. State Farm Fire and Cas. Co.*, 431 F.Supp.2d 501, 505-06 (D.N.J. 2006) (finding water exclusion applied, and "the possibility that other conditions, namely decay and snow load, also contributed to the loss does

---

[13] Plaintiff suggests the anti-concurrent causation clause would "nullify" the "give back" if applied. (Plaintiff's Brief at 17-18). In reality, however, the anti-concurrent causation clause only applies to the perils specifically articulated in Section B.1 of the Policy, such as water and earth movement. (Ex. 5 at AMS-GHR000070-72). The anti-concurrent causation clause does not apply to other exclusions applicable to this loss, such as collapse, negligent maintenance, weather conditions, decay, deterioration and wear and tear. (*Id.* at AMS-GHR000072-75); *see also Pak*, 2009 WL 2366549 at *3, n.3. Thus, a "collapse" (as defined in the Policy) *not* involving water or earth movement would be covered if it is proximately caused by one of the perils specifically articulated in Section D of the "Special Risk" form. (*Id.* at AMS-GHR000075). But here, because the loss involved water and earth movement, no coverage exists regardless of other contributing perils. (*Id.* at AMS-GHR000070-71); *Coney Island Auto Parts*, 619 Fed. Appx. 28 at *30.

not preclude application of the policy's exclusions"); *Amherst Country Club, Inc. v. Harleysville Worcester Ins. Co.*, 561 F.Supp.2d 138 (D.N.H. 2008) (applying similar anti-concurrent-causation language to hold that because water and earth movement contributed to loss, exclusions applied regardless of other causes); *see also Provencal, LLC v. Tower Ins. Co. of New York*, 30 N.Y.S.3d 138 (N.Y. App. Div. 2016) (applying water exclusion to rain-related retaining wall collapse).

In short, policies must be read as a whole. *Heitmann v. Am. Family Mut. Ins. Co*., 2016 S.D. 51, ¶ 12, 883 N.W.2d 506, 509-510.   And the general provisions of a policy are not abrogated, waived, limited or modified by a "give-back" unless expressly stated therein that such provisions are substituted for those in the body of the policy, or unless the provisions in the policy conflict with the "give-back."  *See North Star Mut. Ins. v. Korzan*, 2015 S.D. 97, ¶ 26, 873 N.W.2d 57, 64 (*citing Pete Lien & Sons, Inc. v. First Am. Title Ins. Co.*, 478 N.W.2d 824, 827 (S.D.1991)).   Here, reading the policy as a whole, the "Additional Coverage—Collapse" is subject to the Policy's exclusions by the Policy's express treatment of the "additional coverage" as a "Covered Cause of Loss."[14] And since the anti-concurrent provision applies to the perils articulated in Section B.1, losses where water caused or contributed to the loss are not covered.

### 4.  The "Additional Coverage—Collapse" Provision Does Not Apply.

Even ignoring that (1) Plaintiff has not established that the retaining wall is covered property, (2) water and earth movement caused or contributed to the loss, and (3) the anti-concurrent causation clause applies, Plaintiff cannot meet its burden to establish that the "Additional Coverage—Collapse" provision is triggered.  Under the Policy:

---

[14] Plaintiff cites the ASIC corporate-designee deposition to suggest that Defendant concedes the give-back applies without consideration of the exclusions. (Plaintiff's Brief at 15).  In reality, the cited testimony refers to the "collapse" exclusion, *not* the water and earth movement exclusions subject to the anti-concurrent causation provision. (Ex. 49 at 58:2-60:22). With respect to water and earth movement, the ASIC corporate designee testified that any "Additional Coverage—Collapse" coverage would still be subject to those exclusions. (*Id*. at 160:1-161:2).

**D. Additional Coverage – Collapse**

The term Covered Cause of Loss includes the Additional Coverage – Collapse as described and limited in **D.1.** through **D.5**. below.

1. With respect to buildings:

a.     Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose;

b.     A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse;

c.     A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building;

d.     A building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

2.     We will pay for direct physical loss or damage to covered property, caused by collapse of a building or any part of a building that is insured under this coverage form or that contains covered property insured under this coverage form, if the collapse is caused by one or more of the following:

***

b.     Decay that is hidden from view, and less the presence of such decay is known to an insured prior to collapse;

(Ex. 05 at AMS-GHR000075).  In other words, decay is not covered under this provision *unless* latent decay causes collapse to a building or part of the building so that it *cannot be occupied for its intended purpose*.  (*Id.*).  The facts here do not trigger this provision.

### a.   The Building Can Still Be "Occupied for Its Intended Purpose."

There is no genuine dispute that the "building" described in the Policy is the "hotel."  (*Id.* at AMS-GHR000013, 39).  There is also no genuine dispute that the hotel was not damaged by

the incident.  (Ex. 4 at AMS-GHR0000208; Ex. 16 at 43:6-7; Ex. 25 at 58:16-19; Ex. 27 at 55:14-17).  Further, there is no dispute that the hotel could continue to be used after the collapse, and the wall collapse had no impact on the day-to-day operations of the hotel.  (Ex. 1 at 34:13-15; Ex. 16 at 43:6-7; Ex. 40 at 72:14-72:25).  In fact, the hotel did not become a Days Inn franchise until *after* the wall collapsed, and operated for years afterward without the wall. (Ex. 40 at 72:25-73:2).

In other words, the building described in the Policy (the hotel) could still be—and was—"occupied for its intended purpose" after the retaining wall failure.  And as such, because "collapse" as defined under the "Additional Coverage—Collapse" provision requires that collapse occur in a manner in which the building or part of the building "cannot be occupied for its intended purpose," (Ex. 05 at AMS-GHR000075), no "collapse" occurred that would trigger the provision's application.

### b.  There Is No Legitimate Evidence of "Decay."

Moreover, as further detailed in Defendant's motion to exclude the testimony of Mark Duckett, Plaintiff has produced no competent evidence that "decay" occurred.  (Dkt. 49).  First, the assertion derives exclusively from the findings of an "expert" who was retained five years after the loss (Ex. 27 at 7:13-19), who visited the site after the wall had been removed (*Id.* at 10:11-17, 37:23-38:4), and who did not perform any metallurgical or concrete testing, or any reverse engineering to determine the strength of the wall. (*Id.* at 45:10-47:13; 78:8-23).  Instead, relying on weather data from a different city (and without making any substantive effort to investigate actual rain amounts in Lead), this "expert" concluded that "decay" instead of rain caused of loss.  (Ex. 32 at 5; Ex. 27 at 106:25-107:9). This conclusion, contrary to the

observations of all actual witnesses and without evidentiary support, does not create a disputed issue of fact worthy of summary-judgment consideration.[15]

Plaintiff's expert also makes no effort to distinguish between "decay" and "deterioration," concluding that decay *or* deterioration led to the wall's failure. (*Id.*) But "decay" and "deterioration" are distinct terms under the policy. (*E.g.*, Ex. 05 at AMS-GHR000072). Since the terms are distinguished elsewhere in the policy, reading the policy as a whole, the doctrine of *expressio unius est exclusio alterius* (the expression of one thing is the exclusion of another) should apply. *See Haman v. First Nat'l Bank in Sioux Falls*, 115 N.W.2d 883, 887 ("ancient rule" applies to contracts as well as statutes). Further, since neither term is defined in the policy, the standard definition of each term should also apply. *Ass Kickin Ranch, LLC v. North Star Mut. Ins. Co.*, 2012 S.D. 73, ¶ 12, 822 N.W.2d 724, 727-28. Decay is more generally associated with organic material. (Ex. 10); *see also Tabernacle,* 616 Fed. Appx. at 809-811. Deterioration, however, is not. (Ex. 11).

In sum, it is Plaintiff's burden to re-establish coverage under the Policy's "give back." *Modern Equipment,* 355 F.3d at 1128. Because Plaintiff has not provided credible evidence that *decay* caused the loss, and because it conceded that the building could be "occupied for its intended purpose" after the retaining wall-failure, the "Additional Coverage—Collapse" provision cannot apply and its motion must fail.

---

[15] Plaintiff suggests in its brief that because the wall had not failed during prior weather events in the twenty years preceding the failure, the loss could *only* be attributable to latent decay. (Plaintiff's Brief at 4, 17). In so suggesting, Plaintiff puts forward no evidence of similar precipitation amounts or rates in Lead prior to this event, and acknowledges it made no such investigation. (Ex. 27 at 64:14-25, 91:11-92:15). Moreover, this suggestion ignores that the weep holes were clogged (thus preventing the rainwater behind the wall to flow out), but were not clogged throughout the life of the wall. (Ex. 4 at AMS-GHR0000207). It also ignores any possibility of progressive soil creep, and of the fact that no maintenance was performed over the walls' twenty-year life span. (Ex. 48 at 40:5-41:1).

### D.  **American States's Investigation of the Loss Was Reasonable And Proper.**

Finally, Plaintiff criticizes American States for not instructing its retained engineers to evaluate whether negligent workmanship led to latent "decay."  (Plaintiff's Brief at 8-12, 13). Setting aside for a moment that such a further evaluation would not lead to coverage in this instance (*see* Sections II.C.1-3, *supra*), Plaintiff's contentions ignore how this claim was investigated and coverage was determined.  The Haag engineers were asked to *independently* determine the cause of the loss, not to verify the findings of the independent adjuster.  (Ex. 49 at 80:2-14; 93:5-17; 97:16-23; Ex. 51 at 65:12-16).  They were not provided with policy coverage forms, and arrived at their conclusions without knowledge (or the undue influence) of whether the loss was covered or not.  (Ex. 49 at 105:14-20; 163:15-21; Ex. 51 at 74:19-75:3, 100:6-16; Ex. 52 at 44:2-45:13).  They concluded, after a lengthy inspection, that water-related lateral pressure against the wall caused the failure.[16]  (Ex. 4 at AMS-GHR0000207).  Only *after* the Haag engineers reached their conclusions did American States apply the policy to the findings of the investigation and determine no coverage existed.[17] (*See* Ex. 53; Ex. 19).  In other words, the causation determination was made *without consideration* of whether coverage exists, as a proper investigation should.[18]

Plaintiff contends that American States should have done more to direct the investigation based upon its policy form.  (Plaintiff's Brief at 13).  Instead of a completely independent

---

[16] Teasdale testified that if he had observed decay, his report would have included it.  (Ex. 51 at 65:2-11).

[17] Plaintiff contends that "Lawlee's assertion that retaining walls are not covered" led to a "narrowed" investigation. (Plaintiff's Brief at 12).  In reality, Lawlee's coverage determinations came at the *conclusion* of the investigation. (Ex. 53).  Lawlee did not limit the scope of the Haag inspection; in fact, his own site visit took place after the Haag inspection.  (Ex. 17 at AMS-GHR000238).  Further, Plaintiff's expert Brad Blumenthal does not contend that American States improperly directed or influenced the engineering investigation.  (Ex. 54 at 99:13-100:24).

[18] By contrast, Plaintiff's testifying expert was presented with the denial letter and the coverage issues, and his causation evaluation was clearly driven to find an *alternative* conclusion consistent with Plaintiff's theory of the case, regardless of the factual basis for it, rather than to independently evaluate the cause of the failure. *See, e.g., Fail-Safe, L.L.C. v. A.O. Smith Corp.,* 744 F.Supp.2d 870, 893-94 (E.D. Wis. 2010) (finding experts testimony inadmissible where expert "cherry picked" evidence that supported his opinion, made unsupported assumptions, and summarily dismissed contrary evidence).

investigation by a qualified expert, Plaintiff asserts that American States should have pressed for different conclusions based upon the initial observations of its independent adjuster. (*Id.*). This, of course, is an ironic argument, given that Plaintiff argues elsewhere that American States's adjuster was unqualified to render engineering opinions, while here it argues that the same adjuster should have deemed the engineering investigation insufficient.[19] (*Compare id.* at 10 *to id.* at 13).

It is an insurer's duty under South Dakota law to conduct a reasonable investigation. *Dakota, Minn. & Eastern R.R. Corp. v. Acuity*, 2009 S.D. 69, ¶ 19, 771 N.W.2d 623, 629-30. It is not an insurer's duty under South Dakota law to conduct a *perfect* investigation. *Lewison v. Western Nat. Mut. Ins. Co.*, 2014 WL 3573403 at *9 (D.S.D July 21, 2014). And an insurer need not explore *every* potential cause of loss, however unlikely, when the overwhelming evidence supports a single theory of causation. *See, e.g., Nunn v. State Farm Mutual Auto. Ins. Co.*, 729 F. Supp. 2d 801, 808 (N.D. Tex. 2010), subsequent determination, (Nov. 3, 2010) (in its investigation, "the insurer does not have a duty to leave no stone unturned").

Here, the Plaintiff reported the loss as resulting from heavy rains. (Ex. 17 at AMS-GHR000506; *see also* Ex. 12). The independent adjuster confirmed the Plaintiff's account. (Ex. 15 at AMS-GHR0000565; Ex. 17 at AMS-GHR00278). The two Haag engineers confirmed the loss was rain-related. (Ex. 4 at AMS-GHR0000207). The American States adjuster confirmed the loss was caused by rain. (Ex. 17 at AMS-GHR0000238). So too did *Plaintiff's* engineer at that time, who also indicated that he would not have performed any additional testing than that performed by the Haag engineers. (Ex. 24 at 1; Ex. 25 at 60:4-9). In short, *all witnesses* attributed the loss to rain. To suggest that American States should have rejected all first-hand

---

[19] This Court will recall that Plaintiff in the hail-claim dispute between these parties criticized American States for allegedly *over*-directing the investigation. *See Lead GHR Enterprises v. American States Ins. Co*, 2014 WL 10538028, *23 (D.S.D. May 15, 2014). Now Plaintiff reverses course and contends Plaintiff *did not do enough* to influence the investigation here. (Plaintiff's Brief at 13). Plaintiff cannot have it both ways.

24

fact and expert accounts and instead explored and recognized some other cause is itself an unreasonable contention. *Weaver v. Allstate Ins. Co.*, 574 So. 2d 771, 774, (Ala. 1990) ("Allstate did not have a burden to show that the accident did not happen as Weaver claimed"); *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 587 (6th Cir. 2001) (insured's "own statements made further investigation unnecessary insofar as they demonstrated that there was no potential coverage").

### III.   CONCLUSION

Plaintiff's motion for partial summary judgment, which seeks no summary judgment of any claim, contends that American States has "added conditions" to deny coverage.  In reality, however, it is *Plaintiff* that tortures the Policy's express language to seek coverage where none exists.  In short, Plaintiff's motion fails because:

1. The wall that collapsed was *not* attached to—and not "part of"—the covered "building";

2. The loss was caused by a non-covered peril;

3. Any coverage granted under the "Additional Coverage—Collapse" provision is subject to the Policy's exclusions and limitations; and

4. Plaintiff's factual concessions confirm that the "Additional Coverage—Collapse" provision cannot apply.

At the very least, for the reasons stated herein, Plaintiff's motion fails to articulate a basis for summary judgment on its behalf.  But given that the Policy does not provide coverage as a matter of law, American States respectfully requests that the Court exercise its authority under Fed. R. Civ. P. 56(f) to grant summary judgment for the non-moving party.

Dated: June 29, 2018

RICHARDSON, WYLY, WISE, SAUCK & HIEB

_/s/ Jack H. Hieb_

One Court Street
P.O. Box 1030
Aberdeen, SD 57401
Phone: (605) 225-6310
Fax:    (605) 225-2743
jhieb@rwwsh.com

and

GROTEFELD, HOFFMANN, SCHLEITER
GORDON, OCHOA & EVINGER, LLP
Daniel W. Berglund (MN #0329010)
Patrick Jarosch (MN# 0395445)
150 South Fifth St. Suite 3650
Minneapolis, MN 55402
Phone: (612) 564-4895
Fax:    (612) 326-9996
dberglund@ghlaw-llp.com
pjarosch@ghlaw-llp.com

**_ATTORNEYS OF DEFENDANT_**

## **CERTIFICATE OF COMPLIANCE**

I, Jack H. Hieb, certify that *Defendant American States Insurance Company's Response in Opposition to Plaintiff's Motion for Partial Summary Judgment* complies with Local Rule 7.1(B)(1).

I further certify that, in preparation of this memorandum, I used Microsoft Word 2016, and that this word processing program has been applied specifically to include all text, including headings, footnotes, and quotations in the following word count.

I further certify that the above-referenced memorandum contains 9,060 words.

Dated: June 29, 2018

RICHARDSON, WYLY, WISE, SAUCK & HIEB


/s/ Jack H. Hieb

One Court Street
P.O. Box 1030
Aberdeen, SD 57401
Phone:   (605) 225-6310
Fax:       (605) 225-2743
jhieb@rwwsh.com

and

GROTEFELD, HOFFMANN, SCHLEITER
GORDON, OCHOA & EVINGER, LLP
Daniel W. Berglund (MN #0329010)
Patrick Jarosch (MN# 0395445)
150 South Fifth St. Suite 3650
Minneapolis, MN 55402
Phone: (612) 564-4895
Fax:    (612) 326-9996
dberglund@ghlaw-llp.com
pjarosch@ghlaw-llp.com

***ATTORNEYS OF DEFENDANT***