## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH DAKOTA
## WESTERN DIVISION

| | | |
|---|---|---|
| LEAD GHR ENTERPRISES, INC. formerly d/b/a GOLDEN HILLS RESORT, | ) ) ) | Civ. 16-5026-JLV |
| Plaintiff, | ) ) | |
| v. | ) ) | **PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR,** |
| AMERICAN STATES INSURANCE COMPANY, | ) ) ) | **ALTERNATEVELY, FOR PARTIAL SUMMARY JUDGMENT** |
| Defendant. | ) ) | |

## <u>Introduction</u>

Plaintiff, Lead Golden Hills Resort, Enterprises, Inc. ("Lead GHR"), by and through its counsel of record, offers this Response to Defendant's Motion for Summary Judgment or, Alternatively, for Partial Summary Judgment. (Doc. 44).  Plaintiff's Response to Defendant's Statement of Material Facts in Support of Defendant's Motion (Doc. 45) is attached hereto, and incorporated herein by reference. In addition, Plaintiff has filed its own Motion for Partial Summary Judgment. (Doc. 51). Plaintiff incorporates by reference the arguments and authorities set forth in its Motion for Partial Summary Judgment and all attachments thereto.

## <u>Factual Background</u>

As set forth in Plaintiff's Motion for Partial Summary Judgment, (Doc. 51), this case is the result of a collapse of a large retaining wall connected to a hotel in Lead, South Dakota, on October 10, 2010.[1] At the time of the loss that gave rise to this action, American States was the commercial property insurer for the Lead Golden Hills Resort, under the express terms and

---

[1] A more comprehensive factual background is included in Plaintiff's Memorandum of Legal Issues  in Support of Plaintiff's Motion for Partial Summary Judgment. (Doc. 52, pp. 3 to 4). To expedite the discussion of Defendant's arguments, only pertinent portions are identified here.

conditions of Policy No. 0-C1-327361-1 (hereinafter, the "Policy").  (Doc. 54-2). Defendant asserted two reasons for denying Lead GHR's claim for damage resulting from the collapse: (1) Defendant alleged the wall was not covered property under the Policy because it was not "part of" the building, and (2) Defendant alleged the cause of the collapse was excluded under the terms of the Policy. (Doc. 54-6).

   a. **Defendant's Investigation:**

   Within a week after the collapse, American States adjuster, Steven Zaichek, assigned local adjuster, Chris Shopshear, to inspect the loss, and report back to him. Second Affidavit of Nathan R. Oviatt ("*Second Oviatt Aff.*") Ex. 1, Claims File E-Mail (AMS-GHR000282). On October 18, 2010, Mr. Shopshear visited the collapse, and conducted his inspection. (Doc. 54-9). Afterward, he contacted Mr. Zaichek, who memorialized their conversation as follows:

> I received a call from Chris Shopshear at Eagle Adjusting this morning. Chris stated that he inspected this loss yesterday and said that it does appear that the wall is attached to both our building and the YMCA across the parking lot. He stated that they have had so much rain over the past few weeks that the ground is just saturated. Also he stated that under this building and wall there is an old abandoned mine that has filled up with water and they cannot get it pumped out. Above this mind (sic) there is a walk way tunnel that stretches from our insureds building over to the YMCA. This underground tunnel according to the adjuster will probably have to be filled in and *he feels that the wall may not have been constructed properly*. He found very little rebar in place. This wall stretches approx 250-300 lf by 35 ft tall. He said that this loss could run over a million dollars if taken care of properly.

(Doc. 54-10).  Despite Mr. Shopshear's report, Defendant never pursued any investigation with respect to his concern that "the wall may not have been constructed properly." (Doc. 54-5, Rule 30(b)(6) Deposition of American States Insurance Company ("ASIC 30(b)(6) Depo."), at 66:2-10). In addition, aside from Mr. Shopshear's statement that the wall was connected to the building, Defendant never asked him to follow up on whether the wall provided the building with "structural support."

Instead, Defendant reassigned the file from Mr. Zaichek to Janine Mills. (Doc. 54-10). Troy Lumaye, the regional assistant manager on the file, was in charge of this file's assignment. After assigning Ms. Mills, Mr. Lumaye logged the following comment:

> Reviewed L1 Escalation. Assigning to Janine Mills for handling. Approve expert for examination of cause and scope of repair. Coverage questions may exist and ROR should be considered with respect to surface and subsurface water as potential causes and it is unclear at this time whether the retaining [wall] is on premises or connected to insured building. Would it be considered covered property?

*Id.* Ms. Mills then retained two engineers from Haag Engineering, out of Dallas, TX, to inspect the loss. *Second Oviatt Aff.*, Ex.1, October 19, 2010 email Mills to Strasser, at AMS-GHR000274. One of those engineers, David Teasdale, was retained by Defendant as an expert witness in this litigation.  During his deposition, Mr. Teasdale testified that he is typically asked three questions when he receives an assignment:

> A        I'm going to answer questions. Usually, we have three primary questions as a -- that we answer. It's cause of failure, extent of damage, options for repair. And those are the questions that we typically get, and I'm reasonably certain we got something along those lines on this one.

*Second Oviatt Aff.*, Ex. 2, Deposition of David Teasdale ("Teasdale Depo."), at 12:19-23. In fact, Mr. Teasdale was mistaken.  Although Haag was retained for a determination on cause of loss, Ms. Mills never asked the Haag engineers to provide options for repair like Mr. Teasdale testifies he typically provides. *Id.*, at 40:8-25; 41:1-3. Moreover, Ms. Mills never asked the Haag engineers to provide analysis on "scope of repair" as approved by Mr. Lumaye. *Second Oviatt Aff.*, Ex. 3, Claims File Notes, at AMS-GHR000288. In other words, even though it was aware of Mr. Shopshear's opinion that the wall could cost over one million dollars "if taken care of properly," (Doc. 54-10), Defendant never asked any of its experts to determine cost of repair prior to denying the claim. *Id.* Defendant eventually retained an engineer to provide a cost of

repair analysis, *Id.*, Ex. 4, Expert Report of Larry Hermanson, but the Haag engineers were never even asked about cost of repair.

When Ms. Mills retained the Haag engineers for this inspection, the engineers were told:

As indicated, our insured has a retaining wall that is attached to their resort/hotel/building. The retaining wall runs a span of approximately 300 l.f. and connects to an adjacent building, the YMCA which is owned by the City. Apparently on 10/10, the area received significant rainfall. The insured claims that the retaining wall collapsed. Apparently there is an underground walkway under the retaining wall. The property, retaining wall & walkway are said to be built on an old mine. . .

We are looking for a structural engineer to conduct an inspection and provide an opinion on cause of loss of the damage to the retaining wall . . .

*Second Oviatt Aff.*, Ex.1. Given Ms. Mills' email, Defendant was aware of the fact that retaining wall was connected to the building, and the fact that an underground walkway (also connected to the building) ran behind the wall.

On October 22, 2010, the file was once again reassigned.  This time, the claim was assigned to Liberty Mutual general adjuster, Jonathan Lawlee. *Second Oviatt Aff.*, Ex. 1 at AMS-GHR000255). A week later, on October 29, 2010, Mr. Lawlee spoke the Haag engineers on the morning before their inspection of the collapse.  *Second Oviatt Aff.*, Ex. 3, at AMS-GHR000245. That morning, Mr. Lawlee logged in his claims notes the following: "I spoke with engineer and they are scheduled to meet the insured at 10 am today. The (sic) will inspect the retaining wall and *verify* the cause of loss." *Id.* (emphasis added). Like Ms. Mills, Mr. Lawlee never asked the Haag engineers to provide a cost of repair analysis. *Id.*

After spending a few hours, the Haag engineers completed their inspection, which included visual evaluation of the damaged property; measuring the size of the wall; taking photos of the collapsed materials; and, digging into the soil near the collapse.  *Second Oviatt Aff.*, Ex. 2, Teasdale Depo. 27:6-25; 28:1-25; 29:1-8). Nothing in the Haag report suggests the engineers

4

"reverse engineered" the retaining wall, or conducted any soil or forensic testing of the collapsed materials. (Doc. 54-4). Although the Haag engineers attempted to find weather data, they only did so for the month of the collapse.  (Doc. 50-4). Based on this inspection, the Haag engineers concluded that the retaining wall failed as a result of "earth pressure on the wall." *Id.*, at AMS-GHR000207. The Haag engineers never commented on whether they believed the wall provided the rest of the building with "structural support."  *Id.*

On November 4th, 2010, American States general adjuster, Jonathan Lawlee visited the site of the collapse.  He conducted only a visual "inspection" of the wall.  When asked in his deposition about the factual basis for his assertion to the insured that the retaining wall was not "part of" the building, Mr. Lawlee responded as follows:

A       It was my opinion at that time it was not.

Q       Okay. And what were you relying on in formulating that opinion?

A       From my inspections.

Q       So your visual inspection was sufficient, in your mind, to advise the client, the insured that there was no coverage for retaining walls under this policy?

A       Yes.

Q       And that is because your visual inspection informed you that the retaining wall provided no structural support for the building?

A       I thought it was an independent structure from the building.

Q       Okay. Do you have any training or education or experience as a structural engineer?

A       No.

. . .

Q       What was the scope of your inspection on 11-4-2010?

A       That it was just looking at the exterior of the building and the wall. And, like I said, it was my opinion there was two separate structures there.

(Doc. 54-13, at 63:17-25; 64:1-20). Based on only this information, Mr. Lawlee advised Lead GHR that the loss was not covered because the retaining wall was not "part of" the building.  In addition, Mr. Lawlee advised Lead GHR that the loss was not covered because the cause of loss was excluded.

## Procedural Background

The complaint, filed April 26, 2016, alleges that American States "failed to properly adjust the claim and to pay for the damages caused by the Wall's collapse." (Doc. 1, at ¶ 15).[2] The Complaint alleges four causes of action, (1) breach of contract; (2) bad faith, for American States' alleged failure "to give equal consideration to the interest of GHR"; (3) conversion, for American States' acceptance of GHR's premium payments, and (4) punitive damages, for American States' alleged "fraudulent, malicious, intentional, and/or willful and wanton" conduct. (*Id.* at ¶¶ 14-27).

Defendant has filed a Motion for Summary Judgment, or, Alternatively, for Partial Summary Judgment, on all of Plaintiff's claims. (Doc. 43). In nearly 40 pages of briefing, American States lays out its version of what the contract says, and what it believes its duties under South Dakota law to be. The Motion presents four issues for the Court's consideration:

(1) Did the Policy provide coverage for Lead GHR's claim?

(2) Did Defendant act in bad faith by denying Lead GHR's claim for the subject retaining wall, for the reasons set forth in Defendant's denial letter?
(3) Has Lead GHR suffered extra-contractual damages?

(4) Are punitive damages permissible in this case?

---

[2] In the years immediately after the collapse, the parties were engaged in a lengthy litigation battle over a hail loss, which the hotel had suffered in August of 2010. *Lead GHR Enterprises, Inc. v. American State Ins. Co.*, May 15, 2014, No. Civ. 12-5056-JLV, 2014 WL 10538028.

(Doc. 44, p. 1-2). For the reasons set forth below, there is evidence from which a reasonable fact finder could find in Plaintiff's favor, and the jury should be permitted to weigh the credibility of the evidence presented on each of claims.

## Legal Standard

The standard this Court applies when considering a motion for summary judgment is well established. Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "Summary judgment is not the proper method to dispose of factual questions." *Bozied v. City of Brookings,* 2001 S.D. 150, ¶ 8, 638 N.W.2d 264, 268. For summary judgment purposes, "[a] disputed fact is ... material [if] it would affect the outcome of the suit under the governing substantive law in that a reasonable jury could return a verdict for the nonmoving party." *Stern Oil Co., Inc. v. Brown*, 2012 S.D. 56, 817 N.W.2d 395, 400.

### I. Count I -- Breach of Contract:

#### a. The Policy is the Enforceable Promise

First, Defendant moves for summary judgment on Count I of the Complaint -- breach of contract. Defendant argues that it did not breach the Policy because the retaining wall was not: (1) covered property, and (2) collapsed by a covered cause of loss. "[T]he elements of breach of contract are: 1. An enforceable promise; 2. A breach of the promise; 3. Resulting damages." *Guthmiller v. Deloitte & Touche, LLP,* 2005 SD 77, ¶ 14, 699 N.W.2d 493, 498. Here, there is no dispute that Defendant made an enforceable promise to indemnify Lead GHR for direct physical damage to covered property.

**A. Coverage**

> We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss . . .

(Doc. 54-2, at AMS-GHR000039). There is no dispute that the insurance contract is an enforceable promise, and that Lead GHR's uncovered loss has caused it to suffer damages. Thus, the only disputed issue on Count I is whether Defendant breached its enforceable promise. *Guthmiller,* 2005 SD 77, ¶ 14, 699 N.W.2d at 498.

### *b. Evidence of Defendant's Breach*

Defendant argues that it did not breach its duty because the retaining wall was not "Covered Property," and the cause of loss was excluded under the Policy.  Much of Defendant's Motion on this issue is based upon its various "interpretations" of the Policy. At every turn it seems Defendant is attempting to conjure new words to add to its Policy to avoid paying Plaintiff's claims. South Dakota law prohibits this. "Contracting parties are held to the terms of their agreement, and disputes cannot be resolved by adding words the parties left out." *Gettysburg School Dist. 53-1 v. Larson,* 2001 SD 91, ¶ 11, 631 N.W.2d 196, 200-01 (citation omitted). "[W]hen the terms of an insurance policy are unambiguous, [those] terms 'cannot be enlarged or diminished by judicial construction.'"  *Ass Kickin Ranch, LLC v. N. Star Mut. Ins. Co.*, 2012 S.D. 73, 822 N.W.2d 724, 727.

Here, on at least three occasions in its investigating, handling, or litigating Plaintiff's claim, American States has offered a new "interpretation" of its Policy. Not surprisingly, each new "interpretation" always seems to weigh in the company's favor.

> 1. It defines a retaining wall as "part of" a building only if it gives the building structural or foundational support.

> 2. It argues that "occupied" only means "occupancy."

3. It argues that the term "decay" as used in the "Additional Coverage -- Collapse" only applies to organic materials.

(Doc. 44, pp. 2-26).[3]

Fortunately, Lead GHR is not at the mercy of Defendant's "creative interpretations" because insurance contract interpretation is a question of law which must be resolved by the Court. *Ass Kickin Ranch, LLC v. N. Star Mut. Ins. Co.*, 2012 S.D. 73, 822 N.W.2d 724, 726. "The existence of the rights and obligations of parties to an insurance contract are determined by the language of the contract, which must be construed according to the plain meaning of its terms." *State Farm Fire & Cas. Co. v. Harbert*, 2007 S.D. 107, 741 N.W.2d 228, 234. "If doubt exists as to whether the insured's claim falls within the policy coverage after considering the complaint and record evidence, 'such doubts must be resolved *in favor of the insured*.'" *Harbert*, 2007 S.D. 107, 741 N.W.2d 228, 234 (internal citations omitted) (emphasis added).

In this case, Lead GHR has two showings to make in order to find that the collapse should have been covered. First, it must show the wall was "part of" the rest of the building. Second, it must show the wall collapsed because of decay.

### i. "Covered Property" in the Policy:

As discussed in greater detail in Plaintiff's Motion for Partial Summary Judgment (Doc. 51), the first issue is whether the subject retaining wall was covered property under the Policy. Here, the Policy language applicable to this issue reads as follows:

---

[3] Notably, this is not Lead GHR's first experience with American States raising "novel" contract interpretations to effectuate an exclusion where none exists in the Policy. *See Lead GHR Enterprises, Inc. v. Am. States Ins. Co.*, 2014 WL 10538028, at *9 (D.S.D. 2014). Throughout the parties' relationship, in fact, Defendant has consistently attempted to reconfigure its Policy to its own benefit. As this Court will recall, in a separate claim for hail damage sustained to the hotel's metal roof, Defendant urged the Court to adopt an interpretation of "damage" which required "functional damage" in order to justify its refusal to pay the claim pursuant to the Policy's broad coverage grant. *Id.* In that case, the Court rejected Defendant's absurd interpretation, and found that Defendant breached its promise as a matter of law. *Id.*

2**. Property Not Covered**

Covered Property does not include:

…

      **l.** Retaining Walls that are *not* part of a building;

(Doc. 54-2, at AMS-GHR 000040 (emphasis added)). Because there is no dispute that retaining walls that are "part of a building" are "Covered Property," (Doc. 54-5, ASIC 30(b)(6) Depo., at 33:13-16), the only question to answer on this issue is what it means to have a retaining wall be "part of" a building.

Because there is no definition for "part of" a building in the Policy, the Court must turn to outside sources for guidance on the term's meaning. *Prokop v. N. Star Mut. Ins. Co.*, 457 N.W.2d 862, 864 (S.D. 1985). Oxford Dictionary defines "part" as a noun, which means: "An amount *or section* which, when *combined with others* make up the whole of something." ENGLISH OXFORD LIVING DICTIONARIES, https://en.oxforddictionaries.com/definition/part (last visited May 30, 2018) (emphasis added). Here, the retaining wall is a section which, when combined with the walls of the hotel with concrete and iron make up the whole of the building. The wall also creates the space for the underground tunnel which runs from the hotel to the YMCA. Both the wall and tunnel are connected to the hotel, and were owned by Lead GHR. If this retaining wall does not meet the definition of "part of" a building then the contract provision is meaningless.

When its insurance expert, Peter Hildebrand, was asked for an example of a retaining wall which he would consider "part of" a building, he could only offer the following:

> Q     Okay. So then my question again is: Can you give me an example of a retaining wall that would be part of a building?
>
> A     Sure. If you went to Ireland and you were walking into this castle and the castle has a mote around it with all these different walls that surround the castle and the castle is actually part and parcel of the retaining wall which is used to

defend the castle, I think under that example it is possible that that retaining wall would be part of the building.

*Second Oviatt Aff.*, Ex. 5, Deposition of Peter Hildebrand ("Hildebrand Depo."), at 37:19-25; 38:1-3. Mr. Hildebrand's castle example is actually very illustrative of the manner in which American States handles claims. Defendant puts up walls around defenses through bizarre and self-serving "interpretations," that are consistently bent towards protecting the insurer's best interest. Then, when an insured has a claim that fits perfectly within its contorted coverage position its "interpretation," it is only "possible" that claim will be paid.

On the other hand, Plaintiff described in detail the reasons it believed the wall to be "part of" the rest of the building. Lead GHR's Rule 30(b)(6) designee, Rory Maynard explained that this wall "was concreted in, rebarred (sic) in, attached, built prior to when the building was even erected as part of the foundation part of the building. It was stuccoed (sic) and painted to match exact part of the building. It was part of the building." (Doc. 54-8, at 25:11-15). Although it appears that the wall and the building do not in fact share footings, the importance of the wall to the rest of the building cannot be understated.

Mr. Duckett, Lead GHR's engineering expert, explained that the wall was even more integral to the rest of the building than Mr. Maynard understood. He explained in his report:

> Buildings constructed on sloped sites typically require and utilize retaining walls to create flat areas. These areas may consist of planters, grassed areas or, more importantly, paved areas that support activities essential for the required functions of the building and its intended use . . . Barring an inordinate and unreasonable amount of land, buildings constructed on sloped sites without retaining walls could not be planned, permitted or constructed, the retaining wall is an essential element of the building in order to allow the building to be constructed.

(Doc. 54-3, at p. 3). Given this, and the fact that this particular wall was bound to the rest of the building with rebar, concrete and stucco, it is difficult to picture a retaining wall that is more

"part of" a building than this wall. Although not an Irish castle's retaining wall system, this wall is necessary to create the space for the function of the building. It is "a part" of the building in the most natural sense.

By contrast, Defendant urges the Court to adopt a strained interpretation of "part of" a building which requires a retaining wall to give the building "structural support" for it to be considered "covered property" under the Policy. (Doc. 54-6). The plain language of the Policy does not require a retaining wall to provide "structural support" to the building before it is considered "part of" the building, and an insured would have no way of knowing this effective exclusion applies until after a loss occurs. (Doc. 54-7, at 35:1-25). Defendant is once again creating Policy exclusions through hidden/undisclosed terms.

Although Lead GHR believes the Policy clearly covers the subject retaining wall, any ambiguity that exists in the definition of the term "part of" should be resolved in Plaintiff's favor. "If doubt exists as to whether the insured's claim falls within the policy coverage after considering the complaint and record evidence, 'such doubts must be resolved in favor of the insured.'" *Harbert*, 2007 S.D. 107, 741 N.W.2d 228, 234 (internal citations omitted). In light of the foregoing, Plaintiff can carry its burden on the issue of whether the retaining wall is "covered property" under the Policy. Therefore, Defendant's Motion for Summary Judgment on this basis should be denied.

### ii. Evidence of Decay:

The next issue is causation. Plaintiff's engineering expert has opined that the collapse was the result of latent decay, not soil and earth pressure. (Doc. 54-3). The Policy provides additional "give back" coverage for "decay."

### D. Additional Coverage - Collapse

> The term Covered Cause of Loss includes the Additional Coverage - Collapse as described and limited in D.1. through D.5. below.
>
> 1. With respect to buildings:
>
> **a.** Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose; …
>
> **2.** We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building that is insured under this Coverage Form or contains Covered Property insured under this Coverage Form, if the collapse is caused by one or more of the following:
> …
> b. Decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;
> …
> f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation. However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in 2.a. through 2.e., we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling or renovation, contributes to the collapse.

(Doc. 54-2, at AMS-GHR 000075). Plaintiff has not moved for summary judgment on Defendant's breach because a jury will ultimately resolve whether the wall's collapse was caused by decay of the wall's materials, or water and soil pressure. Lead GHR's engineering expert contends that the wall collapsed due to decay of the materials in the wall, while Defendant's engineering expert, David Teasdale, contends that rainwater and soil created lateral pressures which exceeded the strength of the wall, causing it to fail. Although Lead GHR believes that Duckett's investigation was more complete, thorough, and reliable than Mr. Teadale's, Plaintiff will not waste the Court's time arguing that the Haag Report is not evidence.  Whether it was reasonable for Defendant to rely on it, and whether it was conducted in good faith, remain to be determined by the fact finder. *See Mordhorst v. Dakota Truck Underwriters and Risk Admin.*

*Serv's*, 2016 S.D. 70, 886 N.W.2d 322.  In any case, Plaintiff has presented sufficient evidence to meet its burden on this element.

One additional word on Defendant's argument on the additional collapse coverage is warranted. In arguing that the collapse "give back" does not apply to this case, Defendant tries to reconstruct the plain language of the "give back" coverage to change the term "occupied"[4] to "occupancy."  (Doc. 44, pp. 25-26). The definition of "occupied" means simply to be "used by someone." English Oxford Living Dictionaries, https://en.oxforddictionaries.com/definition/occupied (last visited June 19, 2018). The Policy extends coverage for retaining walls which are "part of" the building, and the additional collapse coverage is invoked if the collapse occurs to "part of a building." (Doc. 54-2, at AMS-GHR 000075). Thus, if the retaining wall is "part of" the building, there should be no legitimate dispute that "part of the building" collapsed because it can no longer be used as it was intended. Defendant's engineer, Teasdale, testified that the function of a retaining wall is to retain soil.  (Doc. 54-11, at 67:24-25; 68:1-4).  Mr. Duckett further explains that the function of the wall was to create space for the use of the hotel. (Doc. 54-3). As a result of the failure, it was no longer able to serve this intended function. It could no longer be "used" as intended.  One could no longer occupy the space above and below that the wall had created because it had collapsed. There is sufficient evidence of decay as that term is used in the collapse "give back" to present the issue of Defendant's breach to the jury.

### c. Lead GHR has suffered damages.

The final element on Count I is damages. *Guthmiller,* 2005 SD 77, ¶ 14, 699 N.W.2d 493, 498. On this element, there should be no dispute that sufficient evidence of Lead GHR's damages have been presented. *Second Oviatt Aff.*, Ex. 6. Munro Earthmoving and General

---

[4] The Policy requires a covered collapse to be complete such that the collapse building, or part of the building, cannot be "occupied for its intended purpose." (Doc. 54-2, at AMS-GHR000075).

Contracting ("Munro") has provided an estimate that fixing the damaged wall will cost $1,077,764.00. *Id.* Although the parties disagree on the amount of repair, there is no dispute that the cost for replacing the wall will be substantial. *Second Oviatt Aff.*, Ex. 6. Because Lead GHR can carry its burden at trial on each element of its breach of contract claim, Defendant's Motion for Summary Judgment on Count I of the Complaint should be denied.

## II. Count II -- Bad Faith:

Next, Defendant moves the Court for Summary Judgment on Count II of the Complaint, which alleges that American States breached its implied duty of good faith and fair dealing in the investigation and denial of Lead GHR's claim. (Doc. 44, pp. 30-38). On summary judgment, American States has the initial burden to "*clearly* show an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law." *Hahne v. Burr,* 2005 SD 108, ¶ 6, 705 N.W.2d 867, 870-71 (emphasis added).

### a. Defendant Owed "Equal Consideration" to Lead GHR's Interests

Under South Dakota law, "first-party bad faith ... is an intentional tort and typically occurs when an insurance company consciously engages in wrongdoing during its *processing* or *paying* of policy benefits to its insured." *Hein v. Acuity,* 2007 SD 40, ¶ 10, 731 N.W.2d 231, 235 (citations omitted) (emphasis added). "The question of whether an insurer has acted in bad faith is generally a question of fact." *Dakota, Minnesota & E. R.R. Corp. v. Acuity*, 2009 S.D. 69, 771 N.W.2d 623, 629-30. In first-party cases, "there exists a contractual relationship, whereby the insurer has accepted a premium from its insured to provide coverage." *Id.* ¶ 13, 731 N.W.2d at 236. "An insurer *must not* ignore the interests of its insured because '[t]he relationship of the insurer to the insured is akin to that of a fiduciary since it must give at least as much consideration to the insured's interests as it does to its own.'" *Hill v. Auto Owners Ins. Co.*, 2015

WL 2092680, at *6–7 (D.S.D.,2015) (citing *Trouten v. Heritage Mut. Ins. Co.,* 632 N.W.2d 856, 864 (S.D.2001)) (emphasis added); *see also Landon v. Am. Family Mut. Ins. Co.*, 293 F.Supp.3d 879, 887 (D.S.D. 2017) (emphasis added). "[B]ad faith can extend to situations beyond mere denial of policy benefits." *See Julson v. Federated Mut. Ins. Co.,* 1997 SD 43, ¶ 6, 562 N.W.2d 117, 119. For example, bad faith may include "the failure to conduct a reasonable investigation concerning the claim." *Walz v. Fireman's Fund Ins. Co.,* 1996 SD 135, ¶ 8, 556 N.W.2d at 70 (citing *Isaac v. State Farm Mut. Auto. Ins. Co.,* 522 N.W.2d 752, 758 (S.D.1994)). An insurer's bad faith conduct "is determined based upon the facts and law available to [the] [i]nsurer at the time it made the decision to deny coverage." *Id.*

Defendant flatly rejects the principal of "equal consideration." Instead, it argues that the duty of "equal consideration" only applies to third-party bad faith cases, like uninsured motorist claims. Defendant cites to, does not analyze *Hein v. Acuity*, 2007 S.D. 40, 796 N.W.2d 231, and *Bertelsen v. Allstate Ins. Co.*, 2011 S.D. 13, 796 N.W.2d 685. That citation reads:

> Customarily, bad faith litigation can be classified as either first- or third-party bad faith. Third-party bad faith is traditionally based on principles of negligence and arises when an insurer wrongfully refuses to settle a case brought against its insured by a third-party. Third-party bad faith exists when an insurer breaches its duty to give equal consideration to the interests of its insured when making a decision to settle a case.
>
> First-party bad faith, on the other hand, is an intentional tort and typically occurs when an insurance company consciously engages in wrongdoing during its processing or paying of policy benefits to its insured. In these cases, the parties are adversaries, and therefore, an insurer is permitted to challenge claims that are fairly debatable. However, a frivolous or unfounded refusal to comply with a duty under an insurance contract constitutes bad faith.

731 N.W.2d 231, 235, 2007 S.D. 40, ¶¶ 9-10 (S.D. 2007) (internal citations omitted). Defendant argues that this analysis absolves it of any duty of "equal consideration" in first-party claims. In other words, Defendant argues that because the *Hein* Court doesn't explicitly state that first-party

bad faith requires "equal consideration," like it does for third-party cases, no such duty exists. By doing so, Defendant skirts the fiduciary-like responsibility bestowed upon it by South Dakota law. *Hill v. Auto Owners Ins. Co.*, 2015 WL 2092680, at *6–7 (D.S.D.,2015) (citing *Trouten v. Heritage Mut. Ins. Co.,* 632 N.W.2d 856, 864 (S.D.2001)). If the Court were to accept this argument, purchasing an insurance Policy would transform a promise of protection into a license for litigation -- and insurance abuse. Of course, this is not the law.

As explained by Judge Schreier, the South Dakota Supreme Court has recognized that insurance companies (even in first party cases) have a responsibility to give equal consideration to the interests of insureds and may not force insureds to resort to litigation to vindicate contractual rights.

> [B]oth *Helmbolt* and *Trouten* make clear that the insurance company must give equal consideration to the interests of its insured, *even when those interests are adverse to its own*. Also, an insurance company may not "game" or manipulate its investigation or claims handling process to obtain a more favorable result at the expense of its insured by virtue of the insurance company's superior bargaining power and resources. If discovery revealed that Auto Owners hired adjusters with the understanding that the adjusters were expected to minimize or ignore evidence supporting a claim, or if Auto Owners instructed its adjusters to build a case against the insured rather than reasonably and fairly investigate the claim, or if Auto Owners intentionally adopted a policy of denying valid claims to discourage its insureds from further pursuing benefits, Auto Owners could be liable for the tort of bad faith for actions apart from its denial of benefits. Auto Owners has failed to address this aspect of plaintiffs' bad faith claim.

*Hill v. Auto Owners Ins. Co.*, 2015 WL 2092680, at *6–7 (D.S.D.,2015). (citing *Helmbolt v. LeMars Mut. Ins. Co.,* 404 N.W.2d 55, 58 (S.D.1987); *Trouten*, 632 N.W.2d at 864 (S.D. 2001) (emphasis added)). In this case, Defendant has failed to address a number of aspects of Plaintiff's bad faith claim, including all of the covered causes of loss listed in the collapse "give back." This is unsurprising given Defendant's view of its "equal consideration" duty. During its

deposition, Defendant stated unequivocally (and even argued) that it believes that it owes Lead

GHR no duty of equal consideration.

> Q      And is American States aware that the policy provision required by law is that good faith and fair dealings requires the insurer to give equal consideration to the interest of the insured?
> …
>
> A      Could you further explain what you mean by equal? I don't recall seeing that.
>
> Q      Okay. Is that you would have to give the same consideration to coverage for the insured as you would for not coverage for American States?
> …
>
> A      I'm not aware of that.
>
> Q      Okay. So as we sit here today, the position of American States is that it's not aware of any requirement of good faith and fair dealing which requires the insured to give equal consideration to the interest of the insured?
> . . .
>
> A      I -- I refer you back to my earlier response to that.
>
> Q      And your response was that you're not aware of any?
>
> A      I am not aware of it.
> . . .
>
> Q      As I understood your earlier answer, is that American States understands that every policy of insurance written in South Dakota has a provision that requires good faith and fair dealings?
>
> A      That is correct.
> . . .
> Q      Now, if I understand the answer to my next question was that American States doesn't know or is not aware of any requirement of good faith and fair dealing which requires the insurer to give equal consideration to the interest of the insured?
> . . .
>
> A      The equal consideration I don't understand. If they have coverage, they have coverage. If they don't, they don't.

(Doc. 54-5, ASIC 30(b)(6) Depo., 21:11-25; 22:1-25; 23:1-25; 24:1-2). Plaintiff's bad faith claim

is intertwined with Defendant's failure to give Lead GHR's interests "equal consideration" in the

investigation and adjustment of its claim. Defendant admits it failed to investigate any of "additional collapse coverage" causes of loss. (*Id.* at 55:3-8 and 66:7-10). The duty of an insurer to give "equal consideration" is not novel.[5] Even in the first-party context, "equal consideration" is critical to discharge the duties undertaken pursuant to the Policy.

Defendant's admission that it does not provide its insureds "equal consideration" in adjusting or investigating claims in South Dakota is inculpatory. "A bad faith claim in South Dakota may be based on a 'failure to comply with a duty under the insurance contract,' but must still involve an insurance company consciously engaging in wrongdoing." *Anderson v. Western Nat. Mut. Ins. Co.*, 857 F.Supp. 896, 904 (D.S.D. 2012) (citing *Dakota, Minn. & E.R.R. Corp. v. Acuity*, 771 N.W.2d 623, 629 (S.D. 2009)). Here, Defendant admits that it did not provide its insured's interests any equal consideration to its own. This begs the question: What does the duty of "equal consideration" in the first-party setting require?

A review of pertinent authority reveals that the South Dakota Supreme Court has provided little analysis on this issue.  However, other courts have explained this duty as follows:

> [A]n insurer owes a duty to its insured to investigate *all of the possible bases* of an insured's claim. The insurer's duty to give as much consideration to the insured's interests as it does to its own obligates it to investigate a claim *thoroughly*. An insurer must fully inquire into the bases for the claim; indeed, it "cannot reasonably and in good faith deny [benefits] to its insured without *thoroughly* investigating the foundation for its denial." "An insurance company may not ignore evidence which supports coverage. If it does so, it acts unreasonably towards its insured and breaches the covenant of good faith and fair dealing.". . . The insurer cannot claim a "genuine dispute" regarding coverage in such cases because, by failing to investigate, it has deprived itself of the ability to make a fair evaluation of the claim… "[W]here an insurer denies coverage but a *reasonable investigation* would have disclosed facts showing the claim was covered, the insurer's failure to investigate breaches its implied covenant."

---

[5] Despite its insistence that it does not owe its insureds a duty of "equal consideration" in handling and investigating claims, it acknowledged in its deposition that it owed a duty to investigate all causes of the loss, including those which would have given coverage back to the insured.  (Doc. 54-5, ASIC Depo. 30(b)(6) Depo., 108:6-12).  Despite this known duty, Defendant admits that it did not investigate for decay or defective design. *Second Oviatt Aff.*, Ex. 7, ASIC 30(b)(6) Depo. 104:4-13.

*Jordan v. Allstate Ins. Co.*, (2007) 148 Cal.App.4th 1062, 1073-74 (citations omitted) (emphasis added); *see also Safeco Ins. Co of America v. Parks*, (2009) 170 Cal.App.4th 992, 1003. This explanation "equal consideration" is striking similar to Brad Blumenthal's insurance opinion that an insurer must look at the policy in its "totality" before denying a claim, which he also contends Defendant failed to do.   *Second Oviatt Aff.*, Ex. 8, Blumenthal Depo. II 36:5. Had a full investigation been done, the latent decay and deterioration of the wall identified by Mr. Duckett would have been easily identified.

Instead, Defendant delegated its duty to investigate to the Haag engineers, and in so doing, steered their investigation toward a causation finding which would support the company's denial. By not asking the Haag engineers to provide a cost of repair analysis (which Mr. Teasdale admits he regularly does), Ms. Mills and Mr. Lawlee were effectively advising the engineers that the claim was not going to be paid. This suggestion is particularly troubling when the only information the Haag engineers are given about the assignment is that the collapse occurred after a "significant rainfall." *Second Oviatt Aff.*, Ex. 1, (AMS-GHR000274).  Of course, groundwater is an excluded cause of loss under the Policy.   (Doc. 54-2, at AMSGHR000038). There is nothing in the email about Mr. Shopshear's concerns about the wall's faulty construction, and in fact, nothing about any of the additional collapse coverage causes of loss which would have given coverage back. *Second Oviatt Aff.*, Ex. 1, (AMS-GHR000274). Instead, only facts related to excluded cause of loss are provided to the Haag engineers. Although subtle, Defendant's orchestration of the Haag investigation is no less clear.

The *Jordan* case, cited above, is instructive to the Court's analysis in this matter.  There, the court found that the insurer's failure to investigate coverage under the "additional collapse coverage" was sufficient evidence for the plaintiff to carry its burden on the insurer's breach of

its duty to give "equal consideration" to its insured's interests. *Id.* (finding, "Thus, although Allstate's interpretation of a policy exclusion was reasonable, it also had a duty to investigate Jordan's coverage claim that was based on the "additional coverage" provisions relating to an "entire collapse," which we held, in *Jordan I,* was also reasonable and consistent with Jordan's objectively reasonable expectations.")  Similarly, in this case, Defendant's failure to conduct any investigation into the collapse coverage causes of loss -- particularly in light of Mr. Shopshear's concern regarding the design of the wall -- is clear evidence of its breach of its duty good faith and fair dealing. "An insurer's duty to conduct a reasonable investigation is not narrowly confined to the facts or theories of coverage relied on by its insured." *Safeco Ins. Co of America v. Parks*, (2009) 170 Cal.App.4th 992, 1007. Before representing to the insured that its claim was being denied, Defendant owed a duty to conduct an investigation into the limited collapse causes of loss, which would have provided coverage for the loss. Defendant never did this.

In this case, the only basis Defendant had to represent to Lead GHR that its wall did not "structurally support" the building was Mr. Lawlee's visual inspection, which included no examination of the building's blueprints. The company never did any investigation into the relative strength of the wall at the time of the collapse, and it never looked at the competency of the wall's designers, or the performance of the wall of the course of its 20-year lifetime. The reasonableness of this investigation should be weighed by the fact finders at trial.

### b. Plaintiff's extra contractual damages.

In addition to Defendant's contention that it had a reasonable basis to deny Lead GHR's claim as a matter of law, Defendant also contends that Count II should be dismissed because it has suffered no extra contractual damages. (Doc. 44, pp. 30-33). The crux of Lead GHR's bad faith claim is that American States designed its claims handling process to produce evidence and

"interpretations" which could be used to unfairly deny valid claims, thereby forcing its insureds to take extra steps to obtain payment while hoping enough people would be discouraged from pursuing benefits to enable the insurer to realize a profit at the expense of its insureds. *See* 2015 WL 2092680, at *6 (D.S.D. 2015). "The South Dakota Supreme Court has recognized that insurance companies have a responsibility to give equal consideration to the interests of insureds and may not force insureds to resort to litigation to vindicate contractual rights . . ." *Id.*

Here, the only extra contractual rights incurred by Lead GHR are those expenses related to this litigation brought to "vindicate contractual rights." Lead GHR is not seeking attorney's fees associated with this litigation as bad faith damages. Nor is it seeking damages for loss of business. Instead, Lead GHR is seeking exactly what it claimed to be seeking when asked in its deposition -- expenses.

> Q      What is Lead GHR's current claim for damages in this lawsuit?
>
> A      Well, I'd like to get, I guess, what it takes to replace the existing wall. Plus the -- I guess the time, *expense*, interest, from the collapse until now. I mean, that can be a demand. And really what it's going to take for Liberty Mutual, American States, whoever they are to do their job and pay the -- pay everybody else's claim.

(Doc. 50-1) (Lead GHR Depo. 97:7-15) (emphasis added). This expense will continue to grow as the case advances forward.  Currently, the expense is $17,247.84. *Second Oviatt Aff.*, Ex. 16, Plaintiff's Amended Disclosures Under Fed.R.Civ.P. 26(a)(1). Although not as substantial as the damages associated with Count I, this expense is one that would not have been incurred but for Defendant's shoddy investigation. These expenses for things like filing fees, deposition transcripts, and copies. Moreover, these were requested in the Complaint, *see generally* Doc. 1, and have been incurred by both parties throughout this litigation.  There should be no "surprise" by this expense, given that costs were claimed in the Complaint.  In any case, there is sufficient

damage to put the question to the fact finder.  For this reason, Defendant's Motion for Summary Judgment should be denied.

### III. Count III - Conversion

Defendant also moves for summary judgment on Plaintiff's claim for conversion. (Doc. 44, pp. 27-28). Plaintiff's conversion claim flows from its bad faith claim.

> An insurer's failure to pay policy benefits is similar to a conversion . . . If the insured is successful on his bad faith claim, then it follows that the insurer "cannot argue in good faith that [it] believed the money could legally remain in [its] possession."

*Hurley v. State Farm Mut. Auto. Ins. Co.*, 2012 WL 6012803, at *4, n.3 (D.S.D., 2012). Thus, if Plaintiff is successful on its bad faith claim, it has also established its conversion claim. The analysis of both claims overlap. For the same reasons that Defendant's Motion for Summary Judgment on Plaintiff's bad faith claim should be denied, so too, should Defendant's Motion for Summary Judgment on Plaintiff's conversion claim.

### IV. Count IV – Punitive Damages:

Lastly, Defendant has moved for Summary Judgment on Count III of the Complaint, which seeks punitive damages for Defendant's conduct.   In order for an award of punitive damages to be permitted, South Dakota Codified law requires the element of malice. SDCL §§ 21-1-4.1; 21–3–2. "The required malice may be actual or presumed." *Bertelsen*, 2011 S.D. 13, 796 N.W.2d 685, 699 (citation omitted). "Actual malice is a positive state of mind, evidenced by a positive desire and intention to injure one another, actuated by hatred or ill-will towards that person." *Id.* By contrast, presumed malice is "malice which the law infers from or imputes to certain acts." *Id.* (citations omitted). Presumed malice is not necessarily "motivated by hatred or ill-will but is present when a person acts willfully or wantonly to the injury of others." *Biegler*, 2001 S.D. 13, ¶ 45, 621 N.W.2d at 605 (quoting *Case*, 488 N.W.2d at 891).

In the context of first-party insurance bad faith, "[a]n insurer's clear breach of contract or denial of a claim that is not fairly debatable may indicate malice." *Bertlesen*, 2011 S.D. 13, ¶ 41, 796 N.W.2d 685, 699.  As discussed, American States admits that it did not give its insured's interests equal consideration to its own. (Doc. 54-5, ASIC 30(b)(6) Depo., 108:6-12).  It also admits that it did not investigate into either decay, or defective design.  In addition, throughout this case (and in a previous claim) Defendant has demonstrated a pattern and practice of generating "inventive" interpretations of Policy terms to exclude coverage. Finally, when Mr. Lawlee visited the hotel in November of 2010, he and Mr. Maynard had a lengthy discussion about the relative bargaining powers of the two parties:

> A    We actually went down the tunnel as well. I believe this was when it was stated to me that Liberty Mutual is on top of Mount Everest and that I'm going to have to take the time and resources it takes to climb Everest to knock Liberty Mutual off and to win this case or win this claim . . . which has now turned into a lawsuit.

*Second Oviatt Aff.*, Ex. 9, Maynard Dep. 59:23-25; 60:1-3. With this colloquy in mind, Defendant's interpretations of "part of" and "decay" begin to show Defendant's intent. Defendant never intended to pay this claim. Instead, Defendant intended to build an "Irish castle" of defensive walls designed to wear out its insured and overwhelm its resources. Despite this, Lead GHR persisted.

Defendant's argument rests primarily on its contention that Lead GHR can point to no extra-contractual damages sustained as a result of Defendant's bad faith conduct.  As set forth in Section II(b), that conclusion is incorrect. Those damages are those incurred in this litigation vindicating its rights under the Policy.  As such, there is sufficient evidence of damages to present the question of punitive damages to the jury.  For these reasons, the Court should deny Defendant's Motion for Summary Judgment, and permit the jury to determine whether punitive damages are warranted.

<u>**CONCLUSION**</u>

In sum, there is evidence (in some cases substantial evidence) supporting each Count of Lead GHR's Complaint.  When viewed in the light most favorable to it, Lead GHR can present a claim for each breach of contract, bad faith, and punitive damages. As such, Plaintiff respectfully requests the Court deny Plaintiff's Motion for Summary Judgment, or Alternatively, Partial Summary Judgment.

Dated this 29th day of June, 2018.

GOODSELL QUINN, LLP

/s/   Nathan R. Oviatt
Nathan R. Oviatt
G. Verne Goodsell
GOODSELL QUINN, LLP
246 Founders Park Dr., Suite 201
P.O. Box 9249
Rapid City, SD 57709-9249
Tel:  (605) 343-3000

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| LEAD GHR ENTERPRISES, INC., formerly d/b/a GOLDEN HILLS RESORT, | ) ) ) | Civ. 16-5026-JLV |
| | ) | |
| Plaintiff, | ) ) | **CERTIFICATE OF SERVICE** |
| vs. | ) ) | |
| AMERICAN STATES INSURANCE COMPANY, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

I hereby certify that on the 29th day of June, 2018, I sent to:

Jack H. Hieb
One Court Street
Post Office Box 1030
Aberdeen, SD  57402-1030
JHieb@rwwsh.com

Daniel W. Berglund
Patrick P. Jarosch
Grotefeld Hoffman Schleiter
Gordon, Ochoa & Evinger LLP
150 South Fifth Street, Suite 3650
Minneapolis, MN  55402
dberglund@ghlaw-llp.com
pjarosch@ghlaw-llp.com

by Notice of Electronic Filing generated by the *CMECF* system, a copy of the **PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR, ALTERNATEVELY, FOR PARTIAL SUMMARY JUDGMENT**  relative to the above-entitled matter.

BY:   */s/ Nathan R. Oviatt*
         Nathan R. Oviatt