UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| LEAD GHR ENTERPRISES, INC. formerly d/b/a GOLDEN HILLS RESORT, | CIV. 16-5026-JLV |
| Plaintiff, | ORDER |
| vs. | |
| AMERICAN STATES INSURANCE COMPANY, | |
| Defendant. | |

**INTRODUCTION**

This case stems from an insurance claim denial.   Defendant American States Insurance Company ("American States") denied an insurance claim related to the collapse of a retaining wall owned by plaintiff Lead GHR Enterprises ("Lead GHR").   (Docket 1 at ¶¶ 6-12).   In its complaint, plaintiff alleges the denial constituted breach of contract, bad faith, and conversion.   Id. at ¶¶ 14-25.   Plaintiff also seeks punitive damages.   Id. at ¶¶ 26 & 27.

Now pending before the court are the parties' motions for summary judgment.   Defendant moved for summary judgment on all counts.   (Docket 43).   Plaintiff resists defendant's motion and defendant filed a reply.   (Dockets 60 & 65).   Defendant filed a statement of undisputed material facts in support of its motion.   (Docket 45).   Plaintiff filed its own statement of undisputed material facts in response to defendant's motion.   (Docket 61).   Plaintiff

cross-moved for partial summary judgment on three questions of contract interpretation. (Docket 51). Defendant resists plaintiff's motion and plaintiff filed a reply. (Dockets 57 & 70). Plaintiff filed a statement of undisputed material facts in support of its motion and defendant responded. (Dockets 53 & 58).

For the reasons stated below, defendant's motion for summary judgment is denied as to Counts I and IV of the complaint, denied in part and granted in part as to Count II, and granted in full as to Count III. See infra Section III. Plaintiff's cross-motion for partial summary judgment is also granted in part and denied in part, as described below. See infra Section IV.

## ANALYSIS

### I. Factual Findings

The following recitation consists of the material facts developed from the complaint (Docket 1), defendant's answer (Docket 6), the parties' statements of undisputed material facts (Dockets 45 & 53), the parties' responses to opposing parties' statements of undisputed material facts (Dockets 61 & 58) and other evidence where indicated. Where a statement of fact is admitted by the opposing party, the court will only reference the initiating document. These facts are "viewed in the light most favorable to the [party] opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The facts material to the parties' motions for summary judgment are as follows.

Lead GHR was a South Dakota corporation that owned and operated a hotel in Lead, South Dakota.[1]   (Docket 45 at ¶ 4).   In 2014, Lead GHR sold the hotel to another entity, Roundhouse Properties, LLC.   (Docket 50-2).   On May 2, 2018—approximately two years after plaintiff filed its complaint—plaintiff signed a memorandum of understanding with Roundhouse agreeing plaintiff retained ownership of the insurance claim at issue here.   (Dockets 54-1 & 1). Plaintiff and Roundhouse also agreed any proceeds from the case will be assigned to Roundhouse.   Id.   The South Dakota Secretary of State administratively dissolved Lead GHR on May 4, 2018, for failure to file three consecutive annual reports.   (Docket 50-3).

## A.    Wall collapse and investigation

One of the hotel's parking lots, located between the hotel and a neighboring recreational center, was supported by a retaining wall approximately 10 feet tall.   (Docket 45 at ¶ 5).   The physical layout of this wall, or wall system, is disputed between the parties.   Plaintiff characterizes it as a single wall attached to the main hotel building, extending outward to support the parking lot.   (Docket 53 at ¶ 2).   Defendant argues there were three separate walls, one attached to the hotel, another extending outward to support the parking lot, and a third attached to the recreational center.   (Docket 45 at ¶ 5).

---

[1]The hotel was known as the Golden Hills Resort at the time of the retaining wall collapse.   (Docket 1 at ¶ 1).   It later became a Days Inn franchise and now appears to be called the Copper Mountain Resort.   Id.; Docket 6 at ¶ 2.

During the early morning hours of October 10, 2010, the retaining wall supporting the parking lot collapsed.[2]  (Docket 53 at ¶ 3).  A substantial rainstorm—approximately four to six inches of rain—occurred in Lead during the evening of October 10, 2010, and into the morning hours of October 11.  (Docket 45 at ¶ 24).  Defendant alleges the rainstorm caused the collapse.  (Docket 44 at p. 1).  Plaintiff instead posits the wall may have decayed, leading to its collapse.  (Docket 60 at pp. 13-14).  Each party supports its theory of causation with expert reports.  (Dockets 50-4 & 50-32).

Lead GHR insured the hotel with a commercial property policy purchased from American States, effective from April 14, 2010, until April 14, 2011.  (Docket 61 at ¶¶ 6 & 9).  Plaintiff filed a claim with defendant on October 11, 2010.  (Docket 50-17 at pp. 7-8).  Defendant retained two insurance adjusters and an engineering firm to investigate plaintiff's claim.  (Docket 45 at ¶¶ 30, 33-34).  The first adjuster, Chris Shopshear of Eagle Adjusting Services, inspected the collapsed wall on October 18.  (Docket 50-15 at p. 2).  Mr. Shopshear stated in his post-inspection report, under a heading labeled "Origin of Loss," that the retaining wall collapsed during the October 10 rainstorm, but did not explicitly conclude the rainstorm caused the collapse.  Id. at p. 3; see

---

[2]The record is inconsistent regarding the date of the wall collapse. Plaintiff states the wall collapsed around 3:30 a.m. on October 10.  (Docket 53 at ¶ 3).  Defendant first stated the collapse occurred during the overnight hours between October 10 and 11, coinciding with the rainstorm.  (Docket 45 at ¶¶ 24 & 25).  Defendant's expert states in its initial report the collapse occurred on October 8.  (Docket 50-4 at p. 2).  Defendant later agreed to plaintiff's date in its response to plaintiff's statement of undisputed material facts.  (Docket 58 at ¶ 3).  The court accordingly adopts plaintiff's date.

<u>also</u> Docket 61 at ¶ 30. The second adjuster, Jonathan Lawlee, was an American States employee. (Docket 45 at ¶ 33). Mr. Lawlee inspected the wall on November 4 and concluded, in internal notes, "there is not much of a question on what caused the wall to collapse." <u>Id.</u> at ¶ 34. He blamed groundwater for the loss and informed the hotel's general manager the policy did not cover groundwater or retaining walls, but agreed to wait for the engineering report before deciding the claim. (Docket 50-17 at p. 2).

Defendant retained Haag Engineering, a Texas firm, to "determine the cause of retaining wall failure." (Docket 50-4 at p. 2). Haag engineers inspected the exterior of the wall on October 29 and determined the wall had "toppled outward (south), essentially hinging at the base." <u>Id.</u> at p. 4. The engineers noted the weep holes in the wall—openings designed to allow soil and water to drain—were clogged with soil at the time of inspection. <u>Id.</u> at p. 3. Based on their inspection and analysis, the engineers concluded

    1.    The retaining wall failure at the Golden Hills Resort resulted from earth pressure on the wall. The lateral earth pressure was likely increased by accumulated water behind the wall.

    2.    The wall was originally built with weep holes to help drain soil behind the wall. The wall and weeps were 20 years old. The weeps appeared clogged.

    3.    The wall failed due to bending stresses at the base of the wall that exceeded the capacity of the concrete and reinforcement.

<u>Id.</u> at pp. 6-7.

Plaintiff hired at least three experts to examine the wall.[3]   At the time of the collapse, plaintiff retained a South Dakota engineer, Allan Schreier of Schreier Engineering.   Mr. Schreier visited the site on October 29, and possibly on other dates.   (Docket 50-25 at p. 4).   The record does not contain a report detailing his conclusions from the site visit.   In a deposition, however, Mr. Schreier stated "I'm not disputing the Haag report. I agree that these are the most likely scenarios that happened and their statements are true."   Id. at p. 3.

After plaintiff commenced this litigation, it hired Robson Forensic, a Florida firm, to "look into the causation of the structural failure of the retaining wall[.]"   (Docket 50-27 at p. 3).   Engineer Mark Duckett visited the hotel on November 17, 2015.   Id. at p. 4.   At the time of Mr. Duckett's visit, the remnants of the retaining wall had been cleared away.   Id. at p. 5.   Mr. Duckett did not see the collapsed wall in person, only in photographs.   Id. Nevertheless, he opined in his January 26, 2017, report that:

> The structural collapse of the . . . retaining wall was caused by one or both of the following: latent decay/deterioration of the steel reinforcing of the concrete retaining wall system and/or latent decay deterioration of the weep hole/drainage system for the retaining wall.

---

[3]Defendant filed a 2013 report written by South Dakota engineer Michael Albertson.   (Docket 50-33).   Following a site visit, Mr. Albertson opined the wall's original construction was "deficient and dangerous" and "the primary cause for the failure of the wall."   Id. at p. 4.   The record does not disclose who commissioned this report or for what purpose.   As it was dated after plaintiff's insurance claim was denied but before the onset of this litigation, the court assumes plaintiff commissioned this report.

(Docket 50-32 at p. 7).   In Mr. Duckett's opinion, the resilience of the retaining wall through previous rainstorms indicated the wall's failure was more likely caused by latent decay.   Id. at p. 6.

**B.      Insurance policy and claim denial**

In section A.2 of the policy, which is titled "Property Not Covered," the policy excludes coverage for "[r]etaining walls that are not part of a building." (Docket 50-5 at pp. 40-41).   The parties vigorously dispute whether the retaining wall at issue here is part of the hotel building.   (Dockets 44 at pp. 18-20 & 53 at pp. 5-8).

The policy also excludes coverage for certain causes of loss.   (Docket 50-5 at pp. 71-75).   Section B.1 of the exclusions portion of the policy includes the following anti-concurrent causation provision.

> We will not pay for loss or damage caused directly or indirectly by any of the following.   Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

Id. at p. 71.   "Earth sinking . . . rising or shifting" as well as "the action of water under the ground surface" are excluded from coverage under this provision.   Id. The policy also excludes water-related causes of loss under the anti-concurrent causation provision.   Id. at p. 72.   A separate endorsement modifies the policy's exclusion of water-related causes of loss.   Id. at p. 39.   As modified, the policy excludes losses caused by:

> Water under the ground surface pressing on, or flowing or seeping through . . . [f]oundations, walls, floors, or paved surfaces . . . .

> This exclusion applies regardless of whether [the excluded loss] is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

Id. at p. 40.

The policy generally excludes coverage for collapses. Id. at p. 74. However, the policy includes a coverage "give-back," which covers some losses caused by collapses. (Docket 44 at p. 7). The policy creates the give-back by defining covered collapse losses as a "Covered Cause of Loss." (Docket 50-5 at p. 76). The term "Covered Cause of Loss" is itself defined as direct physical losses, subject to the policy's exclusions and limitations. Id. at p. 71.

In the give-back, collapse is defined as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." Id. at p. 76. The give-back covers collapses caused by "[d]ecay that is hidden from view[.]" Id. It also covers collapses caused by "[u]se of defective materials or methods in construction" if the collapse is also caused in part by another covered cause. Id.

Defendant denied plaintiff's claim in a letter on December 1 on three grounds. (Docket 50-19).

1. The retaining wall was not part of the hotel building. Defendant argued the "wall does not give the building any support or would not be considered part of [the] building." Id. at p. 3. The policy only covers retaining walls that are part of the building. Id.

2. The collapse was caused by "groundwater and soil pressing on the wall." Id. at p. 4. These causes are excluded from coverage. Id. at pp. 3-4.

8

3. The "weep holes were plugged and there was a lack of maintenance to the wall." Id. at p. 5. Collapse caused by maintenance coupled with groundwater is not covered. Id. at p. 7.

Plaintiff did not dispute the denial or communicate further with defendant on this matter until it filed this suit. (Docket 45 at ¶ 43).

## II. Legal Standards

### A. Summary judgment

Under Federal Rule of Civil Procedure 56(a), a movant is entitled to summary judgment if the movant can "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party meets its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing that a genuine issue of material fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). Only disputes over facts which might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. Id. at p. 248. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247-48 (emphasis in original).

If a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate. Id. However, the moving party is

entitled to judgment as a matter of law if the nonmoving party failed to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In such a case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at p. 323.

In determining whether summary judgment should issue, the facts and inferences from those facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88. The key inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at pp. 251-52.

**B.    South Dakota insurance law**

"State law governs the interpretation of insurance policies when federal jurisdiction is based on diversity of citizenship." Secura Ins. v. Horizon Plumbing, Inc., 670 F.3d 857, 861 (8th Cir. 2012). Jurisdiction in this case is based on diversity of citizenship pursuant to 28 U.S.C. § 1332. (Dockets 1 at ¶ 4 & 6 at ¶ 5). Here, the dispute centers on an insurance policy sold in South Dakota to cover a South Dakota hotel. The parties agree South Dakota law governs.

### 1. Insurance policy interpretation

The South Dakota Supreme Court "developed special rules of construction that apply when interpreting an insurance policy." Cornelius v. National Cas. Co., 813 N.W.2d 167, 169 (S.D. 2012) (citations omitted). Courts must "construe an insurance contract's language 'according to its plain and ordinary meaning' and . . . not 'make a forced construction or a new contract for the parties.' " Dakota Fire Ins. Co. v. J & J McNeil, LLC, 849 N.W.2d 648, 650 (S.D. 2014) (quoting Ass Kickin Ranch, LLC v. N. Star Mut. Ins. Co., 822 N.W.2d 724, 727 (S.D. 2012)). "When an insurer seeks to invoke a policy exclusion as a means of avoiding coverage, the insurer has the burden of proving that the exclusion applies." Owners Ins. Co. v. Tibke Constr., Inc., 901 N.W.2d 80, 83 (S.D. 2017) (citations omitted). When an insurance policy is "fairly susceptible of different interpretations" the court should adopt a "rule of liberal construction in favor of the insured and strictly against the insurer[.]" Nat'l Sun Indus., Inc. v. S.D. Farm Bureau Ins. Co., 596 N.W.2d 45, 48-49 (S.D. 1999) (citations omitted). "This rule does not mean, however, that the court may seek out a strained or unusual meaning for the benefit of the insured." Id. at 50.

### 2. First-party bad faith

South Dakota recognizes a "cause of action against an insurance company for bad faith failure to pay a claim." Champion v. U.S. Fidelity & Guaranty Co., 399 N.W.2d 320, 322 (S.D. 1987). A plaintiff alleging bad faith must show two components: the "absence of a reasonable basis for denial of policy benefits" and

"the [insurer's] knowledge of [the lack of] a reasonable basis for denial."

Mordhorst v. Dakota Truck Underwriters & Risk Admin. Servs., 886 N.W.2d 322, 324 (S.D. 2016) (quoting Champion, 399 N.W.2d at 324) (brackets in original).

Bad faith claims may be classified as either first or third-party, depending on the relationship between the insurer and insured. In a first-party relationship, there is "a contractual relationship, whereby the insurer has accepted a premium from its insured to provide coverage." Hein v. Acuity, 731 N.W.2d 231, 236 (S.D. 2007). The South Dakota Supreme Court describes first-party bad faith as

> an intentional tort [that] typically occurs when an insurance company consciously engages in wrongdoing during its processing or paying of policy benefits to its insured. In these cases, the parties are adversaries, and therefore, an insurer is permitted to challenge claims that are fairly debatable. However, a frivolous or unfounded refusal to comply with a duty under an insurance contract constitutes bad faith.

Id. at 235 (citations omitted). Bad faith may "extend to situations beyond mere denial of policy benefits." Id. at 236 (citing Julson v. Federated Mut. Ins. Co., 562 N.W.2d 117, 119 (S.D. 1997)). "[T]he failure to conduct a reasonable investigation concerning the claim[]" may be bad faith. Dakota, Minn. & E. R.R. Corp. v. Acuity, 771 N.W.2d 623, 629 (S.D. 2009). "Whether Insurer acted in bad faith in conducting an inadequate investigation . . . is a question of fact[.]" Walz v. Fireman's Fund Ins. Co., 556 N.W.2d 68, 70 (S.D. 1996) (citing Isaac v. State Farm Mut. Auto. Ins. Co., 522 N.W.2d 752, 758 (S.D. 1994)).

### 3.      Punitive damages

South Dakota law permits a jury to award punitive damages for "any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed[.]" SDCL § 21-3-2.   "[P]unitive damages are not allowed absent an award for compensatory damages."  <u>Schaffer v. Edward D. Jones & Co.</u>, 521 N.W.2d 921, 928 (S.D. 1994).   Although punitive damages may not be awarded for a breach of contract, an insured may "seek punitive damages from her insurer when prosecuting a bad faith action."  <u>Biegler v. Am. Family. Mut. Ins. Co.</u>, 621 N.W.2d 592, 604 (S.D. 2001) (citing <u>Harter v. Plains Ins. Co.</u>, 579 N.W.2d 625 (S.D. 1998).

## III.   Defendant's Summary Judgment Motion

Defendant argues plaintiff's loss was not covered by the policy and it properly denied plaintiff's insurance claim.   (Docket 44 at pp. 1-2).   On this theory, defendant cannot be liable for breach of contract, bad faith, or punitive damages as a matter of law.   <u>Id.</u>   Defendant further argues plaintiff's conversion claim regarding the insurance premiums is baseless because the premiums were consideration for the insurance contract, giving defendant a stronger interest in the premiums than plaintiff.   <u>Id.</u> at pp. 27-28.   The court will examine each of defendant's contentions in turn.

As an initial matter, however, the court will consider defendant's suggestion that plaintiff may lack standing to bring this case.   "Under Article III

of the United States Constitution, federal courts may only adjudicate actual cases and controversies." Pucket v. Hot Springs School Dist. No. 23-2, 526 F.3d 1151, 1157 (8th Cir. 2008). "To show Article III standing, a plaintiff has the burden of proving: (1) that he or she suffered an injury-in-fact, (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision." Id. (internal citation and quotation omitted). In a footnote in its reply brief to plaintiff's motion for partial summary judgment, defendant notes plaintiff sold the hotel to a separate corporation, Roundhouse Properties, LLC, before initiating this case. (Docket 57 at p. 2 n.1). Defendant also notes the South Dakota Secretary of State administratively dissolved plaintiff as a corporation. Id. Defendant implies plaintiff may lack standing due to these ownership and corporate status questions. Id.

Plaintiff and Roundhouse agreed their intent "[a]t the time of the acquisition . . . . was and is that the claim remain the property" of plaintiff. (Docket 54-1). Defendant takes issue with this agreement because it was signed by plaintiff and Roundhouse in May of 2018, long after plaintiff sold the hotel. (Docket 57 at p. 2 n.1). The agreement memorializes the intent of the parties regarding this insurance claim as of the date of the hotel sale. Defendant does not argue plaintiff intended to sell its right to prosecute this claim when it sold the hotel to Roundhouse nor does it suggest the agreement is

otherwise fraudulent. The court concludes plaintiff retained ownership of this insurance claim when it sold the hotel to Roundhouse.

Defendant also suggests plaintiff may be unable to prosecute this action due to its administrative dissolution. Id. South Dakota law forecloses this argument. "A corporation administratively dissolved continues its corporate existence but may not carry on any business except . . . under . . . [SDCL §] 47-1A-1405.1[.]" SDCL § 47-1A-1421. SDCL § 47-1A-1405.1 states corporate dissolution "does not . . . [a]bate or suspend a proceeding pending by or against the corporation on the effective date of dissolution[.]" Under South Dakota law, plaintiff is able to prosecute this claim despite its administrative dissolution. The court finds plaintiff has standing to bring and prosecute this action.

### A. Breach of contract

Defendant raises three arguments to support its contention that the policy did not cover the retaining wall collapse.

1. The retaining wall was not "part of" the hotel building and so was excluded from coverage. (Docket 44 at pp. 18-20).

2. The policy excludes coverage for losses caused by water, earth movement, and negligent workmanship. The loss here was caused by at least one of these forces. Id. at pp. 20-25.

3. The policy's give-back collapse coverage does not include the loss because the collapse did not render the hotel unable to be occupied and because the collapse must not be caused by an excluded force. Id. at pp. 25-26.

The court finds summary judgment is not appropriate on the breach of contract claim. It will address each argument in turn.

### 1. Whether the retaining wall was "part of" the hotel building

The policy excludes coverage for "retaining walls that are not part of a building." (Docket 50-5 at p. 41). Defendant, quoting from the Merriam-Webster dictionary, defines "part" as an "essential portion or integral element." (Dockets 44 at p. 19 & 50-31). As the wall's collapse did not "impact . . . the structure of the hotel or . . . its day-to-day operations," defendant argues the wall cannot be an essential portion or integral element of the hotel. (Docket 44 at pp. 18-19). Defendant also contends the collapsed wall was not attached to the hotel building, but instead argues the collapsed wall was attached to a separate wall connected to the hotel. Id. at p. 18. Under this view, the collapsed wall was not part of the hotel building and so was excluded from coverage.

Plaintiff argues the collapsed wall was one part of a single wall "bound to the rest of the building with rebar, concrete and stucco[.]" (Docket 60 at p. 11). Plaintiff also notes the policy did not define "part of" and argues defendant's definition requires plaintiff to prove the wall provided structural support to the hotel to invoke coverage. Id. at p. 12. In plaintiff's view, defendant is creating additional exclusions not originally written into the policy "through hidden/undisclosed terms." Id.

South Dakota courts do not appear to have considered whether a retaining wall is a part of a building for insurance purposes. Other caselaw suggests the question is one of fact for a jury to determine. In a situation resembling the

instant case, the District Court for the Northern District of Iowa concluded it could not determine whether a retaining wall was part of an insured clubhouse and refused to resolve the issue on summary judgment. <u>Sioux City Country Club v. Cincinnati Ins. Co.</u>, No. C03-4071, 2004 WL 1559705, at *6 (N.D. Iowa 2004). In that case, a retaining wall collapsed due to a rainstorm and the insurer contended the resulting damage was an excluded loss. <u>Id.</u> at *1. The policy at issue, like the instant policy, excluded coverage for retaining walls that are not part of the insured building. <u>Id.</u> at *2. The court found the dispute to be a "factual issue that cannot be resolved on summary judgment." <u>Id.</u> at *6.

Two state supreme courts also found whether a retaining wall is part of an insured building to be a fact question. The Supreme Court of Virginia, confronted with an insurance policy excluding "retaining walls not constituting a part of a building," determined "it was a question of fact whether the . . . wall was covered by the policy's definition[.]" <u>Fidelity & Guar. Ins. Underwriters, Inc. v. Allied Realty Co., Ltd.</u>, 384 S.E.2d 613, 617 (Va. 1989). In that case, the retaining wall was physically attached to an insured warehouse and a jury, in its damage award, determined the wall was covered under the policy. <u>Id.</u> The Supreme Court of Alabama likewise found the question of whether a retaining wall was part of an insured dwelling to be one of fact. <u>State Farm Fire & Cas. Co. v. Slade</u>, 747 So.2d 293, 310 (Ala. 1999). <u>Slade</u> concerned a retaining wall that collapsed after being struck by lightning, allegedly causing damage to the main building. <u>Id.</u> at 297-98. The wall was attached to the main building. <u>Id.</u>

at 297.   The policy at issue covered "structures attached to the dwelling."   Id. at 309.   The court concluded the insurer was not entitled to a preverdict judgment as a matter of law because the issue was properly before the jury as a question of fact.   Id. at 310.

Here, viewing the record in the light most favorable to plaintiff, the court finds a genuine question of material fact exists as to whether the collapsed wall was a part of the insured hotel building.   The site of the hotel is hilly and requires a retaining wall to create level space.   (Docket 50-32 at p. 4).   A jury could find the retaining wall was, to use defendant's definition, an "essential portion or integral element" of the hotel.   (Docket 50-31).   Furthermore, the collapsed retaining wall was connected to the hotel building, either directly or via another wall, depending on one's point of view.   These facts are sufficient for a jury to find the wall was part of the hotel building.   The court denies defendant's motion for summary judgment on this issue.

## 2.     Whether excluded perils caused the loss

The policy contains an anti-concurrent causation provision which excludes coverage for "loss or damage" caused "directly or indirectly" by certain perils "regardless of any other cause or event that contribute[d] concurrently or in any sequence to the loss."   (Docket 50-5 at p. 71).   Among the excluded perils are "[e]arth sinking . . . rising or shifting . . . and the action of water under the ground surface."   Id.   Loss caused by "[w]ater under the ground surface pressing on, or flowing or seeping through . . . [f]oundations, walls, floors, or

18

paved surfaces" is excluded.   Id. at p. 72.   Finally, loss caused by "[f]aulty, inadequate or defective . . . construction . . . maintenance . . . of part or all of any property on or off the described premises" is excluded under the anti-concurrent causation provision.   Id. at p. 74.   Defendant argues the retaining wall collapse here was caused, at least in part, by one of these excluded perils.   (Docket 44 at pp. 20-25).

Plaintiff asserts an alternative theory of causation.   Its engineering expert, Mark Duckett, found the collapse "was caused by one or both of the following: latent decay/deterioration of the steel reinforcing of the concrete retaining wall system and/or latent decay deterioration of the weep hole/draining system for the retaining wall."   (Docket 50-32 at p. 7).   Mr. Duckett opined that water or earth pressure was not a cause of the collapse because the wall had weathered heavier rainstorms, as measured by rainfall records from Spearfish, South Dakota.   Id. at pp. 5-6.   He also noted the lack of evidence "indicating that the retaining wall system was cracked, tilted, leaning or otherwise non-performing" between its construction and collapse.   Id. at p. 6.   As the wall failed to collapse in heavier rainstorms and showed no external signs of decay, Mr. Duckett concluded latent decay or deterioration of the wall or its drainage system was to blame for the collapse.   Id.

The court first finds the anti-concurrent causation clause is enforceable. The Central Division of this court concluded in 2010 "the Supreme Court of South Dakota would follow the great weight of the authority to allow parties to

contractually agree" to anti-concurrent causation clauses.   <u>Swenson v. State</u>

<u>Farm Fire & Cas. Co.</u>, 891 F. Supp. 2d 1101, 1110 (D.S.D. 2012).   Plaintiff does

not argue the anti-concurrent causation clause is unenforceable under South

Dakota law.   The court applies <u>Swenson</u> and will enforce the policy's

anti-concurrent causation provision as appropriate.

The court next finds that the parties' competing causation theories present

a genuine dispute of material fact that cannot be resolved through summary

judgment.   This is admittedly a close question.   It seems unlikely the retaining

wall collapse at issue here—which both parties agree took place during or close

in time to a torrential rainstorm—was entirely unrelated to water or earth

movement.   Nevertheless, this is the position plaintiff takes.   (Docket 60 at

pp. 13-14).   Viewing the issue of causation in the light most favorable to

plaintiff, the nonmoving party, the court finds a jury could reasonably infer water

or earth movement was not the cause of the collapse from plaintiff's assertion the

retaining wall had survived multiple previous rainstorms.

Defendant's attempts to discredit Mr. Duckett are not persuasive at this

stage of the litigation.   Mr. Duckett's expert report is not "mere speculation or

conjecture," as defendant claims.   (Docket 65 at p. 13) (quoting <u>Bayside</u>

<u>Holdings, Ltd. v. Viracon, Inc.</u>, 709 F.3d 1225, 1228 (8th Cir. 2013)).   In fact, the

report stems from a site visit and a review of applicable evidence, combined with

Mr. Duckett's South Dakota engineering certification and 30-plus years of

professional experience.   (Dockets 50-32 at p. 3 & 50-38 at pp. 6-7).

Defendant's invitation to disregard Mr. Duckett's expert report on the basis it is not "competent evidence" misconceives the summary judgment standard. (Docket 65 at p. 13).   The court must determine whether Mr. Duckett's report creates a genuine dispute of material fact, not whether it is entitled to any specific weight.   Attacks on the credibility of Mr. Duckett's report or expert opinion are better addressed to a jury.[4]   See Magner v. Brinkman, 883 N.W.2d 74, 82 (S.D. 2016) ("Fact finders are free to reasonably accept or reject all, part, or none of an expert's opinion.").

Viewing the issue of causation in the light most favorable to plaintiff, the nonmoving party, the court finds a reasonable jury could endorse plaintiff's theory of causation.   Because a genuine dispute of material fact exists, the court denies defendant's motion for summary judgment on the issue of whether the loss triggered the policy's anti-concurrent causation clause.

### 3.   Whether the give-back collapse coverage includes the loss

The policy includes a give-back provision that extends coverage to certain collapse losses.   (Docket 50-5 at pp. 76-77).   Collapse is defined as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended

---

[4]Defendant moved *in limine* to exclude Mr. Duckett's expert testimony. (Docket 48).   The court's finding Mr. Duckett's report creates a genuine dispute of material fact in the summary judgment context does not answer the distinct question of whether his expert testimony is admissible under Federal Rule of Evidence 702.   The court will resolve defendant's motion *in limine* following a pretrial conference consistent with its typical practice.

purpose." Id. at p. 76. The give-back applies when the collapse is caused by "[d]ecay that is hidden from view, unless the . . . decay is known to an insured prior to collapse[.]" Id. "With respect to . . . retaining walls" the policy covers collapse losses only if the wall is covered by the policy. Id. at p. 77.

The give-back provision functions by defining covered collapse losses as included under the term "Covered Cause of Loss." Id. at p. 76. A covered cause of loss is subject to the policy's exclusions. Id. at p. 71. The exclusions contain the anti-concurrent causation provision described above. See supra Section III.A.2.

Defendant argues the give-back does not cover the retaining wall collapse because the collapse did not render the hotel incapable of being occupied and because the collapse was caused by earth and water movement, which are excluded perils under the anti-concurrent causation provision. (Docket 44 at pp. 25-26). Plaintiff responds that the wall is part of the building and, due to the collapse, could no longer serve its "intended function" of creating level space for the use of the hotel. (Docket 60 at p. 14). In plaintiff's view, the loss escapes the anti-concurrent clause provision because the collapse was caused by decay, not by an excluded cause.[5] Id. at pp. 12-13.

_____

[5]In its cross-motion for partial summary judgment, plaintiff asks the court to declare the give-back coverage is not subject to the anti-concurrent causation provision. (Docket 52 at pp. 13-18). The court rejects that argument below, see infra Section IV.A, and need only consider here plaintiff's argument that the anti-concurrent causation clause does not apply because the collapse's cause was not excluded.

The court's previous findings foreclose the possibility of summary judgment on these issues. As to the argument that the wall is not part of the building, the court found this issue to be one of fact for the jury. See supra Section III.A.1. Defendant's argument the policy's occupancy requirement necessarily refers to the hotel building is unpersuasive. The plain terms of the policy require that "the building *or part of the building* cannot be occupied for its intended purpose" before the give-back coverage applies. (Docket 50-5 at p. 78) (emphasis added). If the wall is part of the building, determining whether it collapsed as contemplated by the policy cannot be done by examining only the main part of the hotel building in isolation.

Defendant also argues a wall cannot be occupied whether it is standing or collapsed and the parking lot the wall existed to support is not covered by the policy. (Docket 65 at pp. 12-13). Defendant points to dictionary definitions of the word occupied as "being used by someone," "to take up (a place or extent in space), or "to reside in as an owner or tenant" to support its argument. Id. at p. 12; see also Dockets 72-6 & 72-7.

The court rejects this constrained view of the policy. Under this view, a retaining wall could never collapse as contemplated by the policy because of its inability to be occupied. Such an outcome clashes with the policy language, which expressly envisions the possibility of collapse coverage for retaining walls. (Docket 50-5 at p. 77). Defendant's theory would also curtail the language imposing the occupancy requirement. The policy requires "the building or part

of the building cannot be occupied *for its intended purpose.*" Id. at p. 76

(emphasis added).   Reading the policy to equate occupancy with residence or

other spatial inhabitation would eliminate the possibility a part of a covered

building could collapse as envisioned by the policy unless its intended purpose

was residence or other spatial inhabitation.   Here, the wall's collapse rendered it

unfit "for its intended purpose" of creating level space for the hotel.   Id.   The

court cannot conclude as a matter of law that the give-back's occupancy

requirement bars coverage of the wall collapse.

Defendant's argument that the anti-concurrent causation provision

prevents application of the give-back provision also relies on a factual finding the

court cannot make on summary judgment.   The court previously found a jury

must determine the cause of the wall's collapse.   See supra Section III.A.2.

That factual finding will govern whether the give-back provision comes into play.

If the jury finds the collapse was caused by water or earth movement, the

anti-concurrent causation provision will bar plaintiff from invoking the give-back

coverage.   See infra Section IV.A.   If the jury determines decay caused the

collapse, the give-back coverage may well apply.   The court denies summary

judgment to defendant on the question of whether the give-back excludes

coverage for the collapse as a matter of law.

### B.    Bad faith

Defendant seeks summary judgment on plaintiff's bad faith claim.

(Docket 43 at pp. 1-2).   It advances three arguments in support of its motion:

1. Defendant's denial of plaintiff's claim had a reasonable basis because the policy's coverage of the loss was at least fairly debatable.   (Docket 44 at pp. 29-30).

2. Plaintiff failed to provide legally cognizable evidence of damages resulting from the alleged bad faith denial of its claim.   Id. at pp. 30-33.

3. Defendant had no duty to give equal consideration to plaintiff's interests while considering plaintiff's claim.   Id. at pp. 33-35.

Addressing each argument in turn, the court concludes defendant is entitled to partial summary judgment on the bad faith claim.   The court finds defendant owed no duty of equal consideration to plaintiff.   Because genuine questions of material fact exist regarding defendant's other two arguments, the court denies summary judgment on those issues.

## 1. Whether defendant had a reasonable basis to deny the claim

Defendant argues the bad faith claim is unsustainable under South Dakota law.   In its view, there was "ample" and "abundant" evidence at the time it was considering plaintiff's claim that the loss "was either not covered at the outset, or caused by an excluded peril."   (Docket 44 at pp. 29-30).   Plaintiff responds defendant failed to adequately investigate the loss.   (Docket 60 at pp. 19-21).   Plaintiff argues a "full investigation" would have revealed "the latent decay and deterioration of the wall identified by Mr. Duckett[.]"   Id. at p. 20.

"In order to be successful on a claim of bad faith, a plaintiff must prove: (1) an absence of a reasonable basis for denial of policy benefits, and (2) the insurer's knowledge of the lack of a reasonable basis for denial."   Harvieux v.

Progressive N. Ins. Co., 915 N.W.2d 697, 701 (S.D. 2018). "[A]n insurer is permitted to challenge claims that are fairly debatable." Hein v. Acuity, 731 N.W.2d 231, 235 (S.D. 2007). In South Dakota, "[b]ad faith conduct may include the failure to conduct a reasonable investigation concerning the claim." Dakota, Minn. & E. R.R., 771 N.W.2d at 629. Whether defendant conducted a reasonable investigation "is determined based upon the facts and law available . . . at the time it made the decision to deny coverage." Id. "The question of whether an insurer has acted in bad faith is generally a question of fact." Id. at 629-30. Viewing the facts in the light most favorable to plaintiff, the court must determine whether there is a genuine dispute of material fact regarding whether defendant conducted a reasonable investigation of plaintiff's claim based on the facts and law available at the time of the denial.

Defendant denied this claim on December 1, 2010. (Docket 50-19). Following the October 10, 2010, collapse, defendant hired Chris Shopshear, a local claims adjuster, to inspect the loss. (Docket 50-15 at p. 2). Mr. Shopshear visited the site on October 18. Id. In a phone call, Mr. Shopshear told the American States adjuster who assigned the case to him, Steve Zaichek, "that the wall may not have been constructed properly." Id.; Docket 54-10 at p. 2. Mr. Shopshear "found very little rebar in place." (Docket 54-10 at p. 2). In his report to Mr. Zaichek, however, Mr. Shopshear did not expressly state what caused the loss. He noted the collapse occurred during the rainstorm. (Docket 50-15 at p. 3). Mr. Shopshear also stated "[t]here is no subrogation

potential as an act of nature caused the damage." Id. Defendant then transferred plaintiff's claim to another adjuster "for handling" and concluded an expert was necessary "for examination of cause[.]" (Docket 54-10 at p. 3). Defendant's engineers, Haag Engineering, inspected the exterior of the retaining wall, the associated tunnel and elevator shaft, as well as the surrounding hill and parking lot. (Docket 50-4 at pp. 4-5). The Haag report does not indicate they examined the interior of the wall or otherwise tested it for poor construction or decay.

These facts, viewed in the light most favorable to plaintiff, create a genuine question of material fact regarding the sufficiency of defendant's investigation. One of defendant's own agents, following an inspection barely a week after the loss, raised questions about the internal condition of the wall. Defendant's engineers nevertheless did not examine the wall's internal strength or otherwise evaluate it as a primary or contributing cause of the collapse prior to denying plaintiff's claim. A jury could conclude defendant's failure to investigate the wall's internal strength—despite its adjuster's warning—constitutes "failure to conduct a reasonable investigation[.]" Dakota, Minn. & E. R.R., 771 N.W.2d at 629. Accordingly, the court denies summary judgment to defendant on this issue.

### 2. Whether plaintiff failed to produce evidence of damages

Defendant next asserts plaintiff "failed to produce any evidence that the alleged bad faith of American States resulted in any damage separate and

distinct from the contractual breach." (Docket 44 at p. 30). Defendant concedes "attorney's fees expended to pursue a breach of contract action may arguably be recoverable as an element of compensatory damages for bad faith[.]" Id. at p. 31. However, it argues attorney's fees cannot satisfy the damages element of the bad faith claim here because plaintiff failed to identify attorney's fees as damages under Federal Rule of Civil Procedure 26(a)(1)(A)(iii) and because the fees do not stem from a prior breach of contract action. Id. at pp. 31-32.

Plaintiff responds it is "not seeking attorney's fees associated with this litigation as bad faith damages." (Docket 60 at p. 22). It instead claims "expenses for things like filing fees, deposition transcripts, and copies" as its damages resulting from the bad faith claim. Id. After defendant filed its summary judgment motion, plaintiff provided to defendant amended disclosures of its damages calculation, claiming "continuing" damages totaling $17,247.84. (Docket 64-16). Plaintiff's amended disclosures do not itemize the claimed damages or indicate the "documents or other evidentiary material . . . on which [the] computation is based" have been provided to defendant. Id.; Fed. R. Civ. P. 26(a)(1)(A)(iii). Defendant argues the amended disclosure is untimely and insufficient. (Docket 65 at p. 21). Defendant further asserts plaintiff cannot present evidence of these damages to the jury because it would require expert testimony, which plaintiff has not noticed. Id. at p. 22. Defendant more generally questions whether litigation costs are legally cognizable as damages for a bad faith claim. Id. at p. 23.

Plaintiff's initial Rule 26(a)(1) damages disclosure regarding the bad faith count claimed only "[o]ther damages in an amount to be determined as a consequence of the Defendant's bad faith refusal to pay Plaintiff's insured loss." (Docket 50-26 at p. 4). Plaintiff also stated in that disclosure, "this answer will be supplemented at the appropriate time." Id.

The court previously allowed an insured[6] to present "evidence of any incidental expenses" to satisfy the damages element of a bad faith claim. Lead GHR Enters. v. Am. States Ins. Co., CIV. 12-5056 (Docket 173 at p. 7) (D.S.D. Mar. 16, 2015) (internal quotation omitted). Plaintiff's claimed damages are the type of incidental expenses that may be presented to the jury for its consideration in determining whether defendant's alleged bad faith claim denial damaged plaintiff. Defendant conflates the requirement that plaintiff present evidence of damages as an element of its bad faith claim with the ability of the jury or the court to award damages or costs. (Docket 65 at p. 22) (assuming plaintiff providing evidence of costs to satisfy the damage element would require the jury to determine if the costs were reasonable). If plaintiff seeks to establish the damages element of its bad faith claim with evidence of incidental litigation expenses, the actual awarding of costs would not necessarily be governed by the evidence plaintiff offered at trial. The court's local rules establish a process for taxation of costs that the prevailing party will have to use. D.S.D. Civ. LR 54.1.

---

[6]In fact, the prior case involved these same parties. However, the subject matter of the prior case was a hail-damaged roof. See CIV. 12-5065 (Dockets 82 & 70).

Defendant argues plaintiff's amended notice is insufficient and untimely. (Docket 65 at pp. 20-21). This concern strikes the court as disingenuous. So far as the court is aware, defendant made no discovery requests for a more detailed accounting of plaintiff's bad faith damages. Neither party filed a motion to compel relating to evidence of damages. In its initial Rule 26(a)(1) disclosures, plaintiff informed defendant it had "not definitively determined its damages" and would require expert testimony because it had "no personal knowledge on the matter." (Docket 50-26 at p. 4). When defendant made its concerns known in its motion for summary judgment, plaintiff promptly responded with an amended disclosure. (Docket 64-16).

Under these circumstances, the court struggles to discern any prejudice to defendant from plaintiff's amended disclosure. In addressing a Rule 26(a)(1)(A)(iii) violation, the United States Court of Appeals for the Eighth Circuit approved the use of a balancing test weighing "the importance of the evidence," the "justifications" for the late disclosure, the prejudice to the opposing party, and "whether a continuance would effectively cure the prejudice." Carmody v. Kan. City Bd. Of Police Com'rs., 713 F.3d 401, 405 (8th Cir. 2013) (citing Citizens Bank of Batesville, Ark. v. Ford Motor Co., 16 F.3d 965, 966 (8th Cir. 1994)). Here, the evidence of incidental litigation costs is important because it establishes one of the elements of plaintiff's bad faith claim. Plaintiff's amended disclosure came after the end of discovery because it had no indication defendant was dissatisfied with its disclosure. Furthermore, plaintiff was required to

supplement its disclosure when it "learn[ed] that in some material respect the disclosure . . . [was] incomplete[.]" Fed. R. Civ. P. 26(e)(1)(A). Defendant does not suggest plaintiff should have amended its disclosure earlier.

Moreover, defendant points to no prejudice that could not be cured with a limited reopening of discovery if it felt that step necessary. Defendant asserts it cannot determine which of plaintiff's costs stem from the bad faith claim as opposed to its breach of contract claim. (Docket 65 at p. 21). This confusion, assuming it is at all prejudicial, can be cured with limited additional discovery.

Plaintiff asserted sufficient evidence to allow a reasonable jury to determine that defendant's bad faith denial of its insurance claim damaged it. If defendant believes it needs further information regarding plaintiff's claimed bad faith damages, it may move to reopen discovery for that limited purpose. The court denies summary judgment on this issue.

### 3. Whether defendant had equal consideration duty

Finally, defendant argues it had no duty to give equal consideration to plaintiff's interests while it was considering plaintiff's claim. (Docket 44 at pp. 33-35). In defendant's view, the equal consideration duty arises in third-party insurance relationships, where the insurer has a legal responsibility to defend its insured against the claims of others. Id. at pp. 33-34. Plaintiff responds that defendant misread applicable South Dakota law and that the equal consideration duty is present in the first-party context as well. (Docket 60 at pp. 16-17).

The South Dakota Supreme Court helpfully analyzed this issue in a recent decision. That court, which supplies the law governing this diversity action, held a "tort duty of equal consideration in insurance bad faith cases" exists in the "third-party claims process." Zochert v. Protective Life Ins. Co., 921 N.W.2d 479, 489 (S.D. 2018) (emphasis omitted). In Zochert, the South Dakota Supreme Court was confronted with an insured's claim that the insurer failed "to give his interest in having the claim paid equal weight to the company's interest in not paying the claim." Id. (emphasis omitted). The court declined "to transfigure the duty of equal consideration into an implied contractual provision in a first-party claims context[.]" Id. Noting "an insurer determining a first-party claim does not act like a fiduciary with respect to its insured," the court feared "imposing a duty of equal consideration for first-party claims" because it "could fundamentally alter the rights and obligations of insureds and insurers contained in the express contractual provisions of the policy." Id. at pp. 489-90 (internal quotation and citation omitted). However, the court did not explicitly hold there is no equal consideration duty in the first-party context because such a holding was unnecessary on the facts before it. Id. at 490.

When confronted with issues of first impression under South Dakota law, even when the issue has, like here, been decided in all but name, this court must attempt to predict how the South Dakota Supreme Court would resolve the issue. See Raines v. Safeco Ins. Co. of Am., 637 F.3d 872, 875 (8th Cir. 2011). The South Dakota Supreme Court in Zochert avoided an explicit holding that an

32

equal consideration duty does not apply in the first-party context only because such a holding did not resolve the issue on appeal. 921 N.W.2d at 490. The dicta in that opinion nevertheless make clear South Dakota law does not favor "imposing a duty of equal consideration for first-party claims[.]" Id. Based on Zochert, the court predicts the South Dakota Supreme Court would hold there is no duty for an insurer to give the interests of its insured equal consideration in the first-party context. Accordingly, defendant did not owe such a duty to plaintiff in its consideration of plaintiff's claim. The court grants summary judgment to defendant on this issue. However, plaintiff's bad faith claim persists. It simply may not prove that claim under an equal consideration theory.

### C.    Punitive damages

Defendant seeks summary judgment on plaintiff's punitive damages claim. It argues punitive damages are not available as a matter of law because plaintiff failed to show bad faith or compensatory damages on its bad faith claim. (Docket 44 at pp. 35-37). Plaintiff responds that it presented sufficient evidence of extracontractual damages to survive summary judgment on the punitive damages claim. (Docket 60 at p. 24).

Defendant is correct that the availability of punitive damages is tied to the existence of a viable bad faith claim and the presence of compensatory damages for that claim. See Berry v. Time Ins. Co., 798 F. Supp. 2d 1015, 1021-22 (D.S.D. 2011). However, the court determined plaintiff's bad faith claim

survived summary judgment, including its allegation of compensatory damages.

See supra Sections III.B.1-2.   Plaintiff's punitive damages claim survives as well.

Summary judgment on the punitive damages claim is denied.

### D.   Conversion

Defendant argues "[t]here is no legal basis for a conversion cause of action"

where an insured claims the insurer converts its premiums.   (Docket 44 at

p. 27).   Plaintiff asserts conversion is established if it prevails on its bad faith

claim, relying on a case from the Southern Division of this court.   (Docket 60 at

p. 23) (citing Hurley v. State Farm Mut. Auto. Ins. Co., No. CIV. 10-4165, 2012

WL 6012803 at *4, n.3 (D.S.D. 2012)).   The court finds plaintiff cannot maintain

its conversion claim as a matter of law.

In South Dakota, the elements of conversion are:

> (1) plaintiff owned or had a possessory interest in the property;
> (2) plaintiff's interest in the property was greater than the
> defendant's; (3) defendant exercised dominion or control over or
> seriously interfered with plaintiff's interest in the property; and
> (4) such conduct deprived plaintiff of its interest in the property.

W. Consol. Co-op v. Pew, 795 N.W.2d 390, 397 (S.D. 2011) (citations and

alterations omitted).   Plaintiff alleges defendant converted its premiums.

(Docket 1 at ¶¶ 22-24).   Plaintiff paid its premiums to defendant in exchange for

insurance coverage.   It no longer owned the premiums after they were paid.

This is not a bailment situation where defendant was in possession of the

premiums without obtaining ownership over them.   Defendant took ownership

of the premiums as payment for the policy and plaintiff no longer had any legal

interest in those funds. Plaintiff cannot now attempt to recover those premiums on a conversion theory because it believes defendant breached the insurance contract. A breach of contract action is the appropriate remedy in such circumstances.

Plaintiff's reliance on <u>Hurley</u> is misplaced. In <u>Hurley</u>, the court analogized "[a]n insurer's failure to pay policy benefits" to conversion in analyzing whether an insured could recover attorney's fees expended in a previous breach of contract action in a subsequent bad faith tort action. 2012 WL 6012803 at *4, n.3. Plaintiff quotes dicta from the analogy used in <u>Hurley</u> in an attempt to suggest this court held a claim for conversion necessarily accompanies bad faith. (Docket 60 at p. 23). This theory is legally inaccurate and twists <u>Hurley</u> beyond recognition. The court rejects it. Summary judgment is appropriate on plaintiff's conversion claim.

**E.    Conclusion**

In summary, the court holds genuine questions of material fact exist as to plaintiff's breach of contract, bad faith, and punitive damage claims, except for plaintiff's equal consideration theory. The court therefore grants defendant's motion for summary judgment in part and denies it in part as to these claims which constitute counts I, II and IV of the complaint. The court holds plaintiff's conversion claim fails as a matter law and grants defendant's motion for summary judgment as to count III of the complaint.

**IV.    Plaintiff's Motion for Partial Summary Judgment**

Plaintiff moves for partial summary judgment on three issues.    (Docket 52 at pp. 2-3).    As summarized by the court, those issues are:

1.    Whether the retaining wall was covered property under the policy.    Id. at pp. 4-12.

2.    Whether the anti-concurrent causation clause in the policy governs the collapse give-back coverage.    Id. at pp. 13-18.

3.    Whether the term "decay," as used in the policy, applies only to organic material.    Id. at pp. 19-21.

Defendant opposes the motion in its entirety.    (Docket 57).    The court previously held the question of whether the retaining wall is covered by the policy is one of fact for the jury.    See supra Section III.A.I.    The court denies summary judgment to plaintiff on that issue.    For the reasons given below, the court denies summary judgment as to plaintiff's second argument and grants it as to plaintiff's third argument.

**A.    Whether the anti-concurrent causation clause governs the give-back coverage**

Plaintiff contends the policy's collapse give-back provision covers the loss and is not subject to the anti-concurrent causation clause.    (Docket 52 at pp. 13-15).    The court previously found a jury must determine whether the give-back covers plaintiff's loss.    See supra Section III.A.3.    If the give-back does apply, plaintiff argues the coverage is not limited by the anti-concurrent causation clause, which excludes all coverage for any loss related to earth or water movement.    (Docket 52 at pp. 14-18).    Plaintiff points the court to two non-controlling cases it contends supports its position.    Id. at pp. 14-15, 17-18.

36

Defendant spends much of its response to this argument distinguishing the authority plaintiff cites. (Docket 57 at pp. 15-19).

Plaintiff first highlights Ken Johnson Props., LLC v. Harleysville Worcester Summary Ins. Co., a case from the District of Minnesota. No. 12-1582, 2013 WL 548744 (D. Minn. Sept. 30, 2013). Ken Johnson involved a water-damaged roof. Id. at *1. Under an anti-concurrent causation provision, the insurance policy in question excluded coverage for losses stemming from "[w]ater that backs up or overflows from a sewer, drain or sump[.]" Id. at *2. A modification to the policy "explicitly delete[d]" the water exclusion, however. Id. The policy also included a collapse give-back subject to the policy's general exclusions similar to the give-back at issue here. Id. The court determined the give-back coverage was not blocked by the anti-concurrent causation provision because the policy modification removed the water exclusion. Id. at *13. In considering which policy provision should cover payment of the claim, the court in Ken Johnson held the give-back coverage was not qualified by the anti-concurrent causation clause's exclusions. Id. at *14-15. The court reasoned the policy's use of the term "Covered Cause of Loss" in the give-back should be interpreted generally to include all causes of loss and not restricted to the causes specifically not excluded by the anti-concurrent causation clause. Id.

Ken Johnson is factually inapposite to the situation before the court. No modification to the policy here removes the anti-concurrent causation provision's exclusion of earth and water movement. Furthermore, the court

disagrees with <u>Ken Johnson</u>'s interpretation of the term "Covered Cause of Loss." As explained above, <u>see</u> <u>supra</u> Section III.A.3, the term "Covered Cause of Loss" in the policy and the give-back refer to losses covered under the policy's general provisions, not all possible causes of loss. Interpreting the use of "Covered Cause of Loss" in the give-back to mean all collapse losses are covered would abrogate the clear intention expressed in the give-back. The give-back provision states, "[t]he term Covered Cause of Loss includes the Additional Coverage – Collapse as described and limited . . . below[.]" (Docket 50-5 at p. 76). "Covered Cause of Loss" as used in this context is a specific term referring back to the policy's general coverage provisions—which include the anti-concurrent causation clause and its exclusions.[7] <u>See</u> <u>id.</u> at p. 71 ("Covered causes of Loss means Risks of Direct Physical Loss unless the loss is: Excluded . . . or Limited[.]").

Plaintiff next relies on <u>Tabernacle—The New Testament Church v. State Farm Fire & Cas. Co.</u>, an unpublished case from the Court of Appeals for the Sixth Circuit. 616 Fed. Appx. 802 (6th Cir. 2015). <u>Tabernacle</u> involved a

---

[7]In a string citation, plaintiff notes that <u>Ken Johnson</u> cited to two other federal cases in support of its conclusion that give-back coverage is not limited by anti-concurrent causation clauses. (Docket 52 at p. 15) (citing <u>State Auto. Mut. Ins. Co. v. R.H.L., Inc.</u>, No. 07-1197, 2010 WL 909073 (W.D. Tenn. Mar. 12, 2010); <u>Young Sook Pak v. Alea London Ltd.</u>, No. 1:08-CV-0824, 2009 WL 2366549 (M.D. Penn. July 30, 2009)). Plaintiff does not analyze these cases, but the court finds them inapposite. <u>R.H.L.</u> asserts without analysis that general exclusions in an insurance policy do not qualify give-back coverage. 2010 WL 909073 at *12. The court disagrees with that assertion for the reasons given above. In <u>Pak</u>, the parties agreed that the give-back superseded the policy's general exclusions. 2009 WL 2366549 at *7. The parties here do not agree on that proposition and, more importantly, the court rejects it.

collapsed roof and an insurance policy containing a collapse give-back, subject to the policy's general exclusions.  Id. at 803-04.   The opinion does not indicate the policy contained an anti-concurrent causation clause.   Under Michigan law, the court determined it "must interpret the specific provisions of the [give-back] both as controlling and so as to avoid rendering any of its words or phrases surplusage or nugatory" when "the plain language of the collapse [give-back] clearly negates aspects of [the] general exclusions[.]"   Id. at 811.   The court then held a general exclusion in the policy was superseded by the specific terms of the give-back to avoid "render[ing] the entire collapse extension nugatory[.]" Id. at 812.

Of course, Michigan law does not control this case.   Plaintiff does not support the principle it wishes to invoke—that the specific terms of the give-back supersede the policy's general exclusions when there is conflict—with any reference to South Dakota law.   Furthermore, the give-back and the exclusions set out by the anti-concurrent causation provision do not conflict under plaintiff's theory of the case.   Plaintiff alleges the wall collapse was caused by internal decay or deterioration.   If that is so, the anti-concurrent causation clause does not exclude coverage.   The court need not rank policy provisions where, as here, they may be read in harmony.

"In order to ascertain the terms and conditions" of an insurance policy, the court "must examine the [policy] as a whole and give words their plain and ordinary meaning."   Gloe v. Union Ins. Co., 694 N.W.2d 252, 260 (S.D. 2005).

Plaintiff asks the court to hold the give-back provision supersedes the anti-concurrent causation clause exclusions found in the main body of the policy.   The court cannot grant this request without doing violence to the parties' intentions expressed in the policy in violation of South Dakota principles of insurance policy interpretation.   The court denies summary judgment to plaintiff as to this issue.   If plaintiff successfully invokes the policy's give-back coverage, the reach of that coverage will be limited by the policy's general exclusions, including the anti-concurrent causation clause.

**B.    Whether "decay" refers only to organic matter**

Plaintiff asserts the term "decay," as used in the policy, encompasses the disintegration of nonorganic material, such as the retaining wall.   (Docket 52 at p. 19).   Citing two dictionaries, plaintiff contends decay and deterioration are synonyms and neither require the corroding item to be organic in nature.   Id. at pp. 19-20.   Plaintiff asks the court to find the policy's use of the word decay "has no organic/inorganic element."   Id. at p. 21.   Defendant responds with its own dictionary definitions associating decay with "organic material."   (Docket 57 at p. 22).   It further contends it would be inappropriate to consider decay and deterioration synonyms because the policy uses the terms differently.   Id.

The give-back covers collapses caused by "[d]ecay that is hidden from view[.]"   (Docket 50-5 at p. 76).   The policy does not define decay or deterioration.   An insurance policy is interpreted "according to its plain and ordinary meaning[.]"   Berkley Reg'l Specialty Ins. Co. v. Dowling Spray Serv.,

864 N.W.2d 505, 512 (S.D. 2015).   The South Dakota Supreme Court approved the use of Merriam-Webster's online dictionary to ascertain the plain and ordinary meaning of policy terms.   <u>Ass Kickin Ranch, LLC</u>, 822 N.W.2d at 728-29.

The Merriam-Webster online dictionary first defines decay as "to decline from a sound or prosperous condition."   <u>Decay</u>, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/decay (last visited Feb. 18, 2019).   No definition given by Merriam-Webster specifies the decaying object must be organic in nature.   The dictionaries cited by the parties broadly agree with Merriam-Webster.   Even the dictionary cited by defendant lists its second definition of decay as "to decline in excellence, prosperity, health, etc., deteriorate."   (Docket 50-10).   There is no basis for the court to conclude decay necessarily entails an organic component on the part of the decaying object.

Defendant's argument that defining decay as a synonym to deterioration—i.e. without an organic component—will render the policy's separate use of the terms superfluous is likewise unavailing.   Defendant points the court to a specific portion of the policy which excludes coverage for "[r]ust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself[.]"   (Docket 50-5 at p. 73).   In defendant's view, the fact the policy specified both decay and deterioration in this section indicates the parties intended both terms to have distinct meanings. Accepting this argument would require the court to "make a forced construction

41

or a new contract for the parties." <u>Berkley</u>, 864 N.W.2d at 512 (internal quotation omitted). Defendant does not specify what harm plaintiff's interpretation of decay would work on the policy and the court discerns none. The court cannot redefine decay to favor defendant's interest in the absence of any evidence the parties intended to incorporate a definition of decay other than the common meaning.

Finally, it defies reason to suppose the parties intended to incorporate a definition of decay outside the common meaning *sub silentio* in a policy with complex provisions covering certain collapse losses. If the parties intended to contract for insurance coverage for collapses involving only organic decay, they could have so stated. Without such explicit evidence, the court cannot import additional meaning into the policy's provisions. Accordingly, the court grants summary judgment to plaintiff on this issue. The question of whether the wall's collapse was caused by internal decay does not hinge on whether the wall was organic.

## V. Conclusion

The court grants defendant's motion for summary judgment in part and denies it in part. Plaintiff's conversion claim, count III of the complaint, fails as a matter of law and is dismissed. Plaintiff's breach of contract, bad faith, and punitive damages claims, counts I, II, and IV of the complaint, survive with the exception that plaintiff may not prove its bad faith claim under a theory defendant owed a duty of equal consideration in its investigation or

determination of plaintiff's claim.    The court also grants plaintiff's motion for partial summary judgment in part and denies it in part.    If plaintiff successfully proves facts invoking the policy's collapse give-back coverage at trial, the scope of that coverage will be limited by the policy's general exclusions, including the exclusions created by the anti-concurrent causation provision.    As used in the policy, the term "decay" does not require the wall to be organic in nature to invoke the give-back coverage.

**ORDER**

For the reasons given above, it is

ORDERED that defendant's motion for summary judgment (Docket 43) is granted in part and denied in part.

IT IS FURTHER ORDERED that count III of the complaint (Docket 1) is dismissed with prejudice.

IT IS FURTHER ORDERED that plaintiff's motion for partial summary judgment (Docket 51) is granted in part and denied in part.

Dated February 25, 2019.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE